**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**
**CASE NO. _____**

---

Ramsi A. Woodcock,

      Plaintiff,

v.

The University of Kentucky,
Eli Capilouto (in his official and individual capacities),
Robert DiPaola (in his official and individual capacities),
William Thro (in his official and individual capacities),
James Duff (in his official and individual capacities), and
Linda McMahon, in her official capacity as
United States Secretary of Education;

      Defendants.

---

"*[F]reedom prohibits the prescription of political orthodoxy.*"[1]

-William E. Thro, General Counsel, University of Kentucky

## COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

NOW COMES the plaintiff, Ramsi Woodcock ("Plaintiff" or "Woodcock"), by counsel, and for

his complaint against the defendants, the University of Kentucky ("Defendant" or "the University");

Eli Capilouto (in his official and individual capacities); Robert DiPaola (in his official and individual

capacities); William Thro (in his official and individual capacities); James Duff (in his official and

---

[1] William E. Thro, *No Clash of Constitutional Values: Respecting Freedom and Equality in Public University Sexual Assault Cases*, 28 REGENT U.L. REV. 197, 198 (2016).

individual capacities); and Linda McMahon, in her official capacity as United States Secretary of Education; alleges as follows:

## Introduction

1.  The University of Kentucky has suspended and launched an investigation against one of its tenured law professors, Ramsi Woodcock, because he spoke against Israeli colonialism, apartheid and genocide at academic conferences and on law faculty email listservs, including through a Petition for Military Action Against Israel which he posted on antizionist.net in November 2024.

2.  Professor Woodcock argues that the international norm against colonization established in the 20th century "will survive only so long as states are willing to go to war to defend it," and that states therefore have a duty not only to stop the genocide but bring about "dissolution of the colonial government."[2] Relatedly, he argues that "the Palestinian people alone should decide how Palestine should be governed after independence," and rejects any "externally imposed solution." He defines "the Palestinian people" as the native people of Palestine, including Palestinian Jews.

3.  Although Professor Woodcock had openly expressed these views since at least February 2024, and had sent an earlier statement about them to the University's law faculty listserv in March of 2024 with no issue, the University moved in July 2025 to treat the petition (and related speech) as suspendable offenses after the Commonwealth of Kentucky adopted Senate Joint Resolution 55 in April 2025. That law imposes on public universities in Kentucky the IHRA definition of antisemitism, which characterizes broad categories of constitutionally-protected speech critical of Israel as antisemitic.

---

[2] *Petition for Military Action Against Israel*, ANTIZIONIST LEGAL STUDIES MOVEMENT (Nov. 12, 2024), https://antizionist.net/petition-for-military-action-against-israel/; Ramsi A. Woodcock, *A Law and Economic Argument for Ending Israel*, ANTIZIONIST LEGAL STUDIES MOVEMENT (Oct. 20, 2024), https://antizionist.net/law-and-economics-for-ending-israel/.

4.    Until about two weeks ago, University regulations permitted a suspension, or "assign[ment] to other duties in lieu of suspension, only if immediate harm to the faculty member or others is threatened by the faculty member's continuance," and only upon consultation with the Faculty Senate Advisory Committee on Privilege and Tenure. In violation of those requirements, the University "reassign[ed]" Professor Woodcock's workload away from the usual mix of teaching, research, and service to "100% professional development."

5.    Defendants are now searching for evidence that Professor Woodcock created "a hostile environment for Jewish members of the university community" in order to permanently exclude him from the University, even though they have not alleged a single example of an anti-Jewish remark by Professor Woodcock and have no objective basis for suspecting that a hostile work environment exists.

6.    The University's suspension of Professor Woodcock violates his First Amendment right of freedom of expression and his right to procedural due process, discriminates against him in violation of the Civil Rights Act of 1866, threatens the democratic principles which sustain this Country's form of government, and degrades the quality of education at the University of Kentucky.

7.    Plaintiff seeks an injunction prohibiting Defendants from continuing his suspension and banishment from the law building, an injunction requiring Defendants to cease the discriminatory investigation against him, and a declaratory judgment pursuant to 28 U.S. Code § 2201 that Kentucky Joint Resolution 55 is unconstitutional.

8.    Plaintiff also seeks an injunction prohibiting Defendant McMahon from using or requiring the IHRA definition of antisemitism.

## Parties

9.  Ramsi Woodcock ("Plaintiff" or "Professor Woodcock") is a tenured full professor in the University of Kentucky J. David Rosenberg College of Law ("the College of Law").

10.  Eli Capilouto ("President Capilouto" or "Defendant Capilouto") is the President of the University of Kentucky. Among President Capilouto's duties are to "supervise and administer all phases of the University" and to "take all measures necessary to comply with state and federal law."

11. Robert DiPaola ("Provost DiPaola" or "Defendant DiPaola") is the Provost of the University of Kentucky.

12. William Thro ("General Counsel Thro" or "Defendant Thro") is General Counsel of the University of Kentucky.

13.  James Duff ("Dean Duff" or "Defendant Duff") is the Dean of the College of Law.

14.  Linda McMahon ("Secretary McMahon" or "Defendant McMahon") is the Secretary of Education for the United States Department of Education. Pursuant to Executive Order 13899, the Office of Civil Rights, under the leadership of and with the approval of Secretary McMahon, has used the IHRA definition of antisemitism to enforce Title VI against colleges and universities.

15.  At all times relevant hereto, the University of Kentucky was and is a public educational institution established and maintained by the Commonwealth of Kentucky pursuant to Chapter 164 of the Kentucky Revised Statutes.

## Jurisdiction & Venue

16.  This Court's jurisdiction over the subject matter of this action is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

17.  This District is an appropriate venue for this action because the Defendants are located here and a substantial part of the actions alleged herein occurred in this district.

**Factual Allegations**

18. The University of Kentucky hired Professor Woodcock as an Assistant Professor starting on August 1, 2018.

19. Professor Woodcock is a devoted teacher praised by students for his enthusiasm, ability to explain complex ideas in simple terms, tolerance of diverse points of view, and commitment to student success. One student in his Contracts II course reports that Professor Woodcock held a review session that lasted from 10 a.m. until 1 a.m. the next morning and that Professor Woodcock ended the session only because students ran out of questions.

20. Professor Woodcock's research focuses on identifying opportunities to reform the law to redistribute wealth without harming efficiency. He has published extensively in the areas of antitrust law and personalized pricing and is perhaps best known for his Yale Law Journal article titled *The Obsolescence of Advertising in the Information Age* (127 Yale L.J. 2270). He is a founder of the inframarginalist movement in law and economics, which applies the methods of law and economics to the problem of wealth inequality. He teaches courses primarily in the areas of business and commercial law, including antitrust, business associations, contracts, and secured transactions. Since spring 2023, he has also taught an annual seminar on international law with a focus on governmental legitimacy.

21. The University granted Professor Woodcock tenure and promoted him to Associate Professor on July 1, 2022. On the unanimous recommendation of the College of Law's promotion and tenure committee and the former Dean, the University promoted Professor Woodcock to the position of Professor, the University's highest academic rank, on July 1, 2025.

## **Political Context for the University's Exclusion of Professor Woodcock**

22.  In 2021, responding to the President's Executive Order 13899, the Office of Civil Rights issued guidance requiring federal agencies "to consider" the Working Definition of Antisemitism published by the International Holocaust Remembrance Alliance ("the IHRA definition"), a definition drafted and promoted by groups working to silence criticism of Israel. The Department of Education, currently led by Secretary McMahon, maintains that policy on its website.[3]

23.  The IHRA definition characterizes as "antisemitic" at least three categories of non-discriminatory political speech:

- o  "Drawing comparisons of contemporary Israeli policy to that of the Nazis";

- o  "Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor";

- o  "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation."

24.  The Nazi comparison category represents non-discriminatory political speech because all peoples and states, regardless of religious affiliation or ancestry, are capable of following bad policies, including policies comparable to those of the Nazis. Speech falling in this category therefore does not target Israel based on its claimed Jewish character. To proscribe this speech would grant to Israel an exemption from criticism not enjoyed by any other state.

