# EXHIBIT 1

| | |
|---|---|
| **From:** | Thompson, Farnaz Farkish |
| **To:** | Rima Kapitan |
| **Cc:** | Thro, William; Mudd, Sarah G.; Prendingue, Maricris |
| **Subject:** | Written Questions for Office of Equal Opportunity Case No. 20251230 |
| **Attachments:** | 2025.12.01 Letter to R Kapitan - Written Questions - OEO Case No. 20251230.pdf |

Dear Rima,

I hope you had a good Thanksgiving. Attached, please find my letter with the written questions for Professor Woodcock. Please do not hesitate to contact me, should you have any questions.

Sincerely,
Farnaz

**Farnaz Farkish Thompson** 
Partner
McGuireWoods LLP
888 16th Street N.W.
Suite 500
Washington, DC 20006
T: +1 202 857 2488
M: +1 703 798 0182
F: +1 202 828 3358
fthompson@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com



**McGuireWoods LLP**
888 16th Street N.W.
Suite 500
Washington, DC 20006
Phone: 202.857.1700
Fax: 202.857.1737
www.mcguirewoods.com

**Farnaz F. Thompson**
Direct: 202.857.2488
fthompson@mcguirewoods.com
Fax: 202.828.3358

December 1, 2025

*By Electronic Mail Only*
Rima Kapitan
Kapitan Gomaa Law, P.C.
P.O. Box 6779
Chicago, IL 60680
rima@kapitangomaa.com

      Re:    Written Questions
             University of Kentucky, Office of Equal Opportunity Investigation No. 20251230

Dear Ms. Kapitan:

      As you are Professor Ramsi Woodcock's attorney and advisor for the University of Kentucky's Office of Equal Opportunity Investigation No. 20251230, I am sending you the written questions for Professor Woodcock to respond to in writing **on or before December 15, 2025**. Although my letter, dated August 25, 2025, states that Professor Woodcock will have seven (7) calendar days to respond to written questions, Professor Woodcock is welcome to take fourteen (14) calendar days.

      **Evidence from Professor Woodcock.** By way of background, I met with Professor Woodcock on or about August 22, 2025, and requested that he provide the names of potential witnesses and any evidence that he would like me to consider. I reiterated this request in my August 25, 2025, and September 29, 2025, letters and in my October 14, 2025, email to you. I have received the following items from you on behalf of Professor Woodcock:

- Received October 9, 2025:
  - "link to Prof. Woodcock's remarks at the antitrust symposium . . . in bullet point 2 of [the] July 22, 2025 Notice of Investigation" (link to video)
  - "recording of the 'optional lecture' . . . referenced in [the] September 8, 2025 Amended Notice of Investigation" (link to audio recording)

- Received the following pdf files on October 29, 2025:
  - 25-10-27_Declaration of Lucy Bolter
  - 25-10-28_Declaration of Ben Caldwell
  - 25-03-17 University of Kentucky Mail - Letter Opposing Detention & Deportation of Critics of US Foreign Policy (1)
  - 25-03-17 University of Kentucky Mail - Letter Opposing Detention & Deportation of Critics of US Foreign Policy
  - 24-12-10 University of Kentucky Mail - Fwd_ Busted
  - 24-10-25 University of Kentucky Mail - Fwd_ The History of the Teddy Bear _ Smithsonian

- o 24-10-10 University of Kentucky Mail - Fwd_ This XXL Cordon Bleu Recipe Is Jam-Packed With Extra Ham, Cheese & Deliciousness! - YouTube
- o 24-09-14 University of Kentucky Mail - Fwd_ Did your human try to eat you dog lawyer cartoon
- o 21-04-26 University of Kentucky Mail - Sign before Monday at 2 PM
- o 21-04-20 University of Kentucky Mail - Update re_ our letter, and announcement about a special Senate Meeting.
- o 21-04-20 University of Kentucky Mail - FW_ Please sign and share this letter in support of faculty governance
- o 21-01-21 University of Kentucky Mail - Fw_ Georgia lawyer said he kicked in Pelosi's door, she could've been 'torn into little pieces'
- o 20-07-23 University of Kentucky Mail - For those of you interested_ Petition to divest UK retirement funds from private prisons
- o 20-06-10 University of Kentucky Mail - Fw_ Call to Action for Letters to the Editor
- o 20-06-09 University of Kentucky Mail - Join me by signing this letter

- Received the following pdf file on October 30, 2025:
  - o 25-10-29_Declaration of Zach Lee

