UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| RAMSI A. WOODCOCK, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 25-424-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| THE UNIVERSITY OF KENTUCKY, | ) | **MEMORANDUM OPINION** |
| et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Ramsi Woodcock ("Woodcock") has moved for a preliminary injunction against Defendants the University of Kentucky ("University"), Eli Capilouto, Robert DiPaola, James Duff, and William Thro (collectively "University defendants") to halt their investigation into his speech concerning Israel. [Record No. 19] Thereafter, the University defendants tendered a Motion to Dismiss and a Motion to Abstain. [Record Nos. 23 and 25] On December 19, 2025, the Court held a hearing on the Motion for Preliminary Injunction. [Record No. 30] Having reviewed the parties' arguments, the Court concludes that abstention pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), is appropriate for the reasons outlined below.

## I. Background

Woodcock is a professor of law employed at the University of Kentucky's J. David Rosenberg College of Law ("College of Law"). [Record No. 1 at ¶ 9] He was hired in 2018 as Assistant Professor, promoted to Associate Professor in 2022, and received tenured status in July 2025. [*Id*. at ¶¶ 18, 21] Woodcock's primary area of academic scholarship is antitrust law; specifically, how to "redistribute wealth without harming efficiency." [*Id*. at ¶ 20] But

- 1 -

in 2023, he taught a law school "seminar on international law with a focus on governmental legitimacy" that allegedly piqued his interest in "whether Israel could be considered a Western colony in Palestine." [*Id*. at ¶¶ 20, 44] Woodcock concluded that Israel was a Western colony that was committing genocide that "should be brought to an end." [*Id*. at ¶ 44]

Woodcock began publicly sharing those views in early 2024 *via* the College of Law faculty listserve, academic conferences, circulated petitions, an op-ed, faculty meetings, and various online forums. [*Id*. at ¶ 46] He also created a website (the "Antizionist Legal Studies Movement") to promote his ideas and a petition entitled "Petition for Military Action Against Israel." [*Id.* at ¶ 1; Record No. 19-3 at 10–11] The petition urges other law professors to join as signatories to "demand that every country in the world make war on Israel immediately and until such time as Israel has submitted permanently and unconditionally to the government of Palestine everywhere from the Jordan River to the Mediterranean Sea." Ramsi Woodcock, *Petition for Military Action Against Israel*, ANTIZIONIST LEGAL STUDIES MOVEMENT: THE LAW AND POLICY OF ENDING ISRAEL, https://antizionist.net/petition-for-military-action-against-israel/ [https://perma.cc/M4FL-PLYY] (last visited Jan. 7, 2026). The petition is signed: "Ramsi Woodcock, Professor of Law, University of Kentucky Rosenberg College of Law." *Id.*

Woodcock was contacted by the University concerning his publicstatements on July 18, 2025. On that date, William Thro, General Counsel for the University, sent Woodcock the following letter:

> Recently, the University became aware of your writings on certain websites, your conduct at academic conferences, and your postings on American Association of Law Schools list serves, and other actions. These activities may create a hostile environment for Jewish members of the university community or otherwise constitute harassment as defined by the Supreme Court. The

University has concerns that your actions may violate Title VI of the Civil Rights Act of 1964, the equivalent state laws, and various university policies. Consequently, the University is launching an investigation. Because the allegations require the involvement of multiple university offices, the University has decided to engage outside counsel to conduct the investigation in coordination with the appropriate university offices. Specifically, Farnaz Farkish Thompson of the Washington office of McGuire-Woods LLP will lead the investigation.

[Record No. 19-3 at 273]

College of Law Dean James Duff sent Woodcock a letter on the same day. [*Id.* at 275–76] The letter provided that, consistent with established protocols and past practice, the University was temporarily and immediately reassigning his duties to "100% professional development" during the investigation for his and the University's protection. [*Id.* at 275] Woodcock would receive his full salary during the investigation. [*Id.*] The letter also directed that he not enter the College of Law building during the investigation unless Duff authorized otherwise. [*Id.*] It further directed that Woodcock surrender a university-issued laptop so that the University could copy its contents before returning it. [*Id.*] Finally, the letter made clear that, until the investigation was completed, Woodcock could not serve as the supervisor of record for any staff, student, or personnel, nor serve as a faculty advisor to any registered student groups or organizations. [*Id.*]

Eli Capilouto, the University's president, also sent a campus-wide email message concerning the matter on July 18, 2025. [Record No. 19-3 at 278–80] Without naming Woodcock, the message stated that a university employee had circulated "an online petition calling for the destruction of a people based on national origin" that "can be interpreted as antisemitic in accordance with state and federal guidance." [*Id.* at 278] The message described the petition as a "call for violence" that "express[es] hate." [*Id.*] The email further suggested

that the employee's remarks and petition might "compromise the safety and well-being" of members of the University community and "may create a hostile environment on our campus," in violation of Title VI. [*Id.* at 278–79] The email explained that the "employee has been removed, pending an investigation, from any teaching and classroom responsibilities" and called the employee's views "repugnant." [*Id.* at 278–79]

Woodcock received a Notice of Investigation from outside counsel Thompson four days later. [Record No. 28-1 at 5–8] It indicated that the University received notice that he may have violated: "the Ethical Principles and Employee Code of Conduct (Administrative Regulation – GR XIV); the Institutional Statements Policy; the Use of Technology Resources Policy (Administrative Regulation 10:1); and the Policy on Discrimination and Harassment (Administrative Regulation 6:1), which incorporates the International Holocaust Remembrance Alliance's [("IHRA")] definition of anti-Semitism." [*Id.* at 5] The Notice of Investigation included that the investigation was to be conducted pursuant to the University's Declaration of Principles and Significant Policies and addresses requirements under Title VI of the Civil Rights Act. [*Id.*]

Concerning the impetus for the investigation, the letter explained that four professors, who attended academic conferences where Woodcock presented or participated in common listserves, made the following allegations:

- The Chinese University of Hong Kong's Center for Legal Innovation and Digital Society sponsored an academic conference about law and technology on or about May 30, 2025. You attended in your capacity as a University of Kentucky Law Professor and allegedly began your presentation in which you were invited to speak about antitrust law "with a tirade against the United States and its 'colony' for [committing] genocide in Gaza." When a law professor attempted to speak, you allegedly spoke over him and began chanting "apartheid, apartheid, apartheid" such that this law professor was

- 4 -

unable to present a counterviewpoint concerning the Israeli-Palestinian conflict.[1]

- The George Mason University Law Review held an Antitrust Symposium on or about February 23, 2024, in which you were invited to speak on a panel to address antitrust and privacy. You attended in your capacity as a University of Kentucky Law Professor and began your remarks by allegedly asserting that the United States government was supporting Israel in what was alleged to be a genocide of the Palestinian people. A number of other law professors and faculty allegedly walked out as a result of your conduct. The Dean of the George Mason University Law School allegedly publicly stated that your conduct during this professional conference was inappropriate. [2]

- You allegedly spammed and are spamming listserves, including the Association of American Law Schools (AALS) listserve, which you have access to as a University of Kentucky Law Professor, with your personal viewpoints concerning the Israeli-Palestinian conflict.

- You allegedly are using the University's resources to circulate an online petition, Petition for Military Action Against Israel.

[Record No. 28-1 at 5–6]

In addition to informing Woodcock of the laws, policies, and regulations he may have

violated and the allegations against him, the notice outlines the investigative process, including

---

[1] Woodcock disputes this assertion, stating that he "prefaced remarks on a general theory of antitrust with a brief statement of opposition to Israeli colonization and genocide." [Record No. 19-1 at 10] He insists that the panel "continued without incident until about an hour later when a heckler accused him of being a Hamas support." [*Id.*] Rather than repeating "Apartheid," Woodcock states that he replied to the heckler by explaining that "the international law doctrine of 'responsibility to protect' authorizes military intervention to stop genocide and that Israel is a colonization project that practices apartheid and commits genocide." [*Id.*]

[2] Woodcock also disputes this assertion, stating that he delivered the following 30-second statement: "Our government is currently committing genocide in Palestine through the colony we maintain called Israel. We have killed 30,000 people so far and nearly 15,000 children, and that must stop." [Record No. 19-1 at 10–11] He further contends that the panel continued without incident. [*Id.* at 11]

scheduling a meeting with Thompson, and information regarding compliance with university policy during the investigation.  [Record No. 28-1 at 6–7]  It advised Woodcock that he had the right to have an advisor and assured him that the University "reviews reports objectively and does not advocate for either party," and that he could "submit statements, information, or supporting evidence through the course of this investigation."  [*Id.*]  The Notice of Investigation made clear that "the University is not investigating any viewpoints or speech expressed in [Woodcock's] personal capacity" and emphasized that, under the University's Declaration of Principles, it is "deeply committed to safeguarding academic freedom, which is of transcendent value' for the entire institution."  [*Id.* at 6]  The Declaration Principles further provides that "faculty academic freedom covers all speech in a formal instructional setting related to the subject of the course and all scholarly speech *related to the faculty member's area or expertise*."  [*Id.* (Emphasis in original).]