25.  The self-determination category prohibits discussion of the extent to which Jewish people as a group have a right to self-determination in Palestine, and prohibits the application of universally-applicable rules and principles, including the international norm against colonization and

---

[3] U.S. Dep't of Educ. Office of Civil Rights, QUESTIONS AND ANSWERS ON EXECUTIVE ORDER 13899 (COMBATTING ANTISEMITISM) AND OCR'S ENFORCEMENT OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 (2021), https://www.ed.gov/media/document/faqs-executive-order-13899-combating-anti-semitism-and-ocrs-enforcement-of-title-vi-of-civil-rights-act-of-1964-2021-33939.pdf#:~:text=UNITED%20STATES%20DEPARTMENT%20OF%20EDUCATION,individual%E2%80%99s%20race%2C%20color%2C%20or%20national

international prohibitions on segregation and apartheid, to this question. To proscribe this speech would grant to the Zionist movement and Israel an exemption from criticism not enjoyed by any other nationalist movement or state.

26. The double standards category sweeps in non-discriminatory political speech because Israel may violate a standard that does not target Jewish people, but which no other democratic nation happens to violate. To call for an end to all Western colonies in the Middle East requires of Israel a behavior (dissolution), not required of any other democratic country. But it would require of Israel a behavior required of all other Western colonies in the Middle East—and not long ago there were many. So, again, the standard would not discriminate against Israel based on its claimed Jewish character.

27. Title VI does not and cannot constitutionally prohibit criticism of Israel. Defendant Thro has himself acknowledged this. He once wrote that a "public institution's first obligation is to the Constitution, not Title IX [the sex discrimination analogue of Title VI] or the collegial epistles of the Assistant Secretary of Education for Civil Rights."[4]

28. Shortly after October 7, 2023, the Heritage Foundation created Project Esther, which the New York Times describes as a "proposal to rapidly dismantle the pro-Palestinian movement in the United States, along with its support at schools and universities, at progressive organizations and in Congress."[5] In early 2025, the Trump Administration adopted many of its recommendations by

---

[4] William E. Thro, *No Clash of Constitutional Values: Respecting Freedom and Equality in Public University Sexual Assault Cases*, 28 REGENT U. L. REV. 197, 201 (2016).

[5] Katie J. M. Baker, *The Group Behind Project 2025 Has a Plan to Crush the Pro-Palestinian Movement*, N.Y. TIMES (May 18, 2025), https://www.nytimes.com/2025/05/18/us/project-esther-heritage-foundation-palestine.html.

creating a multi-agency Task Force to Combat Antisemitism coordinated by the Department of Justice's Civil Rights Division.[6]

29. Over the course of spring 2025, the Task Force engaged in a number of high-profile efforts to induce universities, including Harvard and Columbia, to suppress pro-Palestine speech on campus under threat of withdrawal of federal funding.[7] The College of Law receives little or no federal funding. But the University of Kentucky received $250 million in federal funding in 2025.[8] Meanwhile, a member of the Heritage task force known as the Combat Antisemitism Movement (CAM) helped bring about the enactment, on April 2, 2025, of Kentucky Joint Resolution 55 directing public universities in Kentucky to use the IHRA definition of antisemitism to "combat" antisemitism.[9] 2024 Ky. S.J.R. 55.

30. In or about July of 2025, the University implemented a Discrimination and Harassment policy that requires its Office of Equal Opportunity to "utilize[]" the IHRA definition of antisemitism.[10] The Board of Trustees approved the adoption of the IHRA definition in September of 2025.

31. Kenneth Stern, one of the drafters of the IHRA definition, has stated that "[t]he IHRA working definition of antisemitism that is being adopted as a de facto hate speech code at universities around the country was never intended to be used to determine whether speech should

---

[6] *See Discriminating Against Dissent: The Weaponization of Civil Rights Law to Repress Campus Speech on Palestine*, AAUP at 21 (Nov. 5, 2025), https://www.aaup.org/news/new-report-civil-rights-law-weaponized-chill-speech.

[7] *Id.* at 23.

[8] *University of Kentucky Funding for FY25*, UK: OFFICE OF THE VICE PRESIDENT FOR RESEARCH: STATES & RANKINGS, https://research.uky.edu/vice-president-research/stats-rankings.

[9] Barney Breen-Portnoy, *Kentucky Governor Signs Law to Combat Antisemitism at State's Colleges and Universities*, COMBAT ANTISEMITISM MOVEMENT (Apr. 3, 2025), https://combatantisemitism.org/government-and-policy/kentucky-governor-signs-law-to-combat-antisemitism-at-states-colleges-and-universities/.

[10] *Discrimination and Harassment*, UNIV. OF KY OFF. OF EQUAL OPPORTUNITY, https://oeo.uky.edu/key-priorities/discrimination-and-harassment.

be disciplined. It was never intended to be used by campus administrators at all."[11] He has lamented that "the working definition has been primarily used (and I argue, grossly abused) to suppress and chill pro-Palestinian speech."[12]

32.  As further detailed below, since July 2025, the University has been conducting what President Capilouto describes as a "neutral, third-party review" to assess whether Professor Woodcock's speech about Israel and Palestine violated University policy or Title VI of the Civil Rights Act of 1964 ("Title VI").

33.  The investigation, General Counsel Thro announced, would be conducted by Farnaz Thompson, a contributor to a political manifesto titled "Project 2025" that aims to "[s]ustain support for Israel" and "ensur[e] Israel has both the military means and the political support and flexibility to take what it deems to be appropriate measures to defend itself against the Iranian regime and its regional proxies Hamas, Hezbollah, and Palestinian Islamic Jihad."[13]

34.  In service of the goal of ensuring continued "political support" for Israel in the face of protests at college campuses across the country opposing Israel's genocide, Defendants relied on a Department of Education policy which directs the use of the IHRA definition under the guise of enforcing Title VI.

35.  Joint Resolution 55's prohibition of broad categories of political speech critical of Israel is flagrantly unconstitutional.

---

[11] Kenneth S. Stern, *A Bad Deal: By Adopting the IHRA Definition of Antisemitism, Universities Are Sacrificing Academic Freedom*, KNIGHT FIRST AMENDMENT INSTITUTE (Sept. 5, 2025), http://knightcolumbia.org/content/a-bad-deal-why-using-the-ihra-definition-of-antisemitism-on-campus-is-incompatible-with-academic-freedom-and-students-right-to-open-inquiry.

[12] Kenneth S. Stern, *Biden's Pick for Antisemitism Envoy Will Need to Answer These Tough Questions*, THE FORWARD (Jul. 27, 2021), https://forward.com/opinion/473580/i-was-the-lead-drafter-of-the-definition-of-antisemitism-heres-what-id-ask/.

[13] *Mandate for Leadership: The Conservative Promise*, THE HERITAGE FOUNDATION, 94, 185 (2023), https://static.heritage.org/project2025/2025_MandateForLeadership_FULL.pdf (emphasis added) (Project 2025).

## Context for the Protected Speech at Issue

36. Like many scholars, Professor Woodcock takes the view that Israel is a Western colonization project that practices apartheid and is currently committing genocide.[14] According to this view, the history of the State of Israel starts in the late 19th and early 20th centuries, when a group of European Jews formed a movement to ethnically cleanse Palestine of its native inhabitants—the multifaith group comprised mostly of Muslims, Christians and Jews known as the Palestinians—and set up a colony in their place.[15]

37. After leveraging Britain's conquest of Palestine in 1917 to accumulate land and introduce settlers, the Zionist movement put its plan into action in 1947 and 1948, killing tens of thousands of Palestinians, forcing hundreds of thousands from their homes, and declaring the creation of Israel.[16] Thanks to local resistance and help from neighbors, Palestinians were able to cling to 22% of their land, including the West Bank and Gaza, into which the Zionist movement pushed much of the non-Jewish population that it did not force into exile.[17] After seizing the remaining land in 1967,

---

[14] These views have substantial support in scholarly and expert circles. For example, a search of the Journal of Palestine Studies for "settler-colony" and "Israel" returns more than 3,000 results. Search for articles including "[All: 'settler-colony' israel] AND [in Journal: Journal of Palestine Sudies]", TAYLOR & FRANCIS ONLINE, SEARCH RESULTS, https://www.tandfonline.com/action/doSearch?AllField=%22settler-colony%22+israel&SeriesKey=rpal20. A majority of the International Court of Justice found in 2024 that Israel is committing apartheid. Legal Consequences Arising from the Policies and Practices of Israel in the Occupied Palestinian, Including East Jerusalem, Advisory Opinion, 2024 I.C.J. No. 186 ¶ 224 (July 19), (available at https://www.icj-cij.org/sites/default/files/case-related/186/186-20240719-adv-01-00-en.pdf); *see* Legal Consequences arising from the Policies and Practices of Israel in the Occupied Palestinian Territory, including East Jerusalem, Advisory Opinion, 2024 ICJ No. 186 pp. 4-8 ¶¶ 14-32 (July 19, 2024) (Salam Declaration), https://www.icj-cij.org/sites/default/files/case-related/186/186-20240719-adv-01-01-en.pdf. The International Association of Genocide Scholars recently resolved that Israel is committing genocide in Gaza. *IAGS Resolution on the Situation in Gaza*, INT'L ASS'N OF GENOCIDE SCHOLARS (Aug. 31, 2025), https://genocidescholars.org/wp-content/uploads/2025/08/IAGS-Resolution-on-Gaza-FINAL.pdf?utm_source=substack&utm_medium=email.