- Received the following png files on October 31, 2025:
  - o 25-11-03_Reproductive Rights
  - o 25-10-23_DEI_Constitutional crisis
  - o 25-09-24_Fed Soc. originalism
  - o 25-03-25_electoral college is good

- Received the following pdf file on November 1, 2025:
  - o 25-10-31_Declaration of Bird-Pollan

- Received the following pdf files on November 8, 2025:
  - o 25-11-07_Declaration of Florentino Hawthorne
  - o 25-11-07_Declaration of Donovan
  - o 23-12-23 - Genocide Issues_Redacted

- Filed November 13, 2025:
  - o *Woodcock v. The University of Kentucky, et al.*, Complaint and Request for Injunctive Relief, U.S. District Court for the Eastern District of Kentucky, Lexington Division, No. 5:25-cv-00424 (Nov. 13, 2025) (hereinafter "Complaint").

**Written Questions for Professor Woodcock.** Please provide written responses to the questions below. If Professor Woodcock does not know the answer to the question, please state that he does not know. If Professor Woodcock knows part of the answer to a question, please provide all responsive information known and specify in what respect the response is or may be incomplete due to partial lack of knowledge. If Professor Woodcock does not know the exact dates, amounts, or other figures or facts, but he has sufficient information to make an approximate or estimated answer, please respond to the question and indicate that it is an approximation or estimate because more precise information is not known or available to Professor Woodcock. "You," "your," or "yours" refers to Professor Woodcock in the following questions:

I.    **Law and Technology Conference, Chinese University of Hong Kong, Center for Legal Innovation and Digital Society – May 30, 2025**

1.    Describe your conduct on or about May 30, 2025, at the Law and Technology Conference in Hong Kong, hosted by the Chinese University of Hong Kong, Center for Legal Innovation and Digital Society (hereinafter "CUHK Conference").

2.    Who invited you to present at the CUHK Conference? If no one invited you, how did you come to present at the CUHK Conference?

3.    What is the topic that you were asked to present about (or volunteered to present about) at the CUHK Conference?

4.    Do you agree that the agenda for the CUHK Conference is accurately captured here and attached as Exhibit A? If not, provide a copy of the agenda for the CUHK Conference or describe the agenda.

5.    According to Exhibit A, the title of your panel is "Competition Law and Policy in Digital Markets." Does this title accurately capture the topic that you were expected to address at the CUHK Conference? If not, why not?

6.    Did you address any topic other than "Competition Law and Policy in Digital Markets" during your panel presentation at the CUHK Conference? If so, which other topic(s) did you address and why?

    a.    Did you address the Israeli-Palestinian conflict at the CUHK Conference? If so, please describe how you addressed this topic and include any statements you made about the Israeli-Palestinian conflict.

    b.    What relevance, if any, did the Israeli-Palestinian conflict have to the panel on "Competition Law and Policy in Digital Markets" at the CUHK Conference?

    c.    If the Israeli-Palestinian conflict was not relevant to the topic of your panel, why did you address the Israeli-Palestinian conflict while presenting at the CUHK Conference?

7.    Describe what occurred during the question and answer ("Q&A") session at the conclusion of your presentation at the CUHK Conference.

    a.    Do you recall any interactions with a professor or attendee who sought to address the Israeli-Palestinian conflict during this Q&A session? If so, describe all interactions with this professor or attendee.

    b.    Did you state or chant "apartheid, apartheid, apartheid," when a professor or attendee attempted to make a remark or ask a question about the Israeli-Palestinian conflict during the Q&A session at the conclusion of your panel presentation at the CUHK Conference? If so, describe your conduct.

c. Did the moderator for your panel at the CUHK Conference attempt to take your microphone away during the Q&A session at the conclusion of your panel? If so, how did you react or respond to the moderator?

8. Describe in detail your efforts, if any, to demonstrate or clarify that you were not representing or speaking on behalf of the University of Kentucky or its College of Law when you addressed the Israeli-Palestinian conflict at the CUHK Conference.

## II. 27th Annual Antitrust Symposium, George Mason Law Review – February 23, 2024

9. Describe your conduct on or about February 23, 2024, at the 27th Annual Antitrust Symposium, George Mason Law Review (hereinafter "GMU Conference").

10. Who invited you to present at the GMU Conference? If no one invited you, how did you come to present at the GMU Conference?