On August 22, 2025, Woodcock and his attorney, participated in a Zoom meeting with Thompson; Maricris Prendingue, a colleague of Thompson; Sarah Mudd, the University's Executive Director of the Office of Equal Opportunity and Title IX Coordinator; and Mark Maier, Associate University Counsel.  [Record No. 26-4 at 2–3] But Woodcock's counsel sent a letter to Thompson before the meeting, questioning her neutrality as the investigator and whether she could be impartial.  [Record No. 26-3] Specifically, counsel raised concerns about Thompson's Christian faith, her firm's representation of numerous Israeli clients, and her connections to the Christian Broadcasting Network, Regent University, and the Heritage Foundation's Project 2025.  [*Id.*]

According to Thompson, she asked Woodcock during the meeting to provide a list of any witnesses and evidence he wanted her to consider in the investigation.  [Record No. 26-4

at 3]  She also asked Woodcock if and when he would return his laptop, as Dean Duff had previously requested its return a month earlier.  [*Id.*]  However, Woodcock's attorney advised Thompson that a different attorney had been retained to handle the laptop issue and that any related questions should be directed to him.  [*Id.*]  Woodcock also asked about the investigation procedures and requested the opportunity to submit follow-up questions for witnesses after he received access to the evidence, including witness interview transcripts.  [*Id.*]

Thompson sent Woodcock a more detailed letter three days later, outlining the investigation steps and procedures.  [Record No. 28-1 at 16–18]  The letter reiterated Woodcock's right to be accompanied by an advisor of his choice but clarified the advisor's limited role in the investigation.  [*Id.* at 16]  Thompson stated that she could not provide an exact timeline because Woodcock had not yet returned his university-issued laptop, despite a request to do so on July 18, 2025.  [*Id.*]  However, Thompson indicated that she aimed to complete the fact-gathering stage within 60 to 90 calendar days after the University received the laptop.  [*Id.*]  And she further explained that she would conduct the investigation consistent with the process previously described by Mudd, including gathering evidence, interviewing witnesses, and interviewing Woodcock last.  [*Id.*]

The letter then described the stages of the investigation.  [Record No. 28-1 at 16–18]  First, during the fact-gathering stage, Thompson would interview witnesses, including those who reported Woodcock's conduct, collect evidence, and identify additional witnesses.  [*Id.* at 16–17]  The letter stated that Woodcock could submit the names of potential witnesses and any evidence he wished Thompson to consider, such as text messages, emails, timelines, or photographs.  [*Id.* at 17]  Although the University typically conducts interviews in person or *via* Zoom, Thompson Offered Woodcock the option to respond to written questions instead of

participating in a live interview.  [*Id.*]  She further explained that Woodcock would have seven calendar days to submit written responses, which would become part of the investigative record.  [*Id.*]

The first evidence review would begin after the fact-gathering stage concluded. [Record No. 28-1 at 17]  The letter noted that Thompson would make the evidence—both inculpatory and exculpatory—available to Woodcock and his attorney.  [*Id.*]  The letter further explained that Woodcock would have access to interview transcripts of all witnesses and that he would have two weeks to submit a written response to the evidence before the investigation closed.  [*Id.*] During that time, Woodcock could propose follow-up questions for the witnesses, if they directly related to the allegations in the Notice of Investigation.  [*Id.*]  Thompson concluded that this process would afford Woodcock a meaningful opportunity to respond to the evidence before the investigation concluded.  [*Id.*]

Next, the letter described the Second Evidence Review stage.  [Record No. 28-1 at 17] Thompson explained that she would pose Woodcock's follow-up questions to witnesses that directly related to the allegations at issue.  [*Id.*]  After Thompson received the witnesses' responses, Woodcock would have an opportunity to review any additional evidence obtained, including the witnesses' responses to his follow-up questions.  [*Id.*]  He would then have seven days to submit a written response to the Second Evidence Review.  [*Id.*]  Absent extraordinary circumstances, the fact-gathering stage would conclude after competition of this review.  [*Id.*]

Thompson noted in the letter that, as she had explained to Woodcock on August 22, 2025, she would submit an attorney-client privileged report to the University of Kentucky's General Counsel.  [Record No. 28-1 at 17]  The General Counsel would share the report only with individuals who needed to know for purposes of receiving legal advice.  [*Id.*]  Thompson

emphasized that the report belonged to the University and that only it could waive the attorney-client privilege. [*Id.*] The letter acknowledged that, as Woodcock noted, the investigation may raise unique First Amendment issues and that the University had the right to seek privileged legal advice in connection with the investigation. [*Id.*] Thompson also clarified that she would not serve as the decision-maker regarding the allegations against Woodcock. [*Id.*]

Finally, the correspondence addressed the Letter of Findings and Determination. [Record No. 28-1 at 17] After reviewing all evidence and Woodcock's written responses from the First and Second Evidence Reviews, the University President would issue a letter to Woodcock, setting forth the University's findings and the rationale. [*Id.* at 17–18] And the President's letter would include any applicable sanctions if the University found Woodcock responsible for any violations of policies or regulations. [*Id.* at 18] However, if the President determined that termination of a tenured appointment may be warranted, the University would proceed in accordance with Kentucky Revised Statutes § 164.230 and applicable University regulations. [*Id.*]

On September 8, 2025, Thompson sent Woodcock an Amended Notice of Investigation, incorporating new allegations she uncovered during the investigation. [Record No. 28-1 at 20–21] It provided that the University had received reports from four students, some of whom are Jewish, alleging Woodcock "created a hostile environment on the basis of race, color, or national origin by allegedly:"

- using his official position as a University of Kentucky professor to call for violence against Israel, the genocide of Israeli people who are predominantly Jewish, and the ultimate destruction of Israel;

- 9 -

- calling for violence against Israel, the genocide of Israeli people, and the ultimate destruction of Israel in a manner that uses anti-Semitic tropes;

- making anti-Semitic and anti-Israeli remarks during an optional lecture, described as an optional educational program with guest lecturers; such remarks include that Professor Woodcock does not need to invite or include any speakers or guest lecturers with a pro-Israeli viewpoint because such speakers are pro-genocide; and[3]

- shouting, "Free Palestine," while driving a car with University of Kentucky law students who won a bid during a fundraiser for the Student Public Interest Law Foundation to spend time with Professor Woodcock.

[*Id.* at 20–21]  The Amended Notice also reiterates Thompson's request that Woodcock promptly provide a list of witnesses and any evidence he would like her to consider.  [*Id.*]

After this action was filed, Thompson sent a letter to Woodcock on December 1, 2025, which included forty-two questions for him to respond to in writing.  [Record No. 25-1 at 3–10]  Although Thompson had previously stated that Woodcock would have seven calendar days to respond, the letter allowed fourteen days.  [*Id.* at 3]  The questions addressed the eight reports received by the University concerning Woodcock's alleged conduct, as described in the Notice and Amended Notice.  [*Id.* at 4–12; see Record No. 28-1 at 5–8, 20–21]  They are organized into the following eight sections: (1) the Law and Technology Conference at the Chinese University of Hong Kong Center for Legal Innovation and Digital Society on May 30, 2025; (2) the Antitrust Symposium hosted by the George Mason Law Review on February 23, 2024; (3) Woodcock's use of listserves; (4) Woodcock's use of online platforms and

---

[3] Woodcock provides a recording that shows he posed the following question to the speaker leading the discussion at a College of Law community discussion forum on campus free speech: "I asked the University if I could bring someone to campus to talk about genocide and the response was 'Yep, you can do that.  But if you bring in somebody who's like anti-genocide, you have to bring in someone who's pro-genocide.'  What's your view as a . . . First Amendment scholar?"  [Record No. 19-1 at 6–7]

distinctions between official and personal capacity; (5) the optional law school lecture; (6) the Public Interest Law Foundation Fundraiser and related events on March 22, 2025; (7) the scope of Woodcock's appointment at the University of Kentucky and issues of academic freedom; and (8) a miscellaneous section containing a single request for "any facts, legal arguments, names of witnesses, or any other information [Woodcock deems] relevant to this investigation." [Record No. 25-1 at 4–12]  After receiving an extension, Woodcock indicated that he will not respond to the questions until this Court rules on his Motion for Preliminary Injunction.  [Record No. 26-8 at 2]