[15] Ilan Pappe, THE ETHNIC CLEANSING OF PALESTINE 10–126 (2007).

[16] *Id.* at 127–198.

[17] *The UN Partition Plan for Palestine*, THE INSTITUTE FOR MIDDLE EAST UNDERSTANDING (IMEU), https://imeu.org/resources/the-nakba/the-un-partition-plan-for-palestine/148.

Israel has segregated Palestinians there for decades in what South African civil rights leaders have called an apartheid that is worse than what Black South Africans experienced.[18] In an effort to complete the ethnic cleansing of Palestine, Israel is currently exterminating or displacing the remaining Palestinian population of Gaza.[19] The ceasefire that began on October 10, 2025 has merely reduced the intensity.[20]

38. Professor Woodcock follows Israeli historian Shlomo Sand in rejecting as unfounded the claim that the European Jews who created the State of Israel descend from an exiled ancient Jewish population. Sand argues that Judaism was a proselytizing religion in the first millennium CE and that the Jewish communities found throughout Europe and in the Middle East in the early 20th century were more likely to descend from communities of converts than from an exiled population.[21] By contrast, he agrees with David Ben-Gurion, who was a founder of the State of Israel, that Palestinians are likely to be descendants of an ancient Jewish population of Palestine, many of whom converted to Islam or Christianity over time.[22]

39. Professor Woodcock's contribution to scholarly debates about Israel has been to argue that in light of Israel's character as a Western colony in Palestine, Israel must not be treated differently from the dozens of other Western colonies that once controlled nearly all of the Middle East, Africa,

---

[18] *Mandela's Grandson Says Palestinians' Plight is Worse than Apartheid*, REUTERS (Sep. 4, 2025 4:24 AM ET), https://www.reuters.com/world/middle-east/mandelas-grandson-says-palestinians-plight-is-worse-than-apartheid-2025-09-04/; Darryl Li, *On Law and Racial Capitalism in Palestine*, LPE PROJECT (Jun. 15, 2021), https://lpeproject.org/blog/on-law-and-racial-capitalism-in-palestine/.

[19] Zeeshan Aleem, *A Permanent Israeli Occupation of Gaza is the Stuff of Nightmares*, MSNBC (May 7, 2025), https://www.msnbc.com/opinion/msnbc-opinion/israel-gaza-netanyahu-trump-ethnic-cleansing-rcna20506.

[20] *Israel Has Rejected over 100 Aid Requests since Gaza Ceasefire, UN Says*, UN NEWS (Nov. 6, 2025), https://news.un.org/en/story/2025/11/1166295.

[21] Shlomo Sand, THE INVENTION OF THE JEWISH PEOPLE 129-249 (Verso 2009).

[22] *Id.*

and Asia and were brought to an end within living memory.[23] In his view, Israel, too, must be brought to an end.[24] He believes that the continuation of a colony founded as recently as 1948 calls into question the international norm against colonization created in the 20th century. In his view, that in turn calls into question the right to exist of the more than eighty United Nations member states, from Algeria to Vietnam, that are the product of decolonization.[25]

40. Professor Woodcock believes that the colonized population has a right to decide the legal status of the colonizer population in all cases, regardless of the religious affiliation of the colonizer population and regardless of the colony in question. In his view, there can be no meaningful rule against colonization if the colonizer population has a right to self determination in the colony anymore than there can be a rule against trespass if the trespasser gains a right of ownership in virtue of his entry. The owner must retain the right to decide whether to license the entry or reject it.

41. As applied to Palestine, the implication of this view is that Jewish people as a group do not have a right of self determination in Palestine.[26] However, in Professor Woodcock's view, Jewish people who descend from the native Palestinian population participate in the Palestinian right of self determination as Palestinians.[27] Professor Woodcock points out that although the colonized population has a right to reject the colonizer population, it also has a right to regularize the colonizer

---

[23] Ramsi A. Woodcock, *A Law and Economic Argument for Ending Israel*, ANTIZIONIST LEGAL STUDIES MOVEMENT (Oct. 20, 2024), https://antizionist.net/law-and-economics-for-ending-israel/; Ramsi A. Woodcock, *Statement of an American Law Professor Opposing Our Colonization of Palestine and Commission of Genocide Therein*, WHAT AM I MISSING? (Mar. 30, 2024), https://zephyranth.pw/2024/03/30/statement-of-an-american-law-professor-opposing-our-colonization-of-palestine-and-commission-of-genocide-therein/.

[24] *Id.*

[25] *See* Ramsi A. Woodcock, *A Law Professor's Demand that the World Immediately End Israel by Force of Arms*, WHAT AM I MISSING? (Oct. 14, 2024), https://zephyranth.pw/2024/10/14/the-world-must-end-israel-now/; Ramsi A Woodcock, *Petition for Military Action Against Israel*, ANTIZIONIST LEGAL STUDIES MOVEMENT (Nov. 12, 2024), https://antizionist.net/petition-for-military-action-against-israel/.

[26] *Antizionist Legal Studies Movement*, ANTIZIONIST LEGAL STUDIES MOVEMENT (Oct. 20, 2024), https://antizionist.net/ (listing principles of antizionism).

[27] *Id.*

12

population, and in many cases of decolonization in the 20th century, the colonized granted citizenship rights to the colonizer. Moreover, according to Professor Woodcock, all Palestinian political factions have consistently expressed a desire to grant equal rights to the colonizer population.

42. In light of Israel's ongoing genocide of Palestinians in Gaza, which by one estimate has claimed 680,000 lives, Professor Woodcock believes that international military intervention is urgently required to end Israel.[28] Many other scholars have taken the position that military intervention is an appropriate response to colonization. For example, Yale professor Timothy Snyder has called for military intervention to stop Russia's colonization of Ukraine and to end the Russian empire.[29]

43. Professor Woodcock believes that despite Israel's formal status as an independent state, Israel is so dependent upon the United States for diplomatic, political, military and economic support that Israel is not just a Western colony but, functionally, an American colony in Palestine.[30] Accordingly, he believes that Americans have a moral duty as citizens to call for an end to Israel. He further believes that American law professors have a professional duty to call for an end to Israel

---

[28] Richard Hil & Gideon Polya, *Skewering History: The Odious Politics of Counting Gaza's Dead*, ARENA (Jul. 11, 2025), https://arena.org.au/politics-of-counting-gazas-dead (estimating 680,000 dead); Ramsi A. Woodcock, *We Need An International Coalition to Declare War on Israel Right Now*, ANTIZIONIST LEGAL STUDIES MOVEMENT (Dec. 10, 2024), https://antizionist.net/we-need-an-international-coalition-to-declare-war-on-israel-right-now/; *see also* Rasha Khatib et al., *Counting the Dead in Gaza: Difficult but Essential*, 404 THE LANCET 237 (Elsevier Jul. 2024) (suggesting that in excess of 186,000 Palestinians in Gaza may have been killed by Israel as of summer 2024), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(24)01169-3/fulltext.

[29] Sashko Shevchenko, *"Defeating Russia Is The Best Thing We Could Do For Russia": Historian Timothy Snyder On The Ukraine War*, RADIO FREE EUROPE/RADIO LIBERTY (Aug. 7, 2024), https://www.rferl.org/a/timothy-snyder-russia-ukraine-war-victory/33067942.html ("It would be good for [Russia] to lose this war, just like it was good for France to lose in Algeria, just like it was good for Germany to lose in 1945.").

[30] Ramsi A. Woodcock, *Statement of an American Law Professor Opposing Our Colonization of Palestine and Commission of Genocide Therein*, WHAT AM I MISSING? (Mar. 30, 2024), https://zephyranth.pw/2024/03/30/statement-of-an-american-law-professor-opposing-our-colonization-of-palestine-and-commission-of-genocide-therein/.

because their silence in the face of an American-sponsored genocide and colonization project calls into question their competence to opine on any matter of justice in any area of the law.[31] Finally, he believes that he has a scholarly duty to call for an end to Israel because that is a conclusion of his research.