11. What is the topic that you were asked to present about (or volunteered to present about) at the GMU Conference?

12. Do you agree that the agenda for the GMU Conference is accurately captured here and attached as Exhibit B? If not, please include a copy of the agenda for the GMU Conference or describe the agenda.

13. According to Exhibit B, the title of your panel is "Antitrust and Privacy." Does this title accurately capture the topic that you were expected to address at the GMU Conference? If not, why not?

14. Did you address any topic other than "Antitrust and Privacy" during your panel presentation at the GMU Conference? If so, which other topic(s) did you address and why?

a. Did you address the Israeli-Palestinian conflict at the GMU Conference? If so, please describe how you addressed this topic and include any statements you made about the Israeli-Palestinian conflict. (You previously provided a link to a recording of this GMU Conference, and you are welcome to refer to that recording. Please state whether you agree that the recording you previously provided accurately captures your conduct.)

b. What relevance, if any, did the Israeli-Palestinian conflict have to the panel on "Antitrust and Privacy" at the GMU Conference?

c. If the Israeli-Palestinian conflict was not relevant to the topic of your panel, why did you address the Israeli-Palestinian conflict while presenting at the GMU Conference?

15. After you addressed the Israeli-Palestinian conflict during your panel presentation at the GMU Conference, did you notice anyone leave the GMU Conference? If so, please describe in detail approximately how many people left and what happened.

    a. Do you know why attendees left the GMU Conference immediately after you addressed the Israeli-Palestinian conflict during your panel presentation?

    b. Did anyone at the GMU Conference ever address with you why attendees left the GMU Conference immediately after you addressed the Israeli-Palestinian conflict during your panel presentation?

16. Do you recall whether any official on behalf of GMU addressed the attendees at the GMU Conference to clarify that GMU and the GMU Law Review do not hold, espouse, or in any way support the position regarding the Israeli-Palestinian conflict that you presented at the GMU Conference? If so, describe what occurred.

17. Describe in detail your efforts, if any, to demonstrate and clarify that you were not representing or speaking on behalf of the University of Kentucky or its College of Law when you addressed the Israeli-Palestinian conflict at the GMU Conference.

18. State whether you communicated with organizers from George Mason University or its Law Review before or after the GMU Conference to address concerns and, if so, describe those communications.

## III. Use of Listserves

19. Describe in detail or provide any emails from you regarding the Israeli-Palestinian conflict on listserves that the University of Kentucky or the Association of American Law Schools ("AALS") host.

20. Explain the relevance your emails have, if any, to the subject or purpose of each listserve.

21. Provide any email address(es) you used when you sent emails about or related to the Israeli-Palestinian conflict to any AALS listserves or any University of Kentucky listserves.

22. For each listserve, including listserves not affiliated with the University of Kentucky or AALS, on which you used your University of Kentucky email address, and on which you addressed the Israeli-Palestinian conflict, state the basis of your access to such listserve (e.g., by virtue of your faculty status, by virtue of provision by the University of Kentucky, or personal subscription).

23. For each listserve, including listserves not affiliated with the University of Kentucky or AALS, on which you posted using your University of Kentucky email address, and on which you addressed the Israeli-Palestinian conflict, state the purpose, membership, moderation rules, and applicable policies.

24. Define the frequency and volume of your posts, messages, or emails regarding the Israeli-Palestinian conflict, to the AALS listserves, the University of Kentucky listserves, and any other listserves you accessed using your University of Kentucky email address.

      a.  Describe whether your posts, messages, or emails on these listserves were solicited or responsive to other posts, messages, or emails.

      b.  Describe whether any moderators (or other individuals who help administer these listserves) warned, limited, or sanctioned you for the substance or frequency of your posts.

25.  At the time you sent emails about or related to the Israeli-Palestinian conflict to any listserves, did your email signature identify you as a Professor at the University of Kentucky?  If so, replicate that email signature below.

26.  Describe in detail any efforts you took, statements you made, and any other ways you demonstrated or clarified, when sending emails, posts, or any other messages about or related to the Israeli-Palestinian conflict on listserves, that you were not representing or speaking on behalf of the University of Kentucky or its College of Law.

**IV.    Online Platforms – Official Versus Personal Capacity**

27.  List any online platforms, including but not limited to blogs, social media websites, discussion boards, or organizational websites, on which you have made statements about or related to the Israeli-Palestinian conflict and on which you have identified yourself as a Professor at the University of Kentucky or its College of Law.  For each platform, explain in detail where and how you identified yourself in this way, e.g., in your social media bio, in the content posted, or in your title.