During the course of the events outlined above, Woodcock filed this action on November 13, 2025, against the University of Kentucky; Eli Capilouto, in his individual and official capacities as President of the University of Kentucky; Robert DiPaola, in his individual and official capacities as Provost of the University of Kentucky; William Thro, in his individual and official capacities as General Counsel of the University of Kentucky; James Duff, in his individual and official capacities as Dean of the Rosenberg College of Law; and Linda McMahon, in her official capacity as United States Secretary of Education.  [Record No. 1]  Count I alleges First Amendment retaliation claims against Defendants Capilouto, DiPaolo, Thro, and Duff pursuant to 42 U.S.C. §§ 1983 and 1985.  [*Id.* at ¶¶ 100–14]  Count II makes claims of violations of procedural due process against Defendants Capilouto, DiPaolo, Thro, and Duff pursuant to 42 U.S.C. §§ 1983 and 1985.  [*Id.* at ¶¶ 115–27]  Count III asserts race discrimination claims pursuant to 42 U.S.C. § 1981 against all defendants.  [*Id.* at ¶¶ 128–34]  And Count IV incluces a claim under the Administrative Procedures Act, 5 U.S.C. § 706, against Defendant McMahon.  [*Id.* at ¶¶ 135–44]  Woodcock also seeks injunctive relief and damages.  [*Id.* at 38–39]

On December 12, 2025, Woodcock filed a Motion for Preliminary Injunction and Expedited Consideration pursuant to Rule 65 of the Federal Rules of Civil Procedure. [Record No. 19][4] Woodcock purportedly seeks preliminary injunctive relief to "prevent further harm due to the violation by officials at the University of Kentucky" through their actions of "suspending him from teaching and University service, banning him from the University of Kentucky College of Law building, and launching a months-long investigation into his protected speech." [*Id.* at 1] He alleges the University defendants are violating his First Amendment rights and his Fourteenth Amendment right to due process *Id.* And while Woodcock seeks injunctive relief against the University defendants, he does not seek such relief against the United States Department of Education Secretary Linda McMahon (who has yet to enter an appearance) nor the Intervening Defendant, the Commonwealth of Kentucky *ex rel.* Attorney General Russell Coleman.[5] [*Id.*]

The University defendants filed a response in opposition to Woodcock's Motion for Preliminary Injunction the day before the Court's hearing on Woodcock's Motion for Preliminary Injunction. [Record No. 26] Plaintiff Woodcock and the University defendants, together with counsel for the Intervening Defendant Commonwealth of Kentucky, *ex rel.*, Attorney General Russell Coleman were present for the hearing. [Record No. 30] Testimony and arguments were presented on Woodcock's Motion for Preliminary Injunction, the motion

---

[4] The University defendants filed a Motion to Dismiss that has yet to be fully briefed. [Record No. 23] They also filed a Motion to Abstain that has been fully briefed. [Record Nos. 25, 29, and 33]

[5] The Court granted the Commonwealth of Kentucky, *ex rel*. Attorney General Russell Coleman's motion to intervene as a defendant in this action to defend the constitutionality of Senate Joint Resolution 55, 2025 Ky. Acts ch.157. [Record Nos. 16 and 17]

was regarded as fully briefed, and Woodcock's motion for injunctive relief was taken under advisement. [*Id.*] However, on January 2, 2026, Woodcock filed an unsolicited Reply in Support of his Motion for a Preliminary Injunction.[6] [*See* Record Nos. 30 and 34.]

## II. Legal Standard

A preliminary injunction is an extraordinary remedy that should only be granted if movants carry their burden of proving that the circumstances clearly demand it. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). Plaintiffs seeking preliminary injunctive relief must show that "they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction would be in the public interest." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2350 (2025) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025). That said, "*Younger* abstention requires a federal court to abstain from granting

---

[6] During the preliminary injunction hearing, the undersigned acknowledged that the plaintiff had also moved for an expedited decision on his motion for a preliminary injunction. [*See* Record No. 19.] In light of that request, the Court declined to permit additional briefing. Nevertheless, the plaintiff filed an unsolicited Reply in Support of his Motion for Preliminary Injunction two weeks after the hearing was held. [Record No. 34] Although the matter was considered fully briefed before the filing of the reply, the Court has reviewed the reply and concludes that the arguments raised therein do not alter its ruling. Further calling into question the plaintiff's professed interest in an expedited resolution, he not only filed the unsolicited reply but also filed an Amended Complaint on January 7, 2025. [Record No. 36] In the interest of issuing a prompt decision on the motion for a preliminary injunction—particularly given the imminent start of classes at the College of Law on January 12, 2025—the Court has declined to consider any new claims in the Amended Complaint in resolving the Motion for Preliminary Injunction and Motion to Abstain. [*See* Record No. 19 at 2.]

injunctive or declaratory relief that would interfere with pending state judicial proceedings."

*O'Neill v. Coughlan*, 511 F.3d 638, 643 (6th Cir. 2008) (quoting *Younger v. Harris*, 401 U.S.

37, 40–41 (1971)).

### III. Analysis

Although the plaintiff seeks a preliminary injunction to end the University's pending

investigation and his removal from teaching duties and the law school building, abstention is

warranted under the circumstances. As a result, the Court declines to address the plaintiff's

motion on the merits and instead will grant the University defendants' motion to abstain for

the reasons that follow.

### *Younger* Abstention

*Younger* abstention provides a "limited carve-out" to a federal court's "virtually

unflagging obligation" to exercise its jurisdiction. *Frost v. Nessel*, No. 24-1132, 2025 WL

1136288 (6th Cir. Apr. 17, 2025), *cert. denied*, No. 25-275, 2025 WL 2906540 (U.S. Oct. 14,

2025) (citing *Hill v. Snyder*, 878 F.3d 193, 205 (6th Cir. 2017); *Deakins v. Monaghan*, 484

U.S. 193, 203 (1988)). Abstention is based on "principles of federalism [which] dictate that

any federal constitutional claims should be raised and decided in state court without

interference by the federal courts." *Merck Sharp & Dohme Corp. v. Conway*, 909 F. Supp. 2d

781, 784 (E.D. Ky. 2012) (citations omitted). "If a federal district court concludes that its

resolution of the case before it would 'directly interfere with ongoing state proceedings,' then

it must determine whether to abstain from hearing the case altogether." *Id.* (quoting *Mass.

Delivery Ass'n v. Coakley*, 671 F.3d 33, 45 (1st Cir. 2012) (citation modified)); *see also Aaron

v. O'Connor*, 914 F.3d 1010, 1016 (6th Cir. 2019). Thus, the threshold issue in any *Younger*

analysis is the "question of whether 'interference' exists." *Id.* (quoting *Coakley*, 671 F.3d at

40).  "In the typical *Younger* case, the federal plaintiff is a defendant in ongoing or threatened state court proceedings seeking to enjoin continuation of those state proceedings." *Id.* (citation modified) (citing *Devlin v. Kalm*, 594 F.3d 893, 894 (6th Cir. 2010); *Crawley v. Hamilton Cnty. Comm'rs*, 744 F.2d 28, 30 (6th Cir. 1984)).

### (A) *NOPSI* Categories

*Younger* abstention principles extend to: "(1) ongoing state criminal prosecutions, (2) ongoing state-initiated civil enforcement proceedings 'that are akin to criminal prosecutions,' and (3) ongoing state civil proceedings that involve the ability of courts to perform judicial functions."  *Drs. Hosp. of Augusta, L.L.C. v. Kentucky*, No. 6:17-CV-00206-GFVT, 2018 WL 1748112, at *3 (E.D. Ky. Apr. 11, 2018); *see also New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989) (enumerating the "*NOPSI*" factors); *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 79–80 (2013).

### Akin to Criminal Proceedings

"State-initiated civil enforcement proceedings include administrative proceedings that are judicial in nature."  *Klopp v. Kentucky Educ. Pro. Standards Bd.*, 724 F. Supp. 3d 682, 687 (E.D. Ky. 2024), *aff'd*, No. 25-5034, 2025 WL 2105146 (6th Cir. July 28, 2025) (citation modified) (quoting *Drs. Hosp. of Augusta*, 2018 WL 1748112, at *3 and citing *Doe v. Univ. of Kentucky*, 860 F.3d 365, 369 (6th Cir. 2017)).  "This is true 'even if the case has not yet progressed to state-court at the time of federal review.'"  *Id.* (quoting *Drs. Hosp. of* Augusta, 2018 WL 1748112, at *3 and citing *Ohio C.R. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 627 (1986); *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432–34 (1982); *Gibson v. Berryhill*, 411 U.S. 564, 576–77 (1973)).  A proceeding is "judicial

- 15 -

in nature" if it "investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist." *NOPSI*, 491 U.S. at 370.