44. Professor Woodcock first became interested in the legal analysis of colonialism when the College of Law asked him to teach an additional course after obtaining tenure in 2022. Interested in applying his training in law and economics to an offbeat topic, he chose to teach a seminar on international law starting in spring 2023. He soon learned that international law had been transformed by decolonization in the 20th century. When, like many scholars, Professor Woodcock concluded in fall 2023 that Israel was committing genocide, Professor Woodcock decided to focus his research on understanding the roots of the genocide. Drawing on his recent work in international law, he asked whether Israel could be considered a Western colony in Palestine. He determined that the answer is "yes." The conclusion that Israel should be brought to an end followed immediately.

45. Professor Woodcock's conclusion was informed by his mother's experience growing up as a colonized and dispossessed native girl under French colonial rule. In 1961, she was twenty years old and had no hope of going to college despite graduating at the top of her class from high school. The following year, resistance forces brought French Algeria to an end and her life changed completely. Professor Woodcock's mother moved to the capital city of Algiers, found a job, paid her way through college, graduated with a thesis on the American novelist John Dos Passos, and eventually

---

[31] *See* Ramsi A. Woodcock, *Statement of an American Law Professor Opposing Our Colonization of Palestine and Commission of Genocide Therein*, WHAT AM I MISSING? (Mar. 30, 2024), https://zephyranth.pw/2024/03/30/statement-of-an-american-law-professor-opposing-our-colonization-of-palestine-and-commission-of-genocide-therein/.

immigrated to the United States, where she pursued a successful career in the social sciences that included fellowships at Harvard and the Institute for Advanced Study at Princeton.

46. Professor Woodcock started sharing his views in early 2024 in all of the ways in which a scholar would be expected to share research conclusions about how to stop a genocide. He presented his conclusions at a faculty research seminar at the College of Law, emailed the faculty listserv about them, spoke about them at conferences, wrote and circulated petitions based upon them, published an op-ed about them, issued a call for papers and planned a conference about them, discussed them at faculty meetings, blogged about them, posted to social media about them, discussed them in online discussion groups for law professors, and set up a website, antizionist.net, intended to start a scholarly movement based upon them.

47. Professor Woodcock did not, however, discuss his conclusions in his classes because he did not want to cause students to face persecution for speaking about Palestine. As he wrote to one colleague on the question of encouraging students to speak about Palestine: "[S]tudents are some of the most vulnerable members of our community and . . . we as a faculty have a duty not to outsource our consciences to them---both as a way of protecting students and as a way of modeling the right way to behave as professionals."

48. For more than a year after Professor Woodcock first presented his ideas to the College of Law faculty in February 2024, the University expressed no dissatisfaction with his views. Indeed, the University permitted Professor Woodcock to add a presentation on Israel's genocide of Palestinians to the agenda of an August 2024 faculty meeting. At that meeting, the then-Dean of the College of Law introduced Professor Woodcock's presentation by affirming his commitment to the First Amendment.

49. The University's tolerance of this speech ended in summer 2025 after federal government threats to withdraw funding from universities, federal enforcement of the IHRA definition, and

15

passage of Joint Resolution 55 enabled and pressured administrators to suppress speech critical of Israel and Zionism.

### Defendants Target Professor Woodcock for his Protected Speech

50.  The university expressed concerns about Professor Woodcock's speech for the first time at a July 9, 2025 meeting with Vice Provost Jana Jasinski, in which she told Professor Woodcock that the Provost's office had received reports that he had talked about genocide at academic conferences. She also suggested that his College of Law profile page should not link to a personal website in which he talks about genocide. As Vice Provost Jasinski had refused to disclose the topic of the meeting in advance, Professor Woodcock asked for time to collect his thoughts and offered to return the following day to discuss. The University never followed up.

51.  Instead, on July 18, 2025, President Capilouto issued a public statement decrying a Petition for Military Action Against Israel that Professor Woodcock had posted to antizionist.net on November 12, 2024. President Capilouto falsely characterized the petition as "calling for the destruction of a people based on national origin."[32] Professor Woodcock had posted an earlier version of the petition to a personal blog, as well as to social media, in October 2024.[33]

52.  President Capilouto's public letter did not allege that Professor Woodcock had mistreated any member of the university community made threats, or posed a physical threat to the University community or to the orderly conduct of university business, but nonetheless announced an

---

[32] Professor Woodcock responded in an email to his colleagues on the day of his suspension: "[i]n the 20th century, decolonization was carried out dozens of times around the world, often through military action—including in my mother's country, Algeria. The resulting states make up a large part of the United Nations today. No one would characterize the process of decolonization through which these states went as involving the destruction of a people based on national origin or an expression of hate. The same is true of calls to end the last Western colony in the Middle East, which we call Israel. Decolonization is a process of liberation and the ultimate affirmation of human freedom and dignity."

[33] Ramsi A. Woodcock, *A Law Professor's Demand that the World Immediately End Israel by Force of Arms*, WHAT AM I MISSING? (Oct. 14, 2024), https://zephyranth.pw/2024/10/14/the-world-must-end-israel-now/.

investigation into whether his "expressions threaten the safety and well-being of the university's students and staff." President Capilouto had no objective basis for suspecting that Professor Woodcock posed any threat to the "safety and well-being" of the campus community. President Capilouto appointed Ms. Thompson, an attorney associated with the Heritage Foundation,[34] which conceived Project Esther, to conduct what he described as a "neutral" investigation of Professor Woodcock.

53. Making clear that the impetus for the University's investigation was disagreement with Professor Woodcock's views, and purporting to speak for the University, President Capilouto wrote that "[t]he views expressed online certainly do not represent the institution's views. . . . Let me be clear: the views expressed by this employee, if accurately attributed, are repugnant."

54. President Capilouto has long associated with organizations that oppose Professor Woodcock's view that Israel should be brought to an end. In college, President Capilouto was president of a chapter of Zeta Beta Tau, a fraternity that was founded as a Zionist group and describes itself as having a "deep connection to Israel."[35] He appears to have later served on the board of the Jewish Federation of Birmingham, Alabama, which declares that it "stand[s] with Israel".[36] He contributed to an Alabama political action committee called Americans for Good

---

[34] *Mandate for Leadership The Conservative Promise*, HERITAGE FOUNDATION, https://static.heritage.org/project2025/2025_MandateForLeadership_FULL.pdf#page=31&search=%22Far naz%20Farkish%20Thompson%22 (Project 2025).

[35] Sheila Steinman Wallace, *UK President Talks about His Jewish Roots*, JEWISH LOUISVILLE COMMUNITY (Oct. 25, 2014), https://jewishlouisville.org/uk-president-talks-jewish-roots-dr-capilouto-tells-alpha-omega-dental-fraternity-changes-education-health-care-later-evening/; *Israel Education*, ZETA BETA TAU, https://zbt.org/programs/israelnow/.

[36] Shiela Steinman Wallace, *UK President Talks about His Jewish Roots*, JEWISH LOUISVILLE COMMUNITY (Oct. 25, 2014), https://jewishlouisville.org/uk-president-talks-jewish-roots-dr-capilouto-tells-alpha-omega-dental-fraternity-changes-education-health-care-later-evening/; *Israel Resources*, THE BIRMINGHAM JEWISH FOUNDATION, https://bjf.org/israel-resources/ (last visited Nov. 11, 2025).

Government which is listed as "pro-Israel" by Open Secrets.[37] As President of University of Kentucky, he denounced a 2013 resolution of the American Studies Association to join the nonviolent boycott movement against Israel—ironically, in light of President Capilouto's attack on Professor Woodcock, on the ground that the boycott conflicted with academic freedom.[38]

55. On July 18, 2025, General Counsel Thro informed Professor Woodcock that the University had launched an investigation into his "writings on certain websites," his "conduct at academic conferences," his "postings on American Association of Law Schools list serves [*sic.*], and other actions."

56. That same day, Dean Duff sent Professor Woodcock a letter informing him that he had consulted with the Provost's office and that "we are temporarily reassigning you administratively," explaining that he was expected to spend 100% of his time on "professional development." The letter further stated that "[y]ou should not come to the Rosenberg College of Law while the investigation is ongoing," and "[u]ntil the investigation has concluded, you are not permitted to be the supervisor of record for any staff, students or other personnel. You are not permitted to serve as the faculty advisor for any registered student groups or organizations." Professor Woodcock did not receive notice prior to these actions and no hearing either before or after.