28.  By identifying yourself as a University of Kentucky professor, have you represented that your posts represent or are made on behalf of the University of Kentucky or its College of Law?

      a.  If not, describe what efforts you took, statements you made, and any other ways you demonstrated or clarified that your posts were not made on behalf of the University of Kentucky or its College of Law.

29.  For the online "Petition for Military Action Against Israel" ("Petition"), identify the platform, the date of creation, the Petition's text, and all means by which you distributed it.

      a.  Identify any and all University of Kentucky, including College of Law, resources used to create, host, circulate, or promote the Petition, including, but not limited to, email accounts, listserves, websites, or devices.

      b.  For the identified resources above, state whether you sought or obtained approval to use any such resources.

30.  Describe in detail any efforts you took to demonstrate or clarify when distributing this Petition that you were not speaking on behalf of the University of Kentucky or its College of Law.

### V. Optional Lecture

31. Did you organize the optional lecture in this [recording](#) provided in Ms. Kapitan's email, dated October 9, 2025?

32. What was the purpose of the optional lecture? Who was invited to this optional lecture?

33. How was this optional lecture advertised or made known to students?

34. Provide the relevant context for the following statement in Ms. Kapitan's, October 9, 2025, email that you made during this optional lecture:

> So I have a question. So we had an an incident last year on campus that raised some questions for me. We had some students who, I think it was like in November, you know, a little while. **It was sort of after October 6 7th, and the Israeli genocide of Palestinians was getting underway.** And these students sent an email to, they wanted to send an email to the entire student body. And I don't know exactly how it works, but like to send an email to the entire student body, they had to it had to go through the president of the student government here, the SBA, and they so this SBA chair, and the email said something like, you know, there's, you know, crimes against humanity going on right now in Palestine. We urge you to reach out to your, you know, senators, congressmen. Here's a link to a web form where you can just put your name in and it'll sort of send a hand, you know, complaint about American policy. And so they sent this and the SBA head said, you know, so I don't know if all the emails that go out to the student listserv have to be checked by the SBA head with sort of the administration or if this one was just flagged by the head. Like, I don't know all the facts, but somehow this particular email got sent to the administration and apparently got run all the way up the flagpole. Like it went all the way up to sort of the very top of the university. I guess this was within a few months of the United. Yeah, it was late November. And so before the campus protest stuff started in the spring. And so the word came back to the students that they weren't allowed to send this because it was political in nature. That was the word that was given. So this student said, well, wait a second, you know, under the previous dean, like over the past few years, they had received several communications from the College of Law Dean's Office about sort of outside events that could be understood as being political. So, for example, when there was like a mass shooting in California that involved an Asian massage parlor, the dean sent a a message to the entire student body saying, you know, we stand in solidarity with Asian Pacific Americans." And there'd been a few other instances like that in which this list serve had been used by the administration to take what might be considered political positions. soon said, you know, this is an inconsistent treatment, you know, this

form has been opened up to political discussion in the past, and we want to communicate with other students about this issue that, you know, we find incredibly troubling. And the administration sort of thought about it again and said, no, sorry, we're not going to do it. And so, and that was it. And the students were, and, you know, just to give some background, like, you know, these students were, you know, sort of, I'd say some of the very few students coming from an immigrant background in, you know, in in our College of law community. And they really, it had this like incredible effect on them. I mean, they just sort of were like, okay, you know, we're not, we don't feel welcome in this space, basically. And that was it. Like they just sort of went undercover and kind of disappeared. And, you know, and so I didn't even hear about this. Like, normally, you know, I was chair last year of the same community and engagement committee when we normally, you know, normally there's like communication between the administration and me about issues like this, and there was like no communication with me at all. It was like handled entirely, you know, without sort of faculty input. And so I only found out about it like at the end of December. It was like six weeks after it had actually happened. And so when I asked the administration about this, I was told that there had been some like very high level working group that had been convened. And the working group had decided that specifically with respect to Palestine, there could be no discussion that wasn't both sides in nature. And that was that was the language that was given to me. **Because I had said, well, you know, maybe we should support these students by like, you know, having bringing somebody in to talk, you know, let's bring a genocide expert in to talk about what's going on. And the word was, yep, you can do that. But if you bring in somebody who's like anti-genocide, you have to bring in someone who's pro-genocide. I mean, that's basically what I was told. So, where does that stand in terms of like, you know, First Amendment protection, um you know, you know, what's your view as a, you know, as a First Amendment scholar**?"

a. Identify who said that "if you bring in somebody who's like anti-genocide, you have to bring in someone who's pro-genocide."

    i. Did this individual say that if you invite someone who is pro-Palestinian, then you have to invite someone who is pro-Israeli? If so, is it your interpretation that anyone who is pro-Israeli is pro-genocide?

b. During this recording, you suggested bringing in a "genocide expert." Who would qualify as a "genocide expert" in your opinion? What credentials or academic expertise would one need to have to qualify as a "genocide expert" in your opinion?