In *Doe v. University of Kentucky*, a panel of the United States Court of Appeals for the Sixth Circuit determined student disciplinary proceedings to be akin to a criminal prosecution because a state actor brought the action and the procedure was "initiated to sanction the federal plaintiff." 860 F.3d at 369. It emphasized that the disciplinary proceeding "could have severe consequences [for the plaintiff], such as expulsion and future career implications." *Id.* at 370. Although the procedure did not have all the due process protections, the panel noted it "involved a filed complaint, an investigation, notice of the charge, and the opportunity to introduce witnesses and evidence." *Id.* Ultimately, there were sufficient protections and similarities that the proceedings were "akin to criminal prosecutions" for *Younger* abstention. *Id.*; *see also Klopp v. Kentucky Educ. Pro. Standards Bd.*, 724 F. Supp. 3d 682, 687–88 (E.D. Ky. 2024), *aff'd*, No. 25-5034, 2025 WL 2105146 (6th Cir. July 28, 2025) (outlining education board's disciplinary process to demonstrate that it suffices as an adjudicative proceeding under *Younger*).

Further, where federal plaintiffs seek to enjoin a state university's disciplinary proceedings, "multiple courts have concluded that, where the university's internal disciplinary process provides for another level of review beyond the initial adjudicator's decision, an adequate opportunity to raise [due process] claims exists, and *Younger* abstention is appropriate." *Doe v. Nastase*, No. CV SAG-25-03239, 2025 WL 2986805, at *7 (D. Md. Oct. 23, 2025). "Other courts have similarly concluded post-*Sprint* that *Younger* applies to school-related disciplinary proceedings." *Durstein v. Alexander*, No. CV 3:19-0029, 2019 WL 6833858, at *10 (S.D.W. Va. Dec. 13, 2019) (collecting cases). In *Doe v. University of*

*Kentucky*, the panel noted that out-of-circuit "courts have held university hearings in varying circumstances qualify as proceedings akin to criminal prosecutions for *Younger* abstention." 860 F.3d at 373 n.3 (citing *Choudhry v. Regents of the Univ. of Cal.*, No. 16-CV-05281-RS, 2016 WL 6611067, at *3 (N.D. Cal. Nov. 9, 2016) (finding abstention proper in disciplinary action against dean because a state institution initiated the proceedings, a preliminary investigation occurred followed by filing a formal charge, the investigation was designed to sanction Choudhry, and Choudhry faces potential serious consequences); *Sanchez v. Ariz. Bd. of Regents*, No. CV-15-01591-PHX-JAT, 2015 WL 6956288, at *2 (D. Ariz. Nov. 10, 2015) (permitting abstention in student disciplinary hearing when "[e]ach party may offer an opening statement, call witnesses, introduce documents and exhibits into evidence, and generally cross-examine witnesses who are called to testify"); *Cameron v. Ariz. Bd. of Regents*, No. CV-08-1490-PHX-ROS, 2008 WL 4838710, at *3 (D. Ariz. Nov. 6, 2008) ("State university tenure decisions and subsequent appeals are, indeed, state judicial proceedings as contemplated in *Younger*'s progeny.")).

Here, the University claims that the Court should abstain under *Younger* so that it can complete its investigation (and potential administrative proceedings) without judicial interference. [*See* Record No. 25 at 1–2.] It compares this case to *Doe v. University of Kentucky* where the Sixth Circuit affirmed the lower court's decision to abstain while student disciplinary proceedings were pending. [*Id.* at 4 (citing 860 F.3d at 368).] Although Doe's formal proceedings had commenced when he filed suit, the University insists "[t]here is no meaningful distinction between a formal proceeding and an investigation that may lead to a formal proceeding." [Record Nos. 25 at 6 and 33 at 3 (citing *Klopp v. Kentucky Educ. Pro. Standards Bd.*, 724 F. Supp. 3d 682, 688–90 (E.D. Ky. 2024), *aff'd*, 2025 WL 2105146 (6th

Cir. July 28, 2025).]  To support this argument, it references *Middlesex*'s adjudicative and legislative distinction and notes that the present investigation is adjudicative in nature, satisfying the "first prong" of *Younger* abstention.  [Record No. 25 at 6 (citing 457 U.S. at 435).]  Finally, it argues that Woodcock should not be able to sidestep *Younger* "simply because the University is investigating in order to decide which measures to take, if any, and whether to initiate tenure revocation proceedings."  [*Id.* at 7]

Woodcock first argues that his suspension from teaching and banishment from the law building are not judicial proceedings to which *Younger* applies.  [Record No. 29 at 2–3]  He next argues that the investigation is not a judicial proceeding because "no termination charges have been filed" and no formal administrative proceedings have commenced.  [*Id.* at 3]  Specifically, he claims that an investigation can only be a judicial proceeding where the investigator has "independent authority to sanction or discipline the target." [*Id.* (citing *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 65 (9th Cir. 2024).]  And because Thompson is merely a third-party investigator who otherwise lacks the ability to decide whether Woodcock should be disciplined, *Younger* is inapplicable.  [*See id.*]

Further, Woodcock insists that the investigation is not a judicial proceeding because it is *ad hoc*.  [Record No. 29 at 3]  He takes issue with the University's use of Thompson's services and claims that the procedures being used are not authorized in University regulations. [*Id.*]  In support, he asserts that the University "initially claimed to proceed under an antidiscrimination regulation, AR 6.1," but failed to place its Office of Equal Opportunity in charge of the investigation.  [Record No. 29 at 4 (citing AR 6.1 § V.A.).]  He next contends that the University is not following its Regulations Affecting Employment that were in place at the time the investigation began.  [*Id.* at 4 (citing § B.1(f)).]  And once Woodcock notified

- 18 -

the University that it failed to comply with either regulation, the University did away with them, which he claims further supports the *ad hoc* nature of the investigation.  [*Id.*]

Finally, Woodcock argues that the procedures being used in his investigation lack the "hallmarks of criminal proceedings such as a hearing, right of appeal, or an impartial decisionmaker."  [Record No. 29 at 4]  More specifically, Capilouto who initiated the investigation, (calling Woodcock's views "repugnant") will act as decisionmaker following review of Thompson's report.  [*Id.* (claiming that this dual role violates the rule that judges may not decide a case they played a role in bringing).]  Woodcock argues that the *ad hoc* procedures allow Capilouto to determine liability and sanctions without first filing formal charges.  [Record No. 29 at 4]  He also asserts that the University has refused to provide "a complete explanation of what exactly he is accused of and what alleged policies his political and academic speech violate."  [*Id.*]  Finally, Woodcock contendss that *Doe v. University of Kentucky* is inapposite because the University's process in his investigation is not pursuant to any "extant University rule" unlike Doe's student disciplinary proceedings which followed regulations and included hallmarks of a criminal investigation.  [*See id.* at 4–5.]

As an initial matter, Woodcock's removal from the classroom and law school building are part and parcel of the investigation.  And the plaintiff concedes this fact.  [*See* Record No. 34 at 6 ("Here, as part of the investigation, the University has suspended and banned Plaintiff.").]  During the hearing on the request for a preliminary injunction, Mudd (executive director of the University's Office of Equal Opportunity) testified that these interim measures are typical during investigations involving allegations that could impact the educational environment.  Contrary to the plaintiff's assertions, *Younger* does apply to the reassignment of

duties and building ban because enjoining such actions would interfere with the University's ongoing proceeding.

The undersigned is likewise unconvinced by Woodcock's argument that his investigation cannot be a judicial proceeding because the investigator does not have "independent authority to sanction or discipline the target." [Record No. 29 at 3 (citing *Seattle Pac. Univ.*, 104 F.4th at 65).] Thompson was hired by the University to conduct an investigation *on its behalf*. Therefore, the investigator is not a separate entity from the University (which holds adjudicative and sanctioning authority), as was the case in *Seattle Pacific University v. Ferguson*. 104 F.4th 50.

While there is no specific authority in this circuit holding that state university formal investigations against employees are akin to criminal proceedings, the delineation in *NOPSI* notes that *Younger* abstention does not apply to legislative acts but rather adjudicative ones. *NOPSI*, 491 U.S. at 370. The present investigation is a precursor to potential adjudicative acts, not legislative ones. Further, *Doe v. University of Kentucky* explicitly held that a student disciplinary proceeding satisfied *Younger*. 860 F.3d at 370 ("Although the hearing failed to include every element of due process in a criminal prosecution, it is still adjudicative in nature.") (citing *Fieger v. Thomas*, 74 F.3d 740, 744 (6th Cir. 1996)).

Despite finding no case in this circuit analyzing whether a university's investigation of a professor is an ongoing state proceeding under *Younger*, the peripheral case law supports the conclusion that it is. The panel in *Doe v. University of Kentucky* held that a student disciplinary proceeding triggered *Younger* abstention. 860 F.3d at 370–71. Although that proceeding was further along than Woodcock's, the same principles apply. Both proceedings were initiated

by a state actor and could result in severe consequences for the federal plaintiffs, expulsion from school and a tainted record and a loss of tenure and employment, respectively.