57. Since then, Dean Duff has made clear that this ban prevents Professor Woodcock from participating in College of Law faculty meetings. Defendant Thro has stated that Dean Duff has "absolute" authority to "reassign" Professor Woodcock and banish him from the law building. However, Dean Duff has not responded to repeated requests by Professor Woodcock to speak with

---

[37] Linda Blackford & Valarie Spears, *Capilouto: An Alabamian with a Reverence for Education*, LEXINGTON HERALD LEADER (May 3, 2011), https://www.kentucky.com/news/local/education/article44093370.html; *PAC Profile: Americans for Good Government*, OPENSECRETS, https://www.opensecrets.org/political-action-committees-pacs/americans-for-good-government/C00138701/summary/2018.

[38] Becca Clemons, *Capilouto Rejects Boycott of Israel*, KY. KERNAL (Jan. 16, 2014), https://kykernel.com/57547/news/capilouto-rejects-boycott-of-israel/.

him. For example, in response to a September 10, 2025 entreaty from Professor Woodcock to lift the suspension, Dean Duff replied: "better to have your counsel contact UK's General Counsel Bill Thro with these questions[.]" To date, Professor Woodcock has had no opportunity to challenge the University's decision to suspend him and ban him from the law building during the pendency of the investigation.

58. On information and belief, the University did not consult any faculty body in advance of the suspension and investigation.

59. The investigation was initiated not because of a student complaint but rather, according to Ms. Thompson, because of reports by four professors—who presumably teach at other universities—about Professor Woodcock's off-campus speech about Palestine or Israel at conferences and online.

60. As part of this investigation, Ms. Thompson is contacting students, University of Kentucky law professors, and law professors at other schools who are part of online discussion groups hosted by the Association of American Law Schools ("AALS"). She is informing them that she has been retained by the University to "investigate Professor Ramsi Woodcock's conduct and whether his conduct may violate University policies."

61. Professor Emeritus Alvin Goldman, a self-described Zionist who debated Israel's right to exist with Professor Woodcock on the law faculty listserv in May 2024, calls Professor Woodcock's suspension "a threat to academic freedom and institutional integrity." When Ms. Thompson approached Professor Goldman for an interview, he responded: "Although Prof. Woodcock and I have strong opposing views . . . , we have, in my opinion, engaged in these email debates in a civil and appropriate manner."

62. In an August 25, 2025 letter, Ms. Thompson stated that she expects the fact-gathering stage of the investigation to end within 60 to 90 days, after which she will issue an attorney-client

privileged report to the President which will not be shared with Professor Woodcock. Then, "the University President will issue a letter to Professor Woodcock . . . with the University's findings," including, if Professor Woodcock is found "responsible for the allegations," notice of "any sanction for such a finding." She continued: "Should the University President determine that termination of a tenured appointment may be appropriate, then the University shall comply with" relevant state law and university regulations.

63. Although the investigation could conceivably conclude before the Spring 2026 semester begins, the University is refusing to assign Professor Woodcock classes for that semester, even on a contingent basis, signaling it has already decided to terminate his employment, and that the investigation is merely an attempt to find a pretext to support a decision that has already been made.

64. In a July 22, 2025 Notice of Investigation, the University, through Ms. Thompson, stated four allegations that may have been the basis for the University's initial decision to launch the investigation and suspension four days earlier. The allegations are:

- beginning a presentation at an academic conference in Hong Kong on May 30, 2025 "with a tirade against the United States and its 'colony' for coming [*sic.*] genocide in Gaza" and responding to a question by "chanting 'apartheid, apartheid, apartheid'" [In fact, Professor Woodcock briefly stated his opposition to colonization and genocide. When a heckler later accused him of being a Hamas supporter, he replied that Israel is a colonization project that practices apartheid and commits genocide.];

- asserting at an academic conference in Washington, DC on February 23, 2024 that "the United States government was supporting Israel in what was alleged to be a genocide of the Palestinian people"; [In fact, Professor Woodcock stated that "[o]ur government is currently committing genocide in Palestine through the colony we maintain called Israel. We have killed 30,000 people so far and nearly 15,000 children, and that must stop."]

- "spamming listserves [*sic.*] . . . with your personal viewpoints concerning the Israeli-Palestinian conflict;" and

- "using the University's resources to circulate an online petition, Petition for Military Action Against Israel."

65. On September 8, 2025, through Ms. Thompson, the University issued an Amended Notice of Investigation with four additional allegations, which apparently emerged during the investigation, namely:

- "using his official position as a University of Kentucky professor to call for violence against Israel, the genocide of Israeli people who are predominantly Jewish, and the ultimate destruction of Israel" [The University has refused to explain what specific speech this allegation references.];

- "calling for violence against Israel, the genocide of Israeli people, and the ultimate destruction of Israel in a manner that uses anti-Semitic tropes" [The University has refused to explain what specific speech this allegation references.];

- "stating at an optional educational program with guest lecturers that he does not need to invite [speakers] with a pro-Israeli viewpoint because such speakers are pro-genocide" [This appears to be a reference to the following remark by Professor Woodcock at a College of Law event about free speech on campus: "I asked the University if I could bring someone to campus to talk about genocide and the response was 'Yep, you can do that. But if you bring in somebody who's like anti-genocide, you have to bring in someone who's pro-genocide.' What's your view as a . . . First Amendment scholar?"]; and

- "shouting 'Free Palestine,' while driving a car with University of Kentucky law students who won a bid during a fundraiser for the Student Public Interest Law Foundation to

spend time with Professor Woodcock." [In fact, Professor Woodcock called out "Free Palestine" to two men in a crosswalk in downtown Cincinnati who were wearing kuffiyehs (an Arab nationalist symbol) while driving students who had paid to spend time with him in private life to dinner with his family. None of the students complained to the University about this remark, and one of them has since described his reaction as follows: "I remember thinking it was pretty cool that a professor would stand up for what he believes in and rally with causes that are important."]

66. Even if these allegations are taken as true, which, as reflected in the bracketed comments, they in many respects are not, they do not allege a single instance of antisemitic or harassing speech or conduct, let alone a pattern of conduct or speech directed at members of the University community that could form the basis for the initiation of a hostile environment investigation.

67. Ms. Thompson has mostly refused to specify which University policy provisions or rules of law in particular are allegedly implicated by each allegation.

68. General Counsel Thro has clarified that all eight of these allegations serve as the basis for Professor Woodcock's "reassignment." He has also indicated that the fishing expedition will continue: "If [Ms. Thompson] were to issue a third notice of investigation, those aspects would [be] an additional basis for the reassignment as well."

### The University Has No Basis in Policy or Law
### to Continue This Investigation or Suspension

**a. Title VI Investigation as Pretext for Suppression of Speech.**

69.  Defendants have no basis for suspecting that the speech referenced in these allegations was discriminatory or that Professor Woodcock mistreated anyone or denied them access to education. The investigation is a cover for punishment of Professor Woodcock for his speech.

70.  Professor Woodcock presented views very similar to the ones for which he is now being persecuted at the University in the past with no issue. For example, on February 14, 2024, Professor Woodcock presented an early stage work titled "A Law and Economic Argument for Dismantling Israel" during a seminar at the College of Law, applying his expertise in law and economics to international law and politics. In this work, Professor Woodcock argued, by analogy to the law and economics of property, that the creation of Israel was inefficient in an economic sense because it resulted from the equivalent of land theft rather than a voluntary arms-length transaction.

71.  Professor Woodcock engaged in similar speech at least two additional times in 2024. In May of 2024, Professor Woodcock engaged in a scholarly debate with his colleague Alvin Goldman regarding his position that Israel is a colonization project committing genocide and should be brought to an end. On August 13, 2024, he sent an email to the law faculty listserv renewing his request that the faculty sign his proposed statement calling for an end to the genocide and to Israel. In the email, he noted that the death toll in Gaza had reached 186,000 according to estimates published by the medical journal The Lancet, drew his colleagues' attention to a recent opinion by the International Court of Justice that Israel's occupation of Gaza was illegal, argued that military action by Palestinians to resist it was consequently justified, and stated that "[w]e must deploy whatever moral authority we have to oppose this epochal crime now." He shared news accounts and a photo of a massacre of women and children in Gaza while gathered in prayer that Israel had recently carried out. He prefaced his email as follows: "Activism doesn't come naturally to me. I

really hate it and have always tried to avoid it. But I draw the line at genocides committed by my government."