## VI. Public Interest Law Foundation Fundraiser

35. Describe your role, if any, in the Public Interest Law Foundation Fundraiser ("Fundraiser") in spring 2025.

    a. Did students approach you about being involved in this Fundraiser? If so, who?

    b. Did students propose a day with you as an item that students may bid for as part of this Fundraiser? If not, who proposed a day with you as an item for the Fundraiser?

36. In your opinion, is the Public Interest Law Foundation a student organization that the University of Kentucky recognizes? Why or why not?

37. Describe what occurred on or about March 22, 2025, with the students who won the bid to spend the day with you as part of the Fundraiser.

    a. How did your conduct on March 22, 2025, with students align with your statement to your colleague referenced in Paragraph 47 of the Complaint that "[s]tudents are some of the most vulnerable members of our community and . . . we as a faculty have a duty not to outsource our consciences to them – both as a way of protecting students and as a way of modeling the right way to behave as professionals"?

38. Identify the names of all students who spent the day with you on or about March 22, 2025, as part of the Fundraiser.

## VII. Scope of Appointment at the University of Kentucky & Academic Freedom

39. Describe the full scope of your appointment at the University of Kentucky.

40. List all formal correspondence from the University of Kentucky appointing you to a professorship, promoting you, or granting you any other professional role at the institution. Provide such correspondence and documentation of appointments.

41. Describe your academic expertise. (Paragraph 20 of the Complaint states: "Professor Woodcock's research focuses on identifying opportunities to reform the law to redistribute wealth without harming efficiency. He has published extensively in the areas of antitrust law and personalized pricing and is perhaps best known for his Yale Law Journal article titled *The Obsolescence of Advertising in the Information Age* (127 Yale L.J. 2270). He is a founder of the inframarginalist movement in law and economics, which applies the methods of law and economics to the problem of wealth inequality. He teaches courses primarily in the areas of business and commercial law, including antitrust, business associations, contracts, and secured transactions. Since spring 2023, he has also taught an annual seminar on international law with a focus on governmental legitimacy.")

    a. Is your academic expertise in antitrust and commercial law?

    b.   Do you consider your academic expertise to include international law or governmental legitimacy?  If so, please list your courses, research, and scholarly publications about international law or governmental legitimacy.

    c.   Describe your research regarding genocide as referenced in Paragraphs 43, 44, and 46.

## VIII.  Miscellaneous

42.  Provide any facts, legal arguments, names of witnesses, or any other information you deem relevant to this investigation.

*   *   *

I look forward to receiving your responses to these questions.  Please note that your responses will become part of the evidence for the First Evidence Review described in my August 25, 2025, letter.  As stated in my August 25, 2025, letter, at the conclusion of the fact-gathering stage of my investigation, I will make the evidence, whether inculpatory or exculpatory, available for Professor Woodcock's and your review.  You will have access to review such evidence in electronic format through a program that gives you and Professor Woodcock read-only access to the evidence.  You and Professor Woodcock will have an opportunity to review any evidence obtained as part of the investigation that is directly related to the allegations in the original Notice of Investigation and Amended Notice of Investigation, including the evidence upon which the University does not intend to rely on in reaching a determination regarding responsibility.  You and Professor Woodcock will have an opportunity to read and review the interview transcripts of any witnesses whom I interview as part of this investigation.  Professor Woodcock will have two (2) weeks or fourteen (14) calendar days to respond to the evidence in writing and also to provide any follow-up questions, directly related to the allegations in the Notice of Investigation, for any witnesses who participate in this investigation.  Professor Woodcock, thus, will have a meaningful opportunity to respond to the evidence prior to the conclusion of the investigation.

Please do not hesitate to contact me at 202-857-2488 or fthompson@mcguirewoods.com, should you have any questions.