The same is true for Woodcock's claims that the investigation cannot be an ongoing proceeding because it is *ad hoc*.  As an initial matter, at the onset of the investigation, the University notified Woodcock that he may have violated the Ethical Principles and Employee Code of Conduct; the Institutional Statements Policy; the Use of Technology Resources Policy; and the Policy on Discrimination and Harassment, which incorporates the IHRA's definition of anti-Semitism.  [Record No. 23-1 at 2]  Due to the number and diversity of regulations, it is unsurprising that the investigation is proceeding in an unconventional manner. But that is beside the point.  What matters here is that the University is investigating complaints it received to determine whether to commence administrative proceedings and if the Court halted the investigation, it would *interfere* with the ongoing state proceeding.  *See Merck Sharp*, 909 F. Supp. 2d at 784.

The University's process need not possess all the hallmarks of a criminal proceeding to be *akin* to one.  The investigator has provided Woodcock two notices of investigation which include the allegations against him and the policies he may have violated.  [Record Nos. 23-1 at 2–5 and 23-3 at 2–3]  Since commencing the investigation, the University has invited Woodcock to "'[p]rovide any facts, legal arguments, names of witnesses, or any other information [he deems] relevant to this investigation.'"  [Record No. 33 at 5 (quoting Record No. 25-1 at 12).]  Letters from Thompson explain that after the fact gathering is over, Woodcock will be able to review the evidence including witnesses' transcripts.  [Record Nos. 25-1 at 12 and 23-2 at 3]  Following review, Woodcock will have two weeks to respond to the evidence in writing and provide any follow-up questions prior to the close of the investigation.

[Record No. 25-1 at 12]  The University further notes that, if it "concludes that disciplinary action is necessary, then Professor Woodcock will have the opportunity to raise constitutional objections in those proceedings."  [Record No. 33 at 5]  That the present proceeding does not contain all the "hallmarks of a criminal investigation" does not place it beyond *Younger*'s reach.

The Court also is unconvinced by the plaintiff's argument that because the investigation has not yet become a formal proceeding, *Younger* does not apply.  Like Woodcock, a plaintiff in another circuit argued that "abstention is inappropriate because the Department of Education has not called a hearing—the agency is only investigating whether to hold one." *Durstein*, 2019 WL 6833858, at \*11.  The district court disagreed, noting that the Department was actively investigating the plaintiff to determine whether a hearing was warranted. *Id.*  It further explained that to "split the Department's process into separate investigative and adjudicative proceedings as [the plaintiff] argues would effectively eliminate *Younger* by allowing plaintiffs to file in federal court as soon an investigation is announced." *Id.*  Thus, the court determined that the Department's investigation and hearing are two phases of the same proceeding. *Id.* (citing *Ocean Grove Camp Meeting Ass'n of United Methodist Church v. Vespa-Papaleo*, Nos. 07-4253, 07-4543, 339 Fed. App'x. 232, 2009 WL 2048914 (3d Cir. July 15, 2009) (holding the judicial proceeding begins when a complaint is filed and an investigation is launched); *O'Neill*, 511 F.3d at 643–44 (holding that the filing and investigation of a grievance is part of the state's judicial proceeding).

Similarly, the plaintiff in *Klopp v. Kentucky Educ. Professional Standards Board* argued that the *Younger* abstention did not apply because proceedings had not formally begun, no charges had been filed, and no revocation had been initiated.  724 F. Supp. 3d 682, 690

- 22 -

(E.D. Ky. 2024), *aff'd*, No. 25-5034, 2025 WL 2105146 (6th Cir. July 28, 2025). But the court disagreed, calling the argument a "bit to granular" and explaining that "*Younger* principles can still apply even before a formal revocation hearing takes place." *Id.* (citing *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 608 (1975) ("Virtually all of the evils at which *Younger* is directed would inhere in federal intervention prior to completion of state appellate proceedings, just as surely as they would if such intervention occurred at or before trial.")). Accordingly, Woodcock's attempt to avoid abstention based on preliminary posture of the proceeding is unavailing.

In short, the undersigned agrees with the *Durstein* court's determination that an "investigation and hearing are two phases of the same proceeding." Likewise, the undersigned agrees with the *Klopp* court's identifying the plaintiff's argument as a "bit too granular." An alternative conclusion would create perverse incentives for plaintiffs to impede the investigation while simultaneously rushing to federal court for a preliminary injunction to halt it. And as the University argues, if the Court were to demarcate between an investigation and formal proceeding, it would discourage the use of investigations which could result in formal proceedings commencing unnecessarily. [Record No. 33 at 4]

### (B) *Middlesex* Factors

*Sprint* dictates that once a proceeding is determined to fit in one of the *NOPSI* categories, then the Court should consider the *Middlesex* factors, specifically, whether: "(1) state proceedings are currently pending; (2) the proceedings involve an important state interest; and (3) the state proceedings will provide the federal plaintiff with an adequate opportunity to raise his constitutional claims." *Univ. of Kentucky*, 860 F.3d at 369 (citing *Middlesex*, 457 U.S. at 432–34); *Aaron*, 914 F.3d at 1018). But these factors "'are not dispositive; they are instead, *additional* factors appropriately considered by the federal court before invoking

- 23 -

*Younger*.'"  *Aaron*, 914 F.3d at 1018 (emphasis in original) (citation modified) (quoting *Sprint*, 571 U.S. at 81).

### (1) Pending State Proceedings

"The first condition for the application of *Younger* abstention is that the state proceeding must be pending on the day the plaintiff sues in federal court—the so-called day-of-filing rule."  *Klopp v. Kentucky Educ. Pro. Standards Bd.*, 724 F. Supp. 3d 682, 688 (E.D. Ky. 2024), *aff'd*, No. 25-5034, 2025 WL 2105146 (6th Cir. July 28, 2025) (citation modified) (citing *Nimer v. Litchfield Twp. Bd. of Trs.*, 707 F.3d 699, 701 (6th Cir. 2013)).  "For *Younger* abstention purposes, state law controls the determination of when the state proceedings began." *James v. Hampton*, 513 F. App'x 471, 474–75 (6th Cir. 2013) (noting that state proceedings to remove judge from office likely began with the filing of a formal complaint) (citing *O'Neill*, 511 F.3d at 643).  An entity's own procedures can also shed light on when those proceedings begin.  *Klopp v. Kentucky Educ. Pro. Standards Bd.*, No. 3:23-CV-00036-GFVT, 2024 WL 5161874, at *1–3 (E.D. Ky. Dec. 18, 2024) (finding that, based on the education board's procedures, the proceeding began with the filing of superintendent's complaint to the board) (collecting cases where courts found similar stages of proceedings to be ongoing for *Younger* abstention).[7]

---

[7] (citing *Berger v. Cuyahoga Cnty. Bar Ass'n*, 983 F.2d 718, 720–23 (6th Cir. 1993) (attorneys' disciplinary proceedings were "pending" following client's Bar complaint and Bar Association's preliminary finding of probable cause, even when the complaint had yet to be certified and a formal hearing had yet to occur); *O'Neill*, 511 F.3d at 643–44 (Ohio judicial disciplinary proceeding began with the filing of a grievance, even though "a grievance is subject to investigation and independent review in order to 'separate the wheat from the chaff' before the filing of a formal complaint")).

In this matter, the proceeding likely commenced on July 18, 2025, when President Capilouto forwarded Woodcock the campus-wide email Capilouto sent that noted that the subject employee "has been removed, pending an investigation, from any teaching and classroom responsibilities." [Record No. 19-3 at 278–80]  That same day, Dean Duff and general counsel Thro emailed letters referencing the commenced investigation.  [*Id.* at 273, 275]  Four days later, investigator Thompson emailed a letter outlining the first four reports it received from outside professors and the specific policies and regulations that Woodcock may have violated.  [Record No. 23-1 at 2–5]  Thus, the undersigned concludes that the proceeding commenced on July 18, 2025 (or July 22, 2025, at the latest), well before the plaintiff filed his Complaint on November 13, 2025.  [*See* Record No. 1.]

## (2) Important State Interests Involved

Woodcock summarily asserts that no important state interest is at stake because the University has not alleged mistreatment of any student or employee; instead, he argues that the investigation alleges only that he "made political and academic statements, some of which offended third parties."  [Record No. 29 at 5]  But contrary to this assertion, the University's investigation implicates important state interests.

As the University defendants contend, Woodcock's argument ignores the University's interests and the purpose of its investigation.  [Record No. 33 at 4]  The University received reports that Woodcock may have violated several University policies, including the Ethical Principles and Employee Code of Conduct, the Institutional Statements of Policy, the Use of Technology Resources Policy, and the Policy on Discrimination and Harassment.  [Record No. 28-1 at 5–8, 20–21]  And as the University argues, because of those complaints, it initiated an investigation into whether Woodcock violated these policies and whether his conduct created

a hostile environment for Jewish members of the University community or otherwise constituted harassment. [Record Nos. 19-3 at 273 (explaining that the investigation is also examining whether his conduct violated Title VI of the Civil Rights Act of 1964 and comparable state laws) and 33 at 4, 8.]