72. Defendants did not subject Professor Woodcock to investigation or suspension for this speech in 2024.

73. Professor Woodcock's characterization of Israel's intentions and actions as genocidal, and its political structure as "apartheid," though controversial in some circles in the United States, are neither antisemitic nor even outside the mainstream in international legal discourse. These statements say nothing about Jews as a people but rather characterize specific actions of governmental and political entities. The genocide allegation is in fact a legal claim formally alleged by the Republic of South Africa in a case it brought before the International Court of Justice and which the Court deemed "plausible" in its interim ruling in that ongoing case. Genocidal intent is reflected in statements of Israeli officials themselves. For example, on October 10, 2023, Israeli Defense Minister Yoav Gallant said in a speech to soldiers, "Gaza won't return to what it was before. We will eliminate everything. If it doesn't take one day, it will take a week. It will take weeks or even months, we will reach all places."[39]

74. Similarly, Professor Woodcock's call for military action and his call for the dismantling of colonial state structures is protected speech. Whether and the extent to which war is justified is a frequent topic of political science and international law. Colonialism is another common topic of academic and political discussion, including in the Project 2025 manifesto, which declares that "the American people rejected European monarchy and colonialism." As the document points out, the United States was itself founded through the dismantling of colonial structures. To call for an end to British America, as the British colonies in America were known, was not to discriminate against the

---

[39] Al Haq, *The Systematic Destruction of Gaza's Healthcare System: A Pattern of Genocide* at p. 11, available at https://www.alhaq.org/publications/25846.html.

British people or to call for the colonies' elimination on the basis of national origin or religion. It was to call for their elimination based on their character as colonies.

75. In addition to affirmative evidence of an objective basis for Professor Woodcock's genocide allegation, the University has no evidence that Professor Woodcock's allegations of genocide and apartheid are in fact "on the ground of race, color, or national origin," nor does it have any evidence of Professor Woodcock mistreating Jewish members of the campus community.

76. Similarly, for a professor to call for freedom for Palestinians in a public street is protected speech, just as it was protected speech when black students held signs in a public street reading, "Down with segregation" in 1961. *Edwards v. South Carolina*, 372 U.S. 229, 231 (1963).

77. To the extent that the IHRA definition prohibits calling for the dismantling of colonial state structures, prohibits legal scholars from debating the contours of the right of self-determination, prohibits allegations of race discrimination, and prohibits allegations of genocide, the IHRA definition is unconstitutional.

### b. The University's Selective Pacifism

78. Two of the allegations fault Professor Woodcock for "calling for violence against Israel." Defendant Capilouto said in his July 18, 2025 statement to the University community, "We condemn any call for violence."

79. These allegations result from viewpoint discrimination. Defendants routinely tolerate calls for violence in other contexts.

80. As of the date of this filing, a webpage maintained by the University's College of Arts and Sciences links to a document that encourages readers to visit a website called "Help Save Ukraine",[40]

---

[40] *See Statement on the Russian Invasion of Ukraine*, UK COLLEGES OF ARTS AND SCIENCES: DEPARTMENT OF MODERN AND CLASSICAL LANGUAGES, LITERATURES AND CULTURES,  https://mcl.as.uky.edu/statement-russian-invasion-ukraine (last visited Nov. 12, 2025).

which solicits donations to the Ukrainian military. The Ukrainian military is itself engaged in armed resistance to a colonization project.

81. The University's Patterson School routinely collaborates with the Army War College to conduct "wargaming" exercises. Participants in the exercises advocate for war and other acts of violence against sovereign states.

82. On information and belief, Defendants have not subjected the individuals engaging in these calls for violence to investigation, suspension and bans from buildings on campus.

**c.  The University's Novel Interpretations of its Longstanding Technology and "Ethical Principles" Policies**

83. The University's allegations relating to use of technology are also pretext for suppressing Professor Woodcock's speech.

84. The University's contention that it is "spamming" for a law professor to send a message to law faculty listservs or discussion groups is pretext for its disagreement with his views. The University does not normally police the messages faculty send to the College of Law faculty listserv or post in AALS online discussion groups, which include messages that have nothing to do with University business or that have political content. For example, the University did not "reassign" a law professor who sent to the law faculty listserv a meme of Luigi from The Super Mario Brothers Movie enjoying a cheeseburger with police officers wearing McDonalds insignia. It did not "reassign" a law professor who circulated a letter expressing support for Black Lives Matter protestors.

85. Similarly, the University has not identified any policy that is violated by a law professor engaging at academic conferences or in AALS online discussion groups about international legal issues or political issues with legal implications. The University's Ethical Principles and Employee Code of Conduct (GR XIV) policy states that "[i]ndividuals writing or speaking publicly in a professional or expert capacity may identify themselves by their relationship with the University,"

and that they must emphasize that their views are their own in instances "where the individual might give even the appearance of speaking on behalf of the University." None of Professor Woodcock's communications had the appearance of being made on behalf of the University. Scholars at conferences and in online fora for faculty do not understand each other to act as spokespeople for their institutions when they speak. When a University of Kentucky English professor speaks about Shakespeare, the University of Kentucky does not appear to take an official position on Hamlet. Similarly, when Professor Woodcock speaks at conferences or online, the University of Kentucky does not appear to take a position on peace in the Middle East.

86. The University's claim that Professor Woodcock used "the University's resources to circulate an online petition" is also pretext for punishing Professor Woodcock for the content of his speech. Not only do members of the University community use the University's resources for non-official communications on a daily basis, but such practices are explicitly permitted by the University's Administrative Regulation 10:1 regarding Use of Technology Resources, which provides that "[i]ncidental personal use is an accepted and appropriate benefit of being associated with the University's technology environment."

87. In short, the investigation itself is punishment for Professor Woodcock's protected speech, not a genuine inquiry into whether he violated University policy or law.

**d. The University Rewrites the Rules**

88. When the University decided to suspend Professor Woodcock and ban him from the law building, it faced a problem: Unlike the University's sexual harassment regulation (AR 6.2) or its regulation regarding termination of faculty members (Regulations Affecting Employment § B(f)(3)), the anti-discrimination regulation that the University wished to invoke against Professor Woodcock (AR 6.1) did not authorize suspension or banishment during pendency of an investigation. The University sought to get around this difficulty by styling Professor Woodcock's suspension as a

reassignment of his job responsibilities from his usual distribution of effort of 50% research, 45% teaching and 5% service to 100% "professional development." The University hoped this might also justify banning Professor Woodcock from his office because, as Defendant Thro put it in a September 19, 2025 letter, "[a]s [Professor Woodcock] has no teaching assignments, there is no reason for him to be present in the law school building."

89. But the "reassignment" subterfuge created other headaches for the University. The University's termination regulation permitted a suspension, or "assign[ment] to other duties in lieu of suspension, only if immediate harm to the faculty member or others is threatened by the faculty member's continuance," and only upon consultation with the Faculty Senate Advisory Committee on Privilege and Tenure—a process the University had not followed. The "immediate harm" language was lifted directly from the American Association of University Professors' Recommended Institutional Regulations on Academic Freedom and Tenure.[41] AAUP guidance made clear that "immediate harm" meant physical harm, as in a professor "making serious threats against others on campus [and] known to have access to weapons", something that was not the case for Professor Woodcock, who had made no threats of any kind.[42] Moreover, the University's workload regulation mandated that workloads be "comparable" with other members of the faculty and that they be based on expertise rather than the need to protect the University. he College of Law had further elaborated on the standard by setting minimum and maximum faculty workloads in the three main areas of faculty responsibility. According to that policy, the minimum workload for law faculty was 35% for research, 40% for teaching, and 5% for service.

---

[41] Recommended Institutional Regulations on Academic Freedom and Tenure at § 5(c)(1), AAUP, https://www.aaup.org/reports-publications/aaup-policies-reports/topical-reports/recommended-institutional-regulations.

[42] Lawrence S. Poston, *The Use and Abuse of Faculty Suspensions*, 94 ACADEME 45 (AAUP 2008).

90. In September 2025, Plaintiff complained that the University's "reassignment" represented a de facto suspension not authorized by the anti-discrimination policy that violated the University's policy against reassignment in lieu of suspension without immediate harm. The University responded by revoking the anti-discrimination policy, deleting the policy against reassignment in lieu of suspension. The University replaced them with new policies on "Equal Dignity" and "Due Process" that authorized the head of the Office of Equal Opportunity or the Provost to issue a suspension pending an investigation upon a showing of "a threat to the safety and well-being of others". The University did not follow the required procedure of seeking comment from stakeholders prior to issuing this new policy.