Sincerely,

Farnaz F. Thompson
Partner

cc:    Bill Thro, General Counsel, University of Kentucky
       Sarah Mudd, Executive Director, Office of Equal Opportunity

# EXHIBIT A

| | **5TH MACHINE LAWYERING CONFERENCE** |
|---|---|
| | 29-30 May 2025 |
| | |
| | Hosted by |
| | Centre for Legal Innovation & Digital Society (CLINDS), CUHK LAW |
| | |
| | **29 May 2025 (Thursday)** |
| 09:00-09:10 | **<u>Welcome Remarks and Ceremony for Best Paper Prize & Honourable Mention Award</u>** <br><br> Moderator: Prof. Eliza MIK – Assistant Professor, CUHK LAW <br><br> • Prof. Jyh-An LEE – Acting Dean and Executive Director, CLINDS, CUHK LAW |
| 09:10-09:50 | **<u>Keynote Speech I</u>** <br><br> Moderator: Prof. Stuart HARGREAVES – Associate Professor, CUHK LAW <br><br> • Prof. Joel SLAWOTSKY – Professor, Harry Radzyner Law School, Reichman University, *New Frontier Technologies, Competition Law, and National Security in the Era of Strategic Rivalry* (Best Paper Prize) |
| 09:50-10:30 | **<u>Keynote Speech II</u>** <br><br> Moderator: Prof. Stuart HARGREAVES – Associate Professor, CUHK LAW <br><br> • Prof. Lin William CONG – Rudd Family Professor of Management & Professor of Finance, Cornell University; Ms. Yu YAN, PhD Candidate in Finance, National University of Singapore, *Centralized Governance in Decentralized Organizations* (Best Paper Prize) |
| 10:30-10:50 | **Tea Break** |
| 10:50-12:10 | **<u>Navigating the Complex Landscape of IP</u>** <br><br> Moderator: Mr. Paul SCHMIDT – Professional Consultant, CUHK LAW <br><br> • Prof. Michael GOODYEAR – Acting Assistant Professor, New York University School of Law, *Artificial Infringement* (Honourable Mention) |

| | |
|---|---|
| | • Prof. Lin William CONG – Rudd Family Professor of Management & Professor of Finance, Cornell University, *Understanding Patenting Disparities via Causal Human+Machine Learning* <br><br> • Mr. Ronald YU – Visiting Fellow, City University of Hong Kong School of Law, *Do Today's IP Rights Offer Sufficient Protection for Agentic AI?* |
| 12:10-13:10 | ***Lunch Break*** |
| 13:10-14:05 | **Regulating FinTech** <br><br> Moderator – Prof. Eliza MIK, Assistant Professor, CUHK LAW <br><br> • Mr. Alessio AZZUTTI – Lecturer, University of Glasgow, *Good Administration in AI-Enhanced Banking Supervision: A Risk-Based Approach* <br><br> • Prof. Jingyi WANG – Assistant Professor, CUHK LAW, *A Simplified Tax Regime for Taxing Cryptocurrencies* |
| 14:05-15:00 | **Making Legal Sense of AI** <br><br> Moderator: Prof. Jingyi WANG – Assistant Professor, CUHK LAW <br><br> • Prof. María L MENA-DURÁN – Assistant Professor, Caedenal Herrea University, CEU Universities; Prof. Antonio FALCÓ MONTESINOS – Professor, Department of Mathematics, Physics, and Technological Sciences, Cardenal Herrera University, CEU Universities, *Is Your Kettle AI? The Expanding Scope of AI Regulation* <br><br> • Prof. Eliza MIK, Assistant Professor, CUHK LAW, *From Fake Citations to Flying Pigs: The Dangers of Legal Hallucinations* |
| 15:00-15:20 | **Tea Break** |
| 15:20-16:40 | **Digital Legislature and Judiciary** <br><br> Moderator: Prof. Yueming YAN, Assistant Professor, CUHK LAW <br><br> • Prof. Xing LIU – Assistant Professor of Finance, Tsinghua University, *Unveiling the Fog of Law: Judicial Transparency and Entrepreneurship* <br><br> • Ms. Lilia LAW – JD Candidate, CUHK LAW, *Hide-and-Seek with DeepSeek: Legal Liabilities in AI Interactions* |