The University's investigation concerning Woodcock's potential violations of its policies and state and federal law directly implicates several important state interests. First, the state has a substantial interest in the orderly operation of its public universities and in preserving the integrity of the tenure process. As a public employer, the University has a compelling interest in administering effective public service through its employees. *See Patterson v. Kent State Univ.*, 155 F.4th 635, 650 (6th Cir. 2025); *see also Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373, 381 (6th Cir. 2024). Consistent with those aims, the University has a strong interest in preventing employee conduct that creates a hostile environment for members of the university community or otherwise constitutes harassment. [*See* Record No. 19-3 at 273.] In addition, the University's obligation to investigate potential violations of Title VI of the Civil Rights Act of 1964 and analogous Kentucky laws further implicates important state interests. [*Id.*] Accordingly, the University's ongoing investigation involves important state interests.

### (3) Adequate Opportunity to Raise Constitutional Claims

Finally, *Younger* abstention requires that a plaintiff have "'an adequate opportunity in the state proceedings to raise constitutional challenges.'" *James*, 513 F. App'x at 475 (quoting *Squire v. Coughlan*, 469 F.3d 551, 556 (6th Cir. 2006)). "'Unless state law clearly bars the imposition of the constitutional claims,' abstention is appropriate." *Id.* (quoting *Moore v. Sims*, 442 U.S. 415, 425 (1979)).

Here, the plaintiff bears the burden of demonstrating that "the state procedurally barred the presentation of [his] claims." *Id.*; *see Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 (1987); *Moore*, 442 U.S. at 432. Moreover, "when a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." *Id.* (quoting *Pennzoil Co.*, 481 U.S. at 15.) Accordingly, the dispositive question is whether state law clearly foreclosed Woodcock from raising his constitutional claims in the investigation and proceedings at the time he filed this lawsuit. *See id.* It did not.

Woodcock asserts that the University's "*ad hoc* process" denies him any meaningful opportunity to raise constitutional objections. [Record No. 29 at 5] He further contends that he cannot challenge the "suspension, banishment, or decision to investigate until after the investigation is completed," at which point he claims the issue will be moot. [*Id.*] He also argues that the investigation provides no mechanism for raising constitutional objections and that he will be unable to review or respond to Thompson's attorney-client privileged report addressing constitutional issues. [*Id.*] But those arguments are unavailing.

Woodcock identifies no reason he cannot raise constitutional objections during the investigation itself. To the contrary, the University expressly invited him to do so. The Notice of Investigation indicated to Woodcock that he could "submit statements, information, or supporting evidence" throughout the investigation. [Record No. 28-1 at 7] More importantly, the investigative process affords Woodcock multiple, meaningful opportunities to raise his constitutional claims, submit evidence, and respond to allegations against him. [Record No. 28-1 at 16–18] Thompson invited Woodcock to submit the names of potential witnesses and any evidence he wished the investigator to consider. [*Id.* at 16–17]

- 27 -

Thompson also provided Woodcock with forty-two written questions addressing the allegations. [Record No. 25-1 at 4–12]  These questions prompted him to describe his conduct and the circumstances surrounding the reported behavior, as set forth in both the Notice of Investigation and the Amended Notice of Investigation.  [*Id.*]  Thompson's final written question explicitly invited Woodcock to "[p]rovide any facts, *legal arguments*, names of witnesses, or any other information [he] deem[s] relevant to this investigation."  [Record No. 25-1 at 12 (emphasis added)]  Woodcock was further informed that his responses would become part of the evidence considered.  [*Id.*]

Additionally, Woodcock has the opportunity to submit a written response after reviewing all of the evidence gathered, to propose follow-up questions for witnesses, and to submit a second written response after reviewing any additional evidence obtained through those follow-up questions.  [Record No. 28-1 at 17–18]  *Nothing* in the record suggests that these procedures foreclosed him from raising constitutional objections in his written submissions or otherwise prevented him from presenting constitutional arguments during the investigation.

Woodcock claims that he was unable to challenge the legality of the investigation itself and the interim measures imposed—specifically, the temporary reassignment of his duties and the directive prohibiting him from entering the law building.  [Record No. 29 at 5]  The University defendants argue that Woodcock fails to carry his burden of showing that "state procedural law barred presentation of his claims." [Record No. 33 at 5 (quoting *Deters*, 2011 WL 127166, at *8).]  They argue that, considering that the University invited him to present legal arguments as part of the investigation and because any subsequent disciplinary hearing would allow him to raise constitutional objection, he has not been barred from presenting

- 28 -

constitutional arguments. [*Id.*] The University defendants also assert that Woodcock's inability to review or respond to Thompson's confidential report does not meet his burden of showing that he was barred from presenting constitutional arguments because it does not prevent him from doing so and he does not have the right to review or respond to the University's attorney-client privileged report. [*Id.*]

The record indicates that Woodcock raised First Amendment concerns with Thompson, as she expressly acknowledged those concerns in her August 25, 2025, letter. [Record No. 28-1 at 17 ("As Professor Woodcock noted, this investigation may raise unique First Amendment issues[.]").] Even if Woodcock had not raised those concerns, his argument would still fail because he has not shown that the process *barred* him from presenting constitutional objections to either the investigation or the interim measures. The governing standard places the burden on Woodcock to demonstrate that the investigative process itself precluded the presentation of his constitutional claims. His failure to identify any procedural barrier is therefore dispositive. As the University defendants demonstrate, the record shows that Woodcock received repeated, explicit, and meaningful opportunities to raise constitutional objections throughout the investigation. [Record No. 23 at 18–19]

Furthermore, the University defendants note that if the investigation results in an adverse decision, Woodcock retains multiple opportunities to raise constitutional objections in subsequent proceedings. [Record Nos. 25 at 8 and 33 at 5] Kentucky law expressly provides that no professor may be removed except for cause and only after receiving a full hearing before the Board of Trustees. KRS § 164.230. This statutory framework affords faculty members—including Woodcock—ample opportunity to raise constitutional claims.

### (C) *Younger* Exceptions

Even when abstention is warranted, a plaintiff still may show that an exception to *Younger* applies. *Univ. of Kentucky*, 860 F.3d at 371. Such exceptions include: "bad faith, harassment, . . . flagrant unconstitutionality of the statute or rule at issue," or where "there is an extraordinarily pressing need for immediate federal equitable relief." *Id.* (citing *Fieger*, 74 F.3d at 750); *Curran v. Fronabarger*, No. 23-6015, 2024 WL 4805017, at *2 (6th Cir. Aug. 27, 2024) (citation modified) (quoting *Kugler v. Helfant*, 421 U.S. 117, 125 (1975)). It is the plaintiff's burden to show that these exceptions are present which prevent the Court from exercising abstention. *Deters v. Davis*, No. CIV.A. 3:11-02-DCR, 2011 WL 127166, at *8 (E.D. Ky. Jan. 14, 2011) (citations omitted).

**Bad Faith and Harassment:** A prosecution is brought in bad faith if it is brought without a reasonable expectation of success. *Deters*, 2011 WL 127166, at *9. "The standard for evaluating claims of bad faith and bias is difficult to meet." *Id.* (citation and quotations omitted). Therefore, "the 'bad faith' exception is narrow and should be granted parsimoniously." *Id.* at *8 (quoting *Hefner v. Alexander*, 779 F.2d 277, 280 (5th Cir. 1985)).

Where a state entity is "incompetent by reason of bias to adjudicate the issues pending before it," abstention is not appropriate. *See Gibson*, 411 U.S. at 577 (finding bias where board members' pecuniary interest disqualified them from adjudicating issue); *see also Watts v. Burkhart*, 854 F.2d 839, 848 (6th Cir. 1988) (citing *Gibson*).

Woodcock makes three arguments that fall under this exception: (1) that the University is investigating a potential Title VI harassment violation with no hope of success; (2) that the *ad hoc* investigation is pretext for silencing unpopular speech; and (3) that President Capilouto is a biased adjudicator. [Record No. 29 at 6–8] He compares the government sanctioned

- 30 -

attempts to silence civil rights activists in *Dombrowski v. Pfister* to the University's actions against him.  380 U.S. 479, 490 (1965).  Further, he argues that because Capilouto instigated the investigation and publicly decried Woodcock's views,[8] he is a biased adjudicator.  [Record No. 29 at 6]  He also asserts that Capilouto is a biased because he has a pecuniary interest in the resolution of the matter "because the federal government has threatened to withdraw federal funding from institutions that tolerate pro-Palestine speech."  [*Id.* (citing *Gibson*, 411 U.S. at 578–79; *Tumey v. Ohio*, 273 U.S. 510, 533 (1927); AAUP & MESA, *Discriminating Against Dissent: The Weaponization of Civil Rights Law to Repress Campus Speech on Palestine*, at 23 (Nov. 2025)).]