### e.  The University's investigation procedures are *ad hoc.*

91. The University's investigation is not judicial or quasi-judicial in character. Rather, it is an act of political persecution that is being carried out on an ad hoc basis.. The University had almost no written procedures to call upon when it started the investigation. The University has subsequently attempted to invent a process specifically for this case.

92. At an August 22, 2025 meeting, the University's Director of the Office of Equal Opportunity claimed that written procedures governing the investigation exist but refused to disclose them. At the meeting, Ms. Thompson suggested that the investigation would follow no procedure but later appeared to change her mind and followed up with her August 25, 2025 letter, in which she indicated that Professor Woodcock would have an opportunity to review evidence (albeit in a limited, copy-restricted environment) and provide follow-up questions.

93. The University regulation, AR 6.1, under which Ms. Thompson claims to be proceeding, provided no process for investigations or the determination of any resulting sanction, in contrast to other university regulations governing investigations. For example, before its recent deletion, the University's sexual harassment regulation, AR 6.2, provided a process for "emergency suspension",

the empanelment of hearing and appeals boards, a hearing procedure, burdens of proof, and an appeals process. The University's termination regulation, contained in the Regulations Affecting Employment, which has also recently been deleted, provided a process for suspension pending an investigation, advance mediation discussions with administrators, a "reasonably detailed statement of charges", an investigation by the Faculty Senate Advisory Committee on Privilege and Tenure and a hearing on sanctions by a panel. After Plaintiff complained about the absence of process, the University deleted the regulation under which it had claimed that the investigation was proceeding, AR 6.1.

94. On October 7, 2025, the University replaced AR 6.1 with new "interim regulations" on Equal Dignity and Due Process without following the required process of soliciting community input on drafts. The new regulations appeared drafted with the investigation of Professor Woodcock in mind. For the first time, they contemplated that an investigation might be conducted by "external entities or individuals retained by the institution" such as Ms. Thompson, provided for "interim suspension", and detailed a hearing process to be followed if the University decides to sanction conduct. The university has not yet invoked the new regulations in Professor Woodcock's case and is still nominally proceeding under the deleted AR 6.1.

95. The investigation will also not afford Professor Woodcock a meaningful opportunity to raise constitutional objections. As noted above, Dean Duff, whose authority to "reassign" and banish Professor Woodcock is alleged by Defendant Thro to be "absolute," has refused to discuss the matter with him. The University offered no substantive response to a letter from Plaintiff challenging the University's decision to investigate. Ms. Thompson's investigation hardly provides an alternative. In her August 25, 2025 letter, Ms. Thompson stated that she will give Professor Woodcock an opportunity to respond to "evidence" but that he will not be permitted to review and respond to her report and recommendation to Defendant Capilouto made no mention of legal

30

argument. After Plaintiff protested at the August 22, 2025 meeting that the investigation violates the First Amendment, Ms. Thompson stated in her letter that "this investigation may raise unique First Amendment issues" (in fact, the First Amendment issues are basic) but did so only to explain why the University has the "the right to seek attorney-client privileged legal advice" from her. She insists that she will "not serve as the decision-maker" but instead that the same University President who chose to initiate a retaliatory investigation against Professor Woodcock will decide whether Professor Woodcock is "responsible or not responsible" and impose a "sanction,", such as "termination of a tenured appointment[.]"

### The impact on the campus community and on Professor Woodcock

96. The University's suspension of Professor Woodcock and its imposition of the IHRA definition on the campus have chilled speech. Faculty are afraid to protest Professor Woodcock's suspension, students are afraid to speak about Palestine, and some are considering separating from the University as a result.

97. Professor Woodcock's suspension is a detriment of the law school's operations. The College of Law is understaffed. Nevertheless, the University canceled Professor Woodcock's Fall 2025 Antitrust Law course, in which students had already enrolled, and assigned an adjunct professor to teach his Secured Transactions class. The professor had never taught the class before. Professor Woodcock lent him his course materials.

98. The University's suspension of Professor Woodcock has led to stigma, damage to his professional reputation, and isolation from his peers and students, many of whom are now afraid or disinclined to speak with him or falsely assume based on the University's actions that he really is a danger to the campus community or is advocating for genocide.

99. The longer Professor Woodcock's suspension is permitted to continue the greater the risk that speech at University of Kentucky will be permanently chilled—even if he later wins reinstatement. Habits of self-censorship will have solidified over time.

## Legal Claims

### Count I
### First Amendment Retaliation
### (42 U.S.C. §§ 1983, 1985)
### Against Defendants Capilouto, DiPaola, Thro and Duff

100. Each paragraph of this Complaint is incorporated as if fully restated herein.

101. The speech which motivates Defendants to suspend Plaintiff from his position relates to matters of public concern.

102. Plaintiff's right to speak about these matters of public concern outweighs any interest of Defendants in avoiding controversy and discomfort.

103. Acting under the color of state law, Defendants DiPaola and Duff are using their authority as Provost of the University and Dean of the College of Law to "reassign" Plaintiff, effectively suspending him from teaching and service and banning him from the College of Law.

104. In approving this suspension, and acting under color of state law jointly and in conspiracy with each other, Defendants Capilouto and Thro are acting with deliberate indifference to Plaintiff's clearly established right to speak about political and legal matters.

105. Along with the suspension, Defendants Capilouto and Thro, acting under color of state law, approved and implemented a punishing, months-long investigation into Professor Woodcock's protected speech.

106. The investigation is being conducted in bad faith in order to suppress Professor Woodcock's speech and punish him for his speech.

107. Defendants Capilouto and Thro have made public statements acknowledging their awareness of the danger to education itself of restricting faculty speech, and the importance to the

University of academic freedom is acknowledged explicitly in the University's policies. President Capilouto, for example, has written about the "core" and "foundational" importance to the broader community of "protecting academic freedom — the idea that scholars and all members of the university community must always be free to inquire, to discover, to teach and to evaluate as they gain and impart understanding and knowledge."[43]

108.    All defendants are also aware that the University's discrimination policies do not apply to conduct that violates the First Amendment. The "Equal Dignity" policy, for example, acknowledges that "regardless of definition, harassment does not include expression protected by the First Amendment." Ex. A at p. 1, § II(A).

109.    The suspension and investigation are in accordance with Secretary McMahon's decision to use the IHRA definition of antisemitism in enforcing Title VI at colleges and universities, including the University of Kentucky. In doing so, Secretary McMahon is requiring University officials to adopt special rules about criticizing Israel that violate the Free Speech Clause's prohibition against viewpoint discrimination.

110.    This suspension and investigation would deter an employee of ordinary firmness from speaking.

111.    Defendants took the actions alleged in this count in order to punish Plaintiff for his protected speech, to preclude him from further speech along those lines, and to isolate him from peers and students. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means.

112.    Plaintiff's protected speech was a substantial motivating factor in Defendants' actions.

---

[43] Eli Capituto, *Many People, One Community*, UK OFFICE OF THE PRESIDENT, https://pres.uky.edu/news/many-people-one-community.

113.    Were it not for Plaintiff's protected speech, Defendants would not have taken the actions alleged herein.

114.    Defendants are not entitled to qualified immunity, since any reasonable official in their positions would understand that public university professors have a clearly established constitutional right to engage in political and academic speech at academic conferences, on faculty listservs, on public streets, and when directing questions about the First Amendment to a First Amendment scholar.

**Count II**
**Violations of Right to Procedural Due Process**
**(42 U.S.C. §§ 1983, 1985)**
**Against Defendants Capilouto, Thro, DiPaolo, and Duff**

115.    Each paragraph of this Complaint is incorporated as if fully restated herein.

116.    Plaintiff has protected property and liberty interests in his tenured position at the University of Kentucky.

117.    Acting under color of state law, Defendants deprived Plaintiff of his property right by "reassigning" Plaintiff to a non-existent position with no duties for the Fall semester of 2025 and continuing into the next semester.

118.    Defendant Capilouto violated Plaintiff's liberty right by publicly announcing his suspension and publicly attributing it to reasons that seriously impugn his morality and professional competence. Although Defendant Capilouto did not explicitly name Plaintiff in his public communication, it was not difficult to infer who he was discussing.