| 30 May 2025 (Friday) | |
|---|---|
| 09:00-09:40 | **Keynote Speech III**<br><br>Moderator: Prof. Sandra MARCO COLINO – Associate Professor, CUHK LAW<br><br>• Prof. Kasim BALARABE – Professor and Associate Dean, Jindal Global Law School, *Neuro-Legal Interfaces: Exploring the Convergence of Neurotechnology, Artificial Intelligence, and the Law* (Best Paper Prize) |
| 09:40-11:00 | **Competition Law and Policy in the Digital Markets**<br><br>Moderator: Mr. Hans-Guenther HERRMANN – Professional Consultant, CUHK LAW<br><br>• Prof. Ramsi WOODCOCK – Associate Professor, University of Kentucky, *Antitrust & Platforms: A Complete Theory*<br><br>• Prof. Sandra MARCO COLINO – Associate Professor, CUHK LAW, *The Calm after the (Chinese Tech Crackdown) Storm*<br><br>• Mr. Jiawei ZHANG – PhD Candidate, Technical University of Munich School of Social Sciences and Technology, *From Deepfake 1.0 to 2.0: How Deepfake Ruins Inter-Informational Competitive Order, and How Can We Rebuild It?* (Honourable Mention) |
| 11:00-11:20 | **Tea Break** |
| 11:20-12:15 | **Digital Criminal Justice**<br><br>Moderator: Prof. Dicky TSANG – Associate Professor, CUHK LAW<br><br>• Prof. Chung-Chia HUANG – Assistant Professor, National Taiwan University, *Holding Users Accountable: Users' Criminal Liability for Harm Caused by their AI Systems*<br><br>• Ms. Jasmine WAN – JD Candidate, CUHK LAW, *Virtual Crimes, Real Consequences: Addressing the Legal Implications of the Metaverse in Relation to Virtual Property Theft, Unauthorised Access and Regulations in Hong Kong* |
| 12:15-13:15 | ***Lunch Break*** |
| 13:15-14:35 | **Challenges in Protecting Digital Personal Data and Privacy** |

| | |
|---|---|
| | Moderator: Prof. Normann WITZLEB – Associate Professor, CUHK LAW <br><br> • Ms Qian YIN – PhD Candidate, CUHK LAW, *Data Privacy Rights in Health Data Sharing: A Government-Centric Paradigm in China* <br><br> • Ms. Peng GUO – PhD Candidate, Faculty of Law, University of Macau, *Safeguarding Sacred Brain Privacy: Addressing Legal Challenges in the Age of Brain-Computer Interface Technology* <br><br> • Ms. Anqi WANG, PhD Candidate, CUHK LAW, *It's Not All About Privacy: the Hidden Interests for Data Protection* |
| 14:35-14:55 | **Tea Break** |
| 14:55-15:45 | <u>**Digital Natives**</u> <br><br> Moderator: Professor Siyi LIN – Assistant Professor, CUHK LAW <br><br> • Ms. Chattrika NAPATANAPONG – Lecturer, Faculty of Law, University of the Thai Chamber of Commerce (UTCC); Ms. Atcharaporn ARIYASUNTHORN – Researcher, Thailand Development Research Institute (TDRI), *Reinforcing Child Data Protection Laws in Thailand in the Age of Technological Change* <br><br> • Ms. Zelin WANG – PhD Candidate, CUHK LAW, *Understanding China's Unique Approach to Online Gaming Regulation* |
| 15:45-16:35 | <u>**Economic and Empirical Analysis of Digital Technology Law**</u> <br><br> Moderator: Professor Siyi LIN – Assistant Professor, CUHK LAW <br><br> • Mr. Yida CAI – PhD Candidate, School of Law, City University of Hong Kong, *Essential Facilities Doctrine for Second Phase Data Competition: From the Perspective of Econometric Efficiency* <br><br> • Mr. Dong WANG – JD Candidate, CUHK LAW, *Copyright Protection of AI-Generated Works: An Empirical Analysis of Academic Impact in Law and Literature* |
| 16:35- 16:40 | <u>**Closing Remarks**</u> <br><br> • Prof. Jyh-An LEE – Professor and Executive Director, CLINDS, CUHK LAW |

# EXHIBIT B



(https://lawreview.gmu.edu)

CATEGORY: SYMPOSIA (/SYMPOSIA)

2024 SYMPOSIUM  •  FEBRUARY 23, 2024

# 27th Annual Antitrust Symposium

### *Spring Symposium in collaboration with the Global Antitrust Institute*

REGISTER HERE
(HTTPS://WEB.CVENT.COM/EVENT/DA9D53A3-624B-4B53-A68F-
D6B13379FC89/REGPROCESSSTEP1)



# Schedule

*All panels will be in Van Metre Hall*



(https://lawreview.gmu.edu)

8:00 – 8:50 A.M

**Continental Breakfast,** *Van Metre Hall Gallery*

9:00 – 9:10 A.M.