The University defendants insist that Woodcock's likening his own situation to the one in *Dombrowski* lacks any factual or evidentiary basis.  [Record No. 33 at 7]  Despite his fears regarding the reason for the investigation, the University maintains that it is merely gathering evidence (which Woodcock has "frustrated and slowed"[9]) to determine whether discipline is appropriate.  [*Id.*]  And unlike the governmental entity in *Dombrowski*, it has made no threats concerning any specific sanction against Woodcock.  [*Id.* at 7–8.]

Regarding Woodcock's claim that Capilouto is functioning as both accuser and adjudicator, the University notes that the investigation was instigated by complaints from third

---

[8] Woodcock also implies that Capilouto's affiliation with pro-Israel organizations will prevent him from fairly deciding whether discipline is warranted.  [*See* Record No. 1 at ¶ 54.]

[9] Woodcock was first asked to return his university-issued laptop, which had been provided for professional use, on July 18, 2025.  [Record No. 10-3 at 275–76]  Woodcock refused to return the laptop unless the university agreed to his demands that certain personal files not be accessed.  [Record No. 26-6]  Woodcock retained separate legal counsel regarding this matter and did not return the laptop until September 2, 2025.  [*Id.* at 17; Record No. 26 at 7]

parties, not the University. [Record No. 33 at 7–8] Therefore, Capilouto cannot be said to be acting as the accuser. [*Id.* at 8.] Additionally, the University asserts that "it was required to investigate" allegations which, if true, may violate Title VI or at a minimum, interfere with its efficient operation. [*Id.* at 7–8 (quoting *Deters*, 2011 WL 127166, at *9).] Because of that triggered duty to investigate, "its investigation cannot 'be called retaliatory or in bad faith.'" [*Id.* at 8 (quoting *Deters*, 2011 WL 127166, at *9).] The University reiterates that it is merely investigating to determine *whether* discipline is warranted. [*Id.* at 7.]

While Woodcock may fear a nefarious intent behind the University's investigation, he has not cleared the bar of demonstrating that the investigation was taken to harass or in bad faith. Instead, the University's investigation was triggered by external complaints. And, as Woodcock concedes, "Title VI requires that universities not show 'deliberate indifference' to 'actual notice' of a hostile environment." [Record No. 34 at 11 (quoting *Wamer v. University of Toledo*, 27 F. 4th 461, 466–67 (6th Cir. 2022).] Dean Duff testified that he believed it would have been negligent for there to be no investigation because the allegations made by third parties, if true, could result in a hostile environment for students.[10] While Woodcock may well be certain that he never "call[ed] for an end to Israel" in the classroom, the University is conducting an investigation (in part) to verify whether that is true. [*Id.* at 3] It is curious why he would want to terminate the very investigation that could exonerate him, considering that he contends that he is being wrongly accused. Prematurely terminating the investigation would

---

[10] So too for Woodcock's claims that even if his speech were not protected, it cannot be "harassment so severe or pervasive and objectively offensive that it effectively bars access to an educational opportunity or benefit offered by the University, as required for a hostile environment to exist." [Record No. 34 at 12] That may be the case, but without investigating further, the University would be unable to make that determination. It cannot, as Woodcock appears to suggest, simply take his word for it.

leave doubts (among students, colleagues, future employers, and the public) rather than ameliorate them as the plaintiff suggests.

In addition to alleging the investigation was commenced in bad faith and to harass, Woodcock argues that the University's chosen investigator (Thompson) further underscores this intent.  [Record No. 34 at 2]  Specifically, he claims that Thompson's ties to a "highly partisan thinktank that explicitly calls for suppression of pro-Palestine speech on campus" suggests that the University defendants' real interest is in "executing a campaign of harassment in retaliation for speech that they consider offensive."  [*Id.* at 2–3 (citing Record No. 1 ¶ 33) (alleging Thompson was "a contributor to a political manifesto titled 'Project 2025' that aims to '[s]ustain support for Israel' and 'ensur[e] Israel has both the military means and the political support and flexibility to take what it deems to be appropriate measures to defend itself'").]  Again, while Woodcock may fear that Thompson may not conduct a fair investigation because of her professional or religious affiliations, he has not shown bad faith or harassment by the University's hiring choice.  It should come as no surprise that the University would seek out an investigator with background knowledge on Israel and Palestine relations due to the nature of the speech at issue.  That hiring choice does not breach the threshold for bad faith or harassment.[11]

This situation is unlike *Dombrowski* because the University was not the impetus for the investigation—third-party complaints were.  Despite noting that following the investigation Capilouto may determine to pursue further sanctions, the University never threatened to take

---

[11] The same is true for his contention that the University's election to not assign him classes on an understudy basis indicates an ill intent.  [Record No. 34 at 3]  The fact that the University did not take some specific action that Woodcock believe to be more appropriate under the circumstances does not demonstrate bad faith or harassment.

any specific action related to Woodcock's speech.  [*See* Record No. 34 at 2, n.4.]  Instead, it listed a number of policies that he may have violated and informed him he was under investigation.  Put simply, Woodcock's fears of a nefarious purpose are not enough for this exception to apply.  Further, there is no indication that this investigation was instigated without a reasonable expectation of finding some violation on Woodcock's part.  *See Deters*, 2011 WL 127166, at *9.

Nor has Woodcock shown that Capilouto would be a biased adjudicator when determining (after reviewing the investigator's report and evidence gathered) whether formal disciplinary procedures are appropriate[12] under the circumstances.  The Court is unconvinced by Woodcock's argument that Capilouto is a biased adjudicator because the federal government has warned that it may withdraw funding for institutions tolerating pro-Palestine speech.  The federal government routinely provides funds with strings attached.  *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987) ("Congress may attach conditions on the receipt of federal funds[.]").  To say that university presidents should be excluded from deciding to commence formal disciplinary proceedings in such an instance would imply that no university president could decide whether to discipline an employee whenever a federal statute was implicated (*e.g.*, Titles VII or IX of the Civil Rights Act) because he or she would have a "pecuniary interest in the outcome."  The University's federal funds do not personally belong to or directly benefit Capilouto as was the case in the matters Woodcock references.  *See*

---

[12] Contrary to Woodcock's implications otherwise, Capilouto would not be deciding "what sanction to impose upon him" after reviewing Thompson's report and evidence garnered.  [*See* Record No. 34 at 2–3.]  Instead, Capilouto would be deciding whether discipline would be appropriate and whether to pursue further sanction-related *proceedings* that the University has ensured would follow state law and University policy and procedures.

*Gibson*, 411 U.S. at 578–79 (independent optometrists running licensing board had pecuniary bias where delicensing corporate optometrists would eliminate competitors); *Tumey*, 273 U.S. at 532 (pecuniary bias found with mayor acting as a judge and collecting fees from defendants found to be violating alcohol prohibition went *directly* to the mayor for his work as judge).

Nor does Woodcock demonstrate bias because Capilouto called his purported views "repugnant." To be sure, the email Woodcock references never mentioned his name as the employee being disciplined. That aside, the University must be allowed to distance itself from any ideology or speech that threatens its efficient operations or undermines its mission or ethos. Whether Capilouto finds Woodcock's views repugnant personally does not dictate whether Woodcock has indeed violated any University policies or Title VI, subjecting him to sanctions. And Woodcock has not offered any credible evidence that Capilouto would not fairly decide whether formal proceedings are warranted. That Capilouto has ties with pro-Israel groups is likewise insufficient to show he would be a biased adjudicator regarding that question.

**Flagrant Unconstitutionality:** An exception to *Younger* applies when the statute or rule at issue is flagrantly unconstitutional. *Univ. of Kentucky*, 860 F.3d at 371. It requires that a statute "'be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.'" *Id.* (quoting *Younger*, 401 U.S. at 53–54 (citation and internal quotations omitted). "Showing such flagrant unconstitutionality is a high bar." *Id.*

Woodcock asserts that three examples within the IHRA's definition of antisemitism are flagrantly unconstitutional. He argues that "there is no facts under which the Constitution would permit the government to sanction speech solely because it criticizes a particular government or opposes self-determination based on religious affiliation, as application of those

examples would require." [Record No. 29 at 6–7] But this assertion is conclusory. It fails to demonstrate that the IHRA definition is unconstitutional in every application and in every conceivable context, as required to invoke this narrow exception to *Younger* abstention. Even if Woodcock successfully argued that the policy was unconstitutional as applied to him, that would not suffice to defeat *Younger* abstention. As the Sixth Circuit has made clear, to satisfy the flagrant unconstitutionality exception, a plaintiff must show not only that a policy "was applied in an unconstitutional manner," but also that the policy is facially unconstitutional. *Univ. of Kentucky*, 860 F.3d at 371.