119.    Teaching and service are among the fundamental duties and privileges of faculty members.

120.    While Dean Duff has some discretion in determining class assignments, that discretion does not permit complete elimination of a professor's teaching and service duties. According to the

34

University's Administrative Regulation 3:8, which is among the regulations that "guide all aspects of the governance of the University," Workload assignments are made "to assure fairness in the distribution of responsibility among faculty employees." Ex. B at p. 1; Ex. C at p. 5, § 3. Procedures and policies for assignments must "assure that all faculty employees within the unit have comparable workloads." Ex. C at p. 6, § A.

121.    Elaborating on this standard, the College of Law developed a policy which set minimum and maximum faculty workloads in the three main areas of faculty responsibility. According to that policy, the minimum workload in teaching for law faculty is 65% and the maximum is 80%. Ex. D at p. 33.

122.    Defendants' suspension of Plaintiff was baseless, unwarranted, and served no important government interest.

123.    Prior to suspending Plaintiff from his faculty position, Defendants did not provide him adequate procedural protections. Specifically, Defendants did not provide Professor Woodcock with oral or written notice of the allegations against him, did not provide him an explanation of any evidence against him, and did not provide him the opportunity to tell his side of the story to an impartial decisionmaker.

124.    Acting jointly and in conspiracy with one another, Provost DiPaola participated in the decision to suspend Prof. Woodcock from his position, Dean Duff made the decision, and President Capilouto and General Counsel Thro approved it.

125.    In implementing and approving Plaintiff's suspension, Defendants acted with deliberate indifference to Plaintiff's rights.

126.    Before even speaking with Prof. Woodcock and conducting any investigation, Defendants determined that his suspension was appropriate. Defendants are therefore not and are not impartial decisionmakers.

127.    Defendants are not entitled to qualified immunity, since any reasonable official in their positions would understand that summary suspension of a tenured professor without any notice or process would violate his constitutional rights. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means.

## Count III
### Race Discrimination (42 U.S.C. § 1981)
### Against All Defendants

128.    Each paragraph of this complaint is incorporated as if fully restated herein.

129.    Plaintiff is an Arab of Algerian national origin. On information and belief, he is the only Arab faculty member in the College of Law.

130.    Plaintiff and the University of Kentucky are parties to an employment contract whereby the University employs Plaintiff as a tenured professor in the College of Law.

131.    Defendants "reassigned" or approved the reassignment of nearly all Professor Woodcock's job duties, imposing on him terms and conditions of employment it does not impose on non-Arab tenured faculty.

132.    Defendants deprived Prof. Woodcock of equal rights in the making, modification and enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with the University because of his race in violation of 42 U.S.C. § 1981.

133.    But for Plaintiff's race, Defendants would not have taken the actions alleged herein.

134.    Defendant's unlawful actions have caused Plaintiff isolation, emotional distress, irreparable damage to his career, attorneys' fees, and other consequential damages.

36

**Count IV**
**Administrative Procedures Act, 5 U.S.C. § 706**

135.    Plaintiff brings his APA claim against Defendant McMahon in her official capacity—facially and pre-enforcement.

136.    The APA requires courts to "set aside agency action" when the action is, among other things, "not in accordance with law," "in excess of statutory jurisdiction, authority or limitations, or short of statutory right," and "without observance of procedure required by law." 5 U.S.C. § 706 (emphasis added).

137.    Secretary McMahon has authority to make and rescind rules and regulations governing the manner of operation of the programs the Department of Education administers, including the Office of Civil Rights. 20 USC 1221e-3.

138.    The Department of Education's use of the IHRA definition is not in accordance with law because it makes viewpoint discrimination a part of the agency's Title VI enforcement practices.

139.    Presidential orders on December 11, 2019 and January 29, 2025 compel the Department of Education to enforce Title VI in accordance with the IHRA definition of antisemitism.

140.    The Department of Education has complied with these presidential orders, enforcing Title VI in accordance with the IHRA definition. In a document currently available on the agency's website, for example, Defendant McMahon explains its approach to complying with the December 11, 2019 order as follows: that it "will consider the IHRA definition in handling complaints of anti-Semitism."[44]

141.    By adopting a policy mandating consideration of the IHRA definition in the enforcement

---

[44] U.S. DEP'T OF EDUC. OFFICE OF CIVIL RIGHTS, QUESTIONS AND ANSWERS ON EXECUTIVE ORDER 13899 (COMBATTING ANTISEMITISM) AND OCR'S ENFORCEMENT OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 (2021), https://www.ed.gov/media/document/faqs-executive-order-13899-combating-anti-semitism-and-ocrs-enforcement-of-title-vi-of-civil-rights-act-of-1964-2021-33939.pdf#:~:text=UNITED%20STATES%20DEPARTMENT%20OF%20EDUCATION,individual%E2%80%99s%20race%2C%20color%2C%20or%20national

of Title VI, the Department of Education has issued a final agency action. The Department of Education treats the policy establishing the IHRA definition as controlling, and that policy has impacted its approach to enforcement.

142.    The policy affects the Free Speech clause rights of government employees (like Professor Woodcock) whose speech becomes regulated by the IHRA definition when universities (like the University officials sued here) use the IHRA definition to punish on the basis of viewpoint.

143.    Because of Defendant McMahon's policy of using the IHRA definition, university officials, including those sued here, are pressured to use the IHRA definition out of fear that Defendant McMahon will find their university in violation of Title VI.

144.    University officials specifically relied on federal guidance about the use of the IHRA definition in justifying their suspension, campus ban and investigation of Professor Woodcock. In relying on the IHRA definition, University officials singled out Professor Woodcock's academic views regarding the legitimacy of a foreign country's claim over territory it controls, even though the topic is a common and typical area of scholarly inquiry that becomes punishable only when the foreign country is Israel.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests:

- A declaration that Joint Resolution 55's incorporation of the IHRA definition of antisemitism violates the First Amendment to the Constitution;

- A declaration that the University of Kentucky may not rely on the IHRA definition of antisemitism in disciplinary proceedings;

- An injunction ordering Secretary McMahon to refrain from requiring or using the IHRA definition of antisemitism in enforcing Title VI;

- An injunction ordering Defendants Capilouto, Thro, DiPaolo, and Duff to act in their official capacities to restore Professor Woodcock to his position as a full-time professor in the College of Law with the typical workload and privileges of a tenured professor in the College of Law and access to the law building commensurate with that of other faculty;

- An injunction ordering Defendants Capilouto and Thro to act in their official capacities to cease the investigation into Professor Woodcock as described herein;

- Monetary damages for emotional distress and reputational damage (against the individual defendants in their personal capacities with respect to Counts I and II, and against all defendants with respect to Count III);

- Attorneys' fees and costs;

- Punitive damages against the individual Defendants;

- Pre- and post-judgment interest; and

- Such other relief as law and justice allow.

## REQUEST FOR TRIAL BY JURY

Plaintiff hereby requests a trial by jury with respect to any issues so triable.

WHEREFORE, Plaintiff prays that this Court grant judgment against Defendants in an amount commensurate with their damages, punitive damages, interest as allowed by law, and all other relief just and proper in the premises.

Respectfully submitted,

/s/ Rima N. Kapitan (pro hac vice petition pending)

Joe F. Childers
Joe F. Childers & Associates
The Lexington Building
201 West Short Street
Suite 300
Lexington, Kentucky 40507
Phone: 859-253-9824
Joe@Jchilderslaw.com

Kapitan Gomaa Law, P.C. (pro hac vice petition pending)
Rima Kapitan (IL Atty No. 6286541)
Hannah Moser (IL Atty No. 6349688)
P.O. Box 6779
Chicago, IL 60680
Phone: (312) 566-9590
rima@kapitangomaa.com

CAIR Legal Defense Fund (pro hac vice petition pending)
Lena F. Masri (VA 93291)
lmasri@cair.com
Gadeir Abbas*(VA 81161)
gabbas@cair.com
Catherine Keck (DC 90027891)
ckeck@cair.com
Ahmad Kaki (VA 101167)
akaki@cair.com
453 New Jersey Ave., S.E.
Washington, DC 20003
Phone: (202) 742-6420
Fax: (202) 488-0833

*Licensed in VA, Not D.C.
Practice limited to federal matters.

Hawks Quindel S.C. (pro hac vice petition pending)
Summer Murshid (WI Atty No. 1075404)
M. Nieves Bolaños (IL Atty No. 6299128)
Patrick Cowlin (IL Atty No. 6308800)
Illinois Attorney No.
111 E. Wacker Drive
Suite 2300
Chicago, IL 60601
Phone: (312) 224-2423
mnbolanos@hq-law.com