**Welcome & Opening Remarks**

**Megan Dill,** Symposium Editor, George Mason Law Review

**Donald J. Kochan**, Professor of Law and Executive Director, Law & Economics Center, George Mason University Antonin Scalia Law School

**John M. Yun**, Associate Professor of Law, George Mason University Antonin Scalia Law School

9:10 – 10:30 A.M.

**Panel 1:** *The FTC and DOJ's Draft Merger Guidelines*

**Dennis W. Carlton**, David McDaniel Keller Professor of Economics Emeritus, The University of Chicago Booth School of Business; Senior Managing Director, Compass Lexecon

**Aviv Nevo**, Director, Bureau of Economics, Federal Trade Commission; George A. Weiss and Lydia Bravo Weiss University Professor, University of Pennsylvania College of Arts and Sciences

**Eric A. Posner**, Kirkland & Ellis Distinguished Service Professor of Law and Arthur and Esther Kane Research Chair, The University of Chicago Law School

**Howard Shelanski**, Joseph and Madeline Sheehy Chair in Antitrust Law and Trade Regulation and Professor of Law, Georgetown University Law Center

**Valerie Suslow**, Professor of Economics, Johns Hopkins Carey Business School

More panelists to be announced.

*Moderator*: **Alexander Raskovich**, Director of Research, Global Antitrust Institute (GAI)

10:30 – 10:50 A.M.

**Break**

10:50 A.M. − 12:10 P.M.

**Panel 2:** *Digital Markets Act Enforcement ompliance*

**Neil Chilson**, Senior Research Fellow, Center for Growth and Opportunity

**Nikhil Shanbhag**, Vice President and Associate General Counsel, Product Legal, Competition and Telecommunications Law, Meta Inc.

More panelists to be announced.

*Moderator*: **Judge Douglas H. Ginsburg**, Judge, U.S. Court of Appeals for the District of Columbia Circuit; Professor of Law, George Mason University Antonin Scalia Law School

12:10 − 12:35 P.M.

**Lunch,** *Van Meter Hall Multipurpose Room*

12:35 − 1:55 P.M.

**Lunch & Panel 3:** *Antitrust and Privacy*

**D. Daniel Sokol**, Carolyn Craig Franklin Chair in Law, Professor of Law and Business, Gould School of Law, and Affiliate Professor of Business, Marshall School of Business, University of Southern California

**Andrew Stivers**, Director, NERA Economic Consulting, Inc.

**Ramsi Woodcock**, Wyatt, Tarrant & Combs Associated Professor of Law Secondary Appointment, Gatton College of Business & Economics, J. David Rosenberg College of Law, University of Kentucky

**Koren W. Wong-Ervin**, Partner, Jones Day

More panelists to be announced.

*Moderator*: **James C. Cooper**, Director, Program on Economics & Privacy; George Mason University Antonin Scalia Law School

1:55 − 2:05 P.M.

**Break**

2:05 − 3:25 P.M.

**Panel 4:** *U.S. Tech Litigation Download*

**Ling Ling Ang**, Managing Director, NERA Economic Consulting, Inc.

**Dale Collins**, Adjunct Professor of Law, Georgetown University Law Center

**Kristen Limarzi**, Partner, Gibson Dunn & Crutcher LLP

**Michael A. Salinger**, Jacqueline J. and Arthur S. Bahr Professor of Management and Professor of Economics, Boston University School of Management; Senior Academic Advisor, Charles River Associates

(https://lawreview.gmu.edu)

More panelists to be announced.

*Moderator*: **John M. Yun**, Associate Professor of Law, George Mason University Antonin Scalia Law School

3:25 – 3:45 P.M.
**Break**

3:45 – 4:45 P.M.
**A Conversation on Antitrust**
An esteemed **Special Guest** (to be announced) joins **Judge Douglas H. Ginsburg**

4:45 – 4:55 P.M.
**Closing Remarks**
**Judge Douglas H. Ginsburg,** Judge, U.S. Court of Appeals for the District of Columbia Circuit; Professor of Law, George Mason University Antonin Scalia Law School

4:55 – 6:00 P.M.
**Reception**

GMU

CONTACT

TERMS OF USE

PRIVACY STATEMENT

Copyright © 2023 The George Mason Law Review.
All rights reserved. Web Design by Amara Vo (https://amaravo.com).