Woodcock's broader contention that all his speech is constitutionally protected and that the University's investigation is obviously unconstitutional also fails. [*See* Record No. 19-1 at 14–24.] When a public employee brings a First Amendment claim against his employer, he must first identify protected speech. *DeCrane v. Eckart*, 12 F.4th 586, 594 (6th Cir. 2021). That speech must then "survive three inquiries to fall within the First Amendment." *Id.* The First Amendment protects this speech only if it addresses a matter of public concern, if the employee speaks as a private citizen rather than pursuant to his official duties, and only if the employee's interest in speaking outweighs the employer's interest in efficient operations. *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 146-47 (1983); *Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (2006); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)).

The University argues that it received complaints indicating that Woodcock was potentially speaking on behalf of the University. [Record No. 23 at 3 (citing *Garcetti*, 547 U.S. at 421–22 (2006).] Specifically, he attended academic conferences (that may have been paid for by University funds), used his University email to spam various listserves with his

views, and signed his petition as a professor at the University of Kentucky J. David Rosenberg College of Law.  [*Id.* at 13]  Accordingly, the University's investigation into Woodcock's speech does not meet the high standard of being "flagrantly and patently" unconstitutional. Circumstances exist in which the University *can* lawfully restrict the speech of its employees. Therefore, an investigation into an employee's speech cannot be deemed flagrantly unconstitutional without more.  The University defendants acknowledge that, because the investigation remains ongoing, they cannot yet determine whether such circumstances apply here and expressly concede that the investigation may ultimately conclude that Woodcock's speech is protected.  [Record Nos. 26 at 6 and 33 at 10]  Regardless, Woodcock has failed to carry his burden of demonstrating that the challenged IHRA definitional examples or the University's investigation into his speech is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.'"  *Univ. of Kentucky*, 860 F.3d at 371 (6th Cir. 2017) (quoting *Younger*, 401 U.S. at 53–54 (citation and internal quotations omitted).

**Extraordinary Circumstances:** The United States Supreme Court in *Younger* explained that "a movant must show not merely the 'irreparable injury' which is a normal prerequisite for an injunction, but also must show that the injury would be 'great and immediate'" for this exception to apply.  *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 601 (1975) (quoting *Younger*, 401 U.S. at 46).  And Woodcock has not met this demanding standard.  He has failed to establish the existence of any extraordinary circumstances that would justify this Court's refusal to abstain under *Younger*.  Specifically, Woodcock has not shown that abstention would subject him to a great and immediate injury.

- 37 -

Woodcock argues that he lacks timely access to constitutional review because he cannot formally respond to the allegations or challenge the constitutionality of the proposed action until the investigation concludes and during that time, he remains reassigned from teaching duties and barred from the law building. [*Id.*] This argument is unpersuasive, however. As discussed at length above, the University's investigative process affords Woodcock multiple meaningful opportunities to respond to the allegations and to raise constitutional claims during the course of the investigation. Woodcock has been expressly invited throughout the investigation to introduce evidence and has been asked to present legal arguments. [Record Nos. 28-1 at 16–17 and 25-1 at 3–10] Furthermore, the record indicates that Woodcock did present constitutional arguments to Thompson regarding the investigation. [Record No. 28-1 at 17] Thus, Woodcock has had multiple opportunities to challenge the investigation and the interim measures imposed during it on constitutional or other grounds.

Moreover, Woodcock has failed to demonstrate an irreparable harm that is both great and immediate would occur if this Court abstains under *Younger*. While he argues that his reassignment away from the classroom and exclusion from the law building have caused him harm, this does not rise to the level of a great and immediate injury. Woodcock himself admitted during the hearing on the preliminary injunction that he continues to receive his full salary and benefits, and the University confirmed that the reassignment and temporary restrictions will end once the investigation is complete, assuming no further adverse actions are taken. Nonetheless, Woodcock likens teaching and research to the playing of a musical instrument, a skill that "decays rapidly without practice," and claims harm due to his inability to teach and conduct research during the investigation. [Record No. 34 at 4]

Although Woodcock is temporarily removed from teaching, there is no evidence in the record to suggest that his ability to conduct research has been substantially impaired.  He points to his denial of access to the law library and an investigator's directive to "'stop immediately' his speech on Palestine."  [Record No. 34 at 4 (quoting Record No. 19-3 at 283)]  However, the letter cited by Woodcock does not order him to stop discussing Palestine. Instead, it instructs him to cease any actions that may violate University policy.  [Record No. 19-3 at 283]  Additionally, since most legal research can be conducted electronically, the lack of access to the law library does not present a convincing barrier to Woodcock's ability to research.  In any event, the possibility that Woodcock may become less practiced at teaching or research does not constitute great and immediate irreparable harm.

Woodcock also cites disruptions to his professional relationships, fear of speaking publicly about Palestine, potential reputational damage, and emotional distress.  [Record No. 34 at 8]  While the Court acknowledges that these may be real hardships, they do not rise to the exceptionally high standard required for federal judicial intervention.  Absent relief, Woodcock faces the stresses and expense of participating in the investigation and defending himself.  But "[m]ere injuries, however substantial, in terms of money, time, and energy necessarily expended . . . are not enough" to warrant federal judicial intervention. *Choudhry*, 2016 WL 6611067, at *7 (quoting *Sampson v. Murray*, 415 U.S. 61 (1974)).

While reassigned to professional development duties, Woodcock remains a tenured faculty member with full pay and benefits from the University.  Such "'disruption of workers' lives and habits' does not generally threaten irreparable harm."  *Id.* (quoting *Graphic Commc'ns Conference—Int'l Bhd. of Teamsters Local 404M v. Bakersfield Californian*, 541 F. Supp. 2d 1117, 1125–26 (E.D. Cal. 2008); citing *Levich v. Liberty Cent. Sch. Dist.*, 258 F.

Supp. 2d 339, 344–45 (S.D.N.Y. 2003)).  Finally, although Woodcock's claimed emotional

distress and disruption to his life cause by the investigation may be significant, it does not

justify federal interference with the University's proceedings.

## IV. Conclusion

The circumstances of this case and the arguments the plaintiff makes do not save him

from *Younger* abstention.  Here, a state university is investigating third-party complaints of a

professor's speech.  And as is customary for the University investigating claims that potentially

impact the educational environment, Woodcock was removed from teaching and the law

building as an interim measure during the investigation.  Abstention is appropriate because

those removals cannot be separated from the investigation and interference clearly would result

if the Court were to enjoin any aspect of the investigation.

That said, "'a federal court's discretion to abstain from exercising jurisdiction does not

extend so far as to permit a court to dismiss or remand, as opposed to stay, an action at law'"

when a plaintiff seeks damages in addition to injunctive relief.  *James*, 513 F. App'x at 476

(quoting *Superior Beverage Co., Inc. v. Schieffelin & Co.*, 448 F.3d 910, 913 (6th Cir. 2006)

and citing *Gray v. Bush*, 628 F.3d 779, 785 (6th Cir. 2010)); *see also Univ. of Kentucky*, 860

F.3d at 372–73 ("We are not able to assess the full measure of potential damages or evaluate

the extent of the harm when another hearing will soon occur.  Depending on what happens at

the next hearing, Doe's federal court claim and alleged damages may change.").  Therefore, a

stay is appropriate at this time because Woodcock also seeks damages.  [*See* Record No. 1 at

38–39.]  Once the investigation is completed or any subsequent disciplinary procedures have

concluded and claims have been exhausted, the stay will be lifted, and Woodcock will be free

to amend his Complaint if necessary.  *See Univ. of Kentucky*, 860 F.3d at 373.

Based on the foregoing analysis, it is hereby **ORDERED** as follows:

1.     Defendants University of Kentucky, Eli Capilouto, Robert DiPaola, William Thro, and James Duff's Motion to Abstain [Record No. 25] is **GRANTED**.  This matter is **STAYED** pending the completion of the investigation and subsequent proceedings, if initiated.

2.     Plaintiff Ramsi Woodcock's Motion for a Preliminary Injunction [Record No. 19] is **DENIED**.

3.     Defendants University of Kentucky, Eli Capilouto, Robert DiPaola, William Thro, and James Duff's Motion to Dismiss [Record No. 23] is **DENIED**, without prejudice.

4.     The parties are directed to tender joint status reports every **thirty days**, apprising the Court of the status of the investigation as well as any other future proceedings.

Dated:  January 8, 2026.

Danny C. Reeves, District Judge
United States District Court
Eastern District of Kentucky