**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

---

Ramsi A. Woodcock,

*Plaintiff*,

v. Case No. 5:25-cv-00424-BJB

University of Kentucky et al.,

*Defendants*.

---

**PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, FOR AN EXPEDITED RULING ON HIS MOTION FOR A PRELIMINARY INJUNCTION AND AN ORDER PRESERVING THE STATUS QUO**

## TABLE OF CONTENTS


Table of Authorities .......... iv

Introduction .......... 1

Background .......... 2

A. The Investigation and the Motion for a Preliminary Injunction .......... 2

B. The Nine-Month Hold .......... 3

C. The Reversal, and Defendants' Acceleration of the Investigation .......... 3

D. Related Proceedings .......... 4

Argument .......... 5

I. The Court Should Enter a Temporary Restraining Order Preserving the Status Quo Until It Rules on the Preliminary-Injunction Motion .......... 5

A. Likelihood of Success .......... 5

1. Woodcock's Speech Is Protected .......... 6

a. It Addresses Matters of Public Concern .......... 6

b. The Speech Is Protected Private Citizen Speech .......... 7

c. In the Alternative, the Speech Is Protected Academic Speech .......... 8

d. Title VI Does Not Strip the Speech of Protection .......... 9

e. Defendants Cannot Show Disruption .......... 9

2. Defendants Took Adverse Action .......... 11

3. The Speech Caused the Adverse Actions .......... 12

4. In the Alternative, Woodcock Is Likely to Succeed on His Due Process Claim .......... 17

B. Irreparable Harm .......... 18

C. Balance of Harms and Public Interest .......... 19

D. No Abstention Doctrine or Stay Justifies Withholding Relief .......... 20

II. In the Alternative, Woodcock Requests That the Court Rule on the Preliminary-Injunction Motion by October 9, 2026 ..........22

III. In the Alternative, the Court Should Enter a Narrow Order Preserving Its Jurisdiction .........23

IV. At a Minimum, the Court Should Convene a Prompt Conference and Invite Defendants to Restore the Voluntary Hold..........24

Notice, Bond, and Hearing..........24

Conclusion ..........24

Index of Exhibits ..........26

## TABLE OF AUTHORITIES

***Cases***


*Bart v. Telford*,
677 F.2d 622 (7th Cir. 1982) .......... 12

*Bell v. Johnson*,
308 F.3d 594 (6th Cir. 2002) .......... 11

*Blick v. Ann Arbor Pub. Sch. Dist.*,
105 F.4th 868 (6th Cir. 2024) .......... 11

*Clinton v. Jones*,
520 U.S. 681 (1997) .......... 21

*Colorado River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976) .......... 20

*Connick v. Myers*,
461 U.S. 138 (1983) .......... 10

*Counterman v. Colorado*,
600 U.S. 66 (2023) .......... 8

*Davis v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) .......... 9, 15

*DeCrane v. Eckart*,
12 F.4th 586 (6th Cir. 2021) .......... 7

*Elrod v. Burns*,
427 U.S. 347 (1976) .......... 18

*Ex parte Young*,
209 U.S. 123 (1908) .......... 23

*FDIC v. Mallen*,
486 U.S. 230 (1988) .......... 17

*Flagner v. Wilkinson*,
241 F.3d 475 (6th Cir. 2001) .......... 23

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
23 F.3d 1071 (6th Cir. 1994) .......... 19

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) .......... 7

*Gunasekera v. Irwin*,
551 F.3d 461 (6th Cir. 2009) .......... 17

*Habich v. City of Dearborn*,
331 F.3d 524 (6th Cir. 2003) ... 18

*Hardy v. Jefferson Cmty. Coll.*,
260 F.3d 671 (6th Cir. 2001) ... 10

*Haw. Hous. Auth. v. Midkiff*,
467 U.S. 229 (1984) ... 20

*Hulen v. Yates*,
322 F.3d 1229 (10th Cir. 2003) ... 17

*Klay v. United Healthgroup, Inc.*,
376 F.3d 1092 (11th Cir. 2004) ... 23

*Kubala v. Smith*,
984 F.3d 1132 (6th Cir. 2021) ... 11

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936) ... 21

*Lemaster v. Lawrence Cnty.*,
65 F.4th 302 (6th Cir. 2023) ... 6, 13

*Levin v. Harleston*,
966 F.2d 85 (2d Cir. 1992) ... 19

*McKennon v. Nashville Banner Publ'g Co.*,
513 U.S. 352 (1995) ... 14

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021) ... 8

*Moltan Co. v. Eagle-Picher Indus., Inc.*,
55 F.3d 1171 (6th Cir. 1995) ... 24

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ... 20

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) ... 6

*Muldrow v. City of St. Louis*,
601 U.S. 346 (2024) ... 12

*Myers v. City of Centerville*,
41 F.4th 746 (6th Cir. 2022) ... 6, 9

*Ne. Ohio Coal. for the Homeless v. Blackwell*,
467 F.3d 999 (6th Cir. 2006) ... 5

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
491 U.S. 350 (1989) ........ 21

*Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*,
112 F.4th 373 (6th Cir. 2024) ........ 7

*Obama for Am. v. Husted*,
697 F.3d 423 (6th Cir. 2012) ........ 5, 22

*Ohio Envtl. Council v. U.S. Dist. Ct.*,
565 F.2d 393 (6th Cir. 1977) ........ 21

*Patterson v. Kent State Univ.*,
155 F.4th 635 (6th Cir. 2025) ........ 7

*Pickering v. Bd. of Educ.*,
391 U.S. 563 (1968) ........ 9

*Porter v. Lee*,
328 U.S. 246 (1946) ........ 23

*Rankin v. McPherson*,
483 U.S. 378 (1987) ........ 7

*Regents of Univ. of Mich. v. Ewing*,
474 U.S. 214 (1985) ........ 16

*Snyder-Hill v. Ohio State Univ.*,
48 F.4th 686 (6th Cir. 2022) ........ 9

*Speech First, Inc. v. Schlissel*,
939 F.3d 756 (6th Cir. 2019) ........ 19

*Sprint Commc'ns, Inc. v. Jacobs*,
571 U.S. 69 (2013) ........ 20

*StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*,
158 F.4th 1 (1st Cir. 2025) ........ 9

*Staub v. Proctor Hosp.*,
562 U.S. 411 (2011) ........ 14

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957) ........ 1, 18

*Thaddeus-X v. Blatter*,
175 F.3d 378 (6th Cir. 1999) (en banc) ........ 5, 6, 12

*Thomas v. Cohen*,
304 F.3d 563 (6th Cir. 2002) ........ 17

*United States v. Campbell*,
168 F.3d 263 (6th Cir. 1999) .......... 20

*United States v. James Daniel Good Real Prop.*,
510 U.S. 43 (1993) .......... 17

*Wamer v. Univ. of Toledo*,
27 F.4th 461 (6th Cir. 2022) .......... 9

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) .......... 19

*Woodcock v. Univ. of Ky.*,
No. 26-5057 (6th Cir. Aug. 24, 2026) .......... *passim*

*Younger v. Harris*,
401 U.S. 37 (1971) .......... 1, 3

*Zwickler v. Koota*,
389 U.S. 241 (1967) .......... 21

***Statutes***

28 U.S.C. § 1651(a) .......... 23

***Federal Rules***

Fed. R. Civ. P. 25(d) .......... 1

Fed. R. Civ. P. 26(d)(1) .......... 15

Fed. R. Civ. P. 65(b)(1)(B) .......... 24

***Other Authorities***

*Scholarship*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/scholarship .......... 8

U.S. Dep't of Educ., Off. for C.R., *Dear Colleague Letter: Protecting Students from Discrimination, such as Harassment, Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics* (May 7, 2024) .......... 9

## INTRODUCTION

This case challenges an investigation into Professor Woodcock's political speech, of the kind the Supreme Court warned against nearly 70 years ago in *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957), and the suspension and ban tied to the unconstitutional investigation. This Court previously denied the injunction motion on the basis of the abstention doctrine of Younger v. Harris. DN 37. The Sixth Circuit reversed the abstention order and remanded "for consideration of Woodcock's motion for a preliminary injunction" to halt the investigation, suspension, and ban. *Woodcock v. Univ. of Ky.*, No. 26-5057, slip op. at 5 (6th Cir. Aug. 24, 2026). The day after that decision, Defendants[1] ended the pause in the investigation that they had kept in place for nine months while the courts considered that motion. They have refused any further pause, and the remaining steps, a Second Evidence Review with a seven-day response window, the investigative report, and findings from the President concluding the investigation, are imminent. If the investigation is completed before this Court rules, the remand will have been overtaken by the conduct that the motion asks the Court to enjoin.

Woodcock therefore asks the Court, in order of preference, to:

1. enter a temporary restraining order halting the remaining stages of the investigation, and lifting the reassignment tied to it, until the Court rules on the pending motion for a preliminary injunction (DN 19); or
2. in the alternative, rule on the pending motion for a preliminary injunction (DN 19) by October 9, 2026, on an expedited schedule; or

[1] In this motion, "Defendants" refers to the University of Kentucky officials sued here: President Eli Capilouto, Provost Robert DiPaola, General Counsel William Thro, and Dean James Duff, whose successor, Dean Gregory Van Tatenhove, is automatically substituted in his official capacity under Fed. R. Civ. P. 25(d). The motion seeks no relief against Defendants Linda McMahon, Secretary of Education, or Russell Coleman, Attorney General of Kentucky.

3. in the alternative, enter an order preserving the Court's jurisdiction by directing Defendants not to conduct the Second Evidence Review, issue the investigative report, or issue any findings or sanction until the Court rules; or
4. at a minimum, convene a prompt status conference and invite Defendants to restore the voluntary hold on the investigation they maintained from December 2025 until August 2026.

None of these requests asks the Court to decide the merits on a new record. The preliminary-injunction record was fully developed before the Court abstained. What has changed is Defendants' refusal to pause the investigation to allow a court to rule on its constitutionality.

## BACKGROUND

### A. The Investigation and the Motion for a Preliminary Injunction

After Woodcock circulated a petition to law professors on July 6, 2025, the University reassigned him to "professional development," barred him from the University of Kentucky J. David Rosenberg College of Law ("law school"), and opened an investigation into his speech about Palestine. *Woodcock*, slip op. at 2. Its investigator described the stages of the investigation in an August 25, 2025 letter: fact-gathering; a First Evidence Review with 14 days to respond; a Second Evidence Review with 7 days to respond; a privileged report to the General Counsel; and a letter of findings and any sanction from the President. Thompson Letter, Aug. 25, 2025 (DN 19-15) at 1569–71.[2]

Woodcock sued on November 13, 2025 and moved for a preliminary injunction to stop the investigation, suspension, and ban on December 12, 2025. DN 1; DN 19. This Court held an

[2] Record citations give the district-court docket entry ("DN") and the PageID number stamped in the CM/ECF header. Citations to "Dkt." refer to the Sixth Circuit docket in No. 26-5057. "First NOI" and "Second NOI" refer to the July 22, 2025 Notice of Investigation and the September 8, 2025 Amended Notice of Investigation.

evidentiary hearing on December 19, 2025. Hr'g Tr. (DN 40). On January 8, 2026, the Court abstained under *Younger v. Harris*, 401 U.S. 37 (1971), and denied the motion without reaching the merits. DN 37.

**B. The Nine-Month Hold**

On December 1, 2025, the investigator sent Woodcock forty-two written questions related to his speech about Palestine. Thompson Written Questions, Dec. 1, 2025 (DN 26-4) at 1455–64. When Woodcock's counsel asked to defer his answers until the Court ruled on the preliminary-injunction motion, the investigator agreed, warning that "any delay in receiving Professor Woodcock's responses to the written questions will delay this investigation." Ex. 2 (Dec. 3–4, 2025 emails). She twice extended the hold during the appeal: first until the Sixth Circuit ruled on the motion for an injunction pending appeal, and then until 14 days after it ruled on the merits of the appeal. *Id.* (Jan. 23 and Feb. 20, 2026 emails). Despite this, Defendants fought Woodcock's efforts to expedite the appeal at every step, and the Sixth Circuit fast-tracked the case only in part. Univ. Appellees' Resp. Emergency Mot. Ruling Inj. Pending Appeal, *Woodcock v. Univ. of Ky.*, No. 26-5057 (6th Cir. Feb. 12, 2026), Dkt. 29 (opposing expedited ruling); Univ. Appellees' Resp. Mot. Expedite Appeal, Dkt. 40-1 (Mar. 2, 2026) (opposing expedited briefing); Univ. Appellees' Resp. Emergency Mot. Issuance Mandate, Dkt. 104 (Sept. 2, 2026) (opposing prompt mandate); Univ. Appellees' Pet. Panel Reh'g, Dkt. 106 (Sept. 4, 2026); Order, Dkt. 41 (Mar. 4, 2026).

**C. The Reversal, and Defendants' Acceleration of the Investigation**

On August 24, 2026, the Sixth Circuit held that the investigation is not an ongoing proceeding for *Younger* purposes because it "remain[s] in a preliminary, investigatory stage," and remanded "for consideration of Woodcock's motion for a preliminary injunction." *Woodcock*, slip op. at 4–5. The next day, the investigator set a September 8 deadline for the written answers. Ex. 2 (Aug. 25, 2026

email). Woodcock asked her to keep the hold in place until this Court could rule on the constitutionality of the investigation on remand; she refused. *Id.* (Sept. 1, 2026 emails). Woodcock notified the Sixth Circuit, which issued its mandate on September 18, 2026. Appellant's Notice New Dev., *Woodcock v. Univ. of Ky.*, No. 26-5057 (6th Cir. Sept. 2, 2026), Dkt. 103; Mandate, *Woodcock v. Univ. of Ky.*, No. 26-5057 (6th Cir. Sept. 18, 2026), Dkt. 109.

To avoid being treated as having abandoned the process, Woodcock answered the questions on September 9, 2026, under protest. Ex. 1 ¶ 6. On September 11, the investigator announced that she had "concluded the Fact-Gathering Stage" and opened the First Evidence Review. Ex. 3 (Sept. 11, 2026 email). She refused a request to extend its deadline, explaining that she had "essentially granted a nine-month extension." *Id.* (Sept. 17, 2026 email). Woodcock submitted follow-up questions for twenty-two witnesses on September 25–26. *Id.* (Sept. 26, 2026 emails). The investigator then removed Woodcock's access to the evidence until the Second Evidence Review. *Id.*

What remains is the Second Evidence Review, with seven days to respond, followed by the report and the President's findings. Thompson Letter, Aug. 25, 2025 (DN 19-15) at 1570–71. The investigator has given no date for the Second Evidence Review, which can begin at any time, and she has refused every extension request since August 25, 2026. Ex. 2; Ex. 3.

**D. Related Proceedings**

Interim Dean James Duff imposed the reassignment and ban on July 18, 2025. Duff Letter, July 18, 2025 (DN 19-3) at 493. On July 20, 2026, Gregory Van Tatenhove replaced him as Dean. Ex. 1 ¶ 4. Two days later, Woodcock wrote to the new Dean asking him to lift the reassignment and ban. *Id.*; Ex. 6. In a letter dated August 21, 2026, Dean Van Tatenhove, who the University says has "absolute authority to determine the assignments of a faculty member," declined, stating that "a review of your status will not be conducted until the investigation is complete." Thro Letter, Sept. 19, 2025 (DN 19-4) at 1066; Ex. 6. On September 10, 2026, Woodcock sought a temporary

restraining order in Franklin Circuit Court in Kentucky. *See* Ex. 5 ¶ 4. On September 24, 2026, that court denied the request without prejudice, directed Defendants to notify the court when the investigative report is complete and to give Woodcock ten days' notice before any further disciplinary action, and asked Defendants to reconsider the campus ban, noting that the record "contains no evidence of any conduct on Plaintiff's part that justifies his being trespassed from the campus of the College of Law." Ex. 5 ¶¶ 4–5. On September 25, 2026, Defendants moved here for judgment on the pleadings. DN 63. On September 28, 2026, four days after the state court's order, Dean Van Tatenhove lifted the ban but not the reassignment, which he said "will not be reviewed until the investigation is complete." Ex. 8. The lifting of the ban was a discretionary decision that the Dean may reverse at any time. *See* Ex. 8.

## ARGUMENT

### I. The Court Should Enter a Temporary Restraining Order Preserving the Status Quo Until It Rules on the Preliminary-Injunction Motion

A temporary restraining order is governed by "the same factors considered in determining whether to issue a TRO or preliminary injunction": likelihood of success, irreparable harm, harm to others, and the public interest. *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). These factors "are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Id.* When the claim is constitutional, likelihood of success "often will be the determinative factor." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

### A. Likelihood of Success

Woodcock is likely to prevail on his First Amendment retaliation claim. He must show that (1) he engaged in protected conduct, (2) Defendants took an adverse action that would deter a person of ordinary firmness from continuing that conduct, and (3) the adverse action was motivated at least in part by the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).

Once he makes that showing, the burden shifts to Defendants to show that they would have acted anyway, *Lemaster v. Lawrence Cnty.*, 65 F.4th 302, 309 (6th Cir. 2023), or that the University's interest in avoiding disruption outweighs his interest in speaking, *Myers v. City of Centerville*, 41 F.4th 746, 764–65 (6th Cir. 2022).

**1. Woodcock's Speech Is Protected**

The protected speech on which this claim rests is Woodcock's circulation of the Petition for Military Action Against Israel on July 6, 2025, when he posted a link to it in four online discussion groups for law professors hosted by the Association of American Law Schools. Am. Compl. ¶ 54 (DN 36) at 1633. That is the speech President Capilouto's July 18 announcement named when it removed Woodcock from the classroom. Capilouto Email, July 18, 2025 (DN 19-3) at 496–97. To prevail, Woodcock need show only that this speech was protected and that the adverse actions were "motivated at least in part by" the speech. *Thaddeus-X*, 175 F.3d at 394. The burden then shifts to Defendants to prove that they would have taken the same actions had he never circulated the petition. *Lemaster*, 65 F.4th at 309. They can carry that burden only by pointing to other conduct that is unprotected and that would independently have led to the same result. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). As shown below, the other speech the notices of investigation swept in is protected as well. The Court need not reach that other speech, however, to find that Woodcock is likely to succeed.

**a. It Addresses Matters of Public Concern**

Every statement cited in the Notices of Investigation, including the petition, concerns colonization, apartheid, genocide in Israel and Palestine, or military action to rectify the foregoing. First NOI (DN 19-15) at 1558–60; Second NOI (DN 19-15) at 1573–74. Defendants have never meaningfully disputed that these are matters of public concern. Defendants contend, instead, that

when speech is "disrespectful, demeaning, rude, and insulting, and is perceived that way in the workplace, the government employer is within its discretion to take disciplinary action." Defs.' Resp. Mot. Prelim. Inj. (DN 26) at 1415. The rule that "disrespectful" speech may fall outside the public-concern category applies to abusive, profanity-laced speech directed at colleagues or supervisors in the workplace. *Patterson v. Kent State Univ.*, 155 F.4th 635, 650 (6th Cir. 2025). Defendants have never alleged that Woodcock's speech is that. *See* First NOI (DN 19-15) at 1558–59; Second NOI (DN 19-15) at 1573–74. They have suggested that Woodcock's speech is inappropriate. Defs.' Resp. Mot. Prelim. Inj. (DN 26) at 1415; First NOI (DN 19-15) at 1559; Capilouto Email, July 18, 2025 (DN 19-3) at 496–97. But "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373, 381 (6th Cir. 2024) (citing *Rankin v. McPherson*, 483 U.S. 378, 387 (1987)).

**b. The Speech Is Protected Private Citizen Speech**

The question is not whether a professor used his employer's resources or was identified by his affiliation when speaking. Speech in the workplace necessarily involves both, and "[e]mployees in some cases may receive First Amendment protection for expressions made at work." *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006). The question is whether the employee spoke as the government's agent, considering the motivation, setting, and audience of the speech. *DeCrane v. Eckart*, 12 F.4th 586, 595–96 (6th Cir. 2021). Woodcock posted the petition to discussion groups hosted by another organization (the Association of American Law Schools) and spoke at conferences hosted by other institutions (George Mason and the Chinese University of Hong Kong) to outside audiences. Am. Compl. ¶ 54 (DN 36) at 1633; First NOI (DN 19-15) at 1558–59. The petition stated that "[i]nstitutional affiliations . . . do not imply institutional endorsement." Petition for Military Action Against Israel (Wayback Machine capture, July 18, 2025), Ex. 7; Hr'g Tr. (DN 40) at 1878. And the University itself treated the speech as personal. Dean Duff testified that he acted because "the

taxpayers of Kentucky should not have to fund someone's personal viewpoints" and because Woodcock could not "use university . . . resources to espouse [his] personal political viewpoints." *Id.* at 1993, 1995. Asked whether the petition was "academic work," he answered: "It wasn't." *Id.* at 1995.

**c. In the Alternative, the Speech Is Protected Academic Speech**

Even speech made in a professor's official role is protected when it is part of "core academic functions, such as teaching and scholarship." *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021). *Meriwether* protected a professor's speech "whether that speech is germane to the contents of the lecture or not." *Id.* at 507. The only classroom speech it placed outside that protection was "non-ideological ministerial" speech such as "call[ing] roll at the start of class." *Id.* Defendants' proposed rule, that academic speech is protected only when it is on topic and within the speaker's expertise, appears in no decision. *See* Defs.' Mot. J. Pleadings (DN 63) at 2213, 2216. It would also force scholars to guess at vague, content-based lines, which is a recipe for self-censorship. *See Counterman v. Colorado*, 600 U.S. 66, 75 (2023) ("A speaker may be unsure about the side of a line on which his speech falls. . . . The result is 'self-censorship' of speech that could not be proscribed . . . ."). In any event, Woodcock taught international law, the field that governs the questions he addressed. Hr'g Tr. (DN 40) at 1815–21.

Woodcock's posting and discussion of his petition, addressed to "[l]aw scholars," in AALS discussion groups; his work on the website of the Antizionist Legal Studies Movement, including the petition itself; his remarks and papers at two academic conferences; and his discussion of the law of free speech on campus with a guest expert are all examples of scholarship, which Webster's defines as the "activity . . . of a scholar." Ex. 7; Woodcock Decl. ¶¶ 8, 19, 38–41, Dec. 12, 2025 (DN 19-3) at 221–22, 226, 228–29; *Scholarship*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/scholarship (last visited Sept. 28, 2026).

**d. Title VI Does Not Strip the Speech of Protection**

Title VI liability arises only when a school "had actual notice and exhibited deliberate indifference" to harassment of persons "participating or at least attempting to participate" in its programs. *Wamer v. Univ. of Toledo*, 27 F.4th 461, 466 (6th Cir. 2022); *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 708 (6th Cir. 2022). It does not authorize retaliation against protected speech, and it cannot override the Constitution. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649 (1999) ("it would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims"). Nor could Woodcock's speech have violated Title VI. When Defendants acted, no member of the University community had complained. Hr'g Tr. (DN 40) at 1982. The complainants were professors at other schools, who are not persons "attempting to participate" in a University program. Hr'g Tr. (DN 40) at 1949, 1980–82. *See Snyder-Hill*, 48 F.4th at 708. And anti-Zionist speech, standing alone, does not create a hostile environment. *See StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1, 18 (1st Cir. 2025) ("We therefore reject plaintiffs' claimed right to stifle anti-Zionist speech by labeling it inherently antisemitic."). The Department of Education has said the same: "Speech expressing views regarding a particular country's policies or practices is protected by the First Amendment and does not necessarily implicate federal civil rights laws," and "[t]he offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a hostile environment under Title VI." U.S. Dep't of Educ., Off. for C.R., *Dear Colleague Letter: Protecting Students from Discrimination, such as Harassment, Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics* 5, 16 (May 7, 2024).

**e. Defendants Cannot Show Disruption**

Under *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), Defendants bear the burden of showing that the potential for disruption outweighs Woodcock's interest in speaking. *Myers*, 41 F.4th at 764.

That burden rises with the importance of the speech, *Connick v. Myers*, 461 U.S. 138, 150, 152 (1983), and speech on war and genocide is at the core of the First Amendment, *see id.* at 145. "[U]ndifferentiated fear or apprehension of disturbance" is not enough, *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 682 (6th Cir. 2001), even when pressure comes from an influential outsider, *id.* at 681–82.

Defendants do not identify any actual disruption that was caused by Professor Woodcock's speech, or any circumstances suggesting that disruption would be caused by refraining from subjecting him to an investigation and suspension because of that speech. *See* Defs.' Resp. Mot. Prelim. Inj. (DN 26) at 1414–15. Interim Dean Duff reassigned and banned Woodcock without a single complaint from a University student or faculty member. Hr'g Tr. (DN 40) at 1982. Although Defendants had taken statements from more than twenty people by December 2025, they called no witnesses at the hearing and submitted no statements from anyone in the University community. Thompson Decl. (DN 26-4) at 1451. The investigation has turned up no reports that Woodcock said anything controversial in any of his classes or promoted his blog, antizionist.net, or X account to his students. Ex. 1 ¶ 9. The investigation has turned up only what Defendants knew at the outset, which is that Woodcock has engaged fellow scholars in debate about Palestine, is an advocate of Palestinian rights in private life, and that his faculty colleagues at University of Kentucky—if not the "outside interests" pushing the University to act—respect his right to speak. Ex. 1 ¶ 9; Hr'g Tr. (DN 40) at 1980.

Defendants argue that they must complete their investigation to determine whether there is any possibility of disruption. Defs.' Resp. Mot. Prelim. Inj. (DN 26) at 1414–15 (cleaned up). But that would mean that no fishing expedition, however unfounded, could violate the First Amendment. In the present case, when Defendants launched their investigation, there was no indication of harm to any member of the University community. Hr'g Tr. (DN 40) at 1982. Accordingly, they had no basis

for embarking on investigation to identify possible disruption. Defendants also reference a general interest in "complying with federal law, including Title VI", but, as already noted, in the absence of covered complainants, Defendants had no basis in federal law for acting. Defs.' Resp. Mot. Prelim. Inj. (DN 26) at 1414.

### 2. Defendants Took Adverse Action

"[T]he adverseness inquiry is an objective one": an action is adverse if it could "'deter a person of ordinary firmness' from the exercise of the right at stake." *Bell v. Johnson*, 308 F.3d 594, 603, 606 (6th Cir. 2002). Defendants publicly removed Woodcock from the classroom, barred him from the law school, and opened an investigation into his political speech that carries the threat of termination. Capilouto Email, July 18, 2025 (DN 19-3) at 496–97; Duff Letter, July 18, 2025 (DN 19-3) at 493. The investigator's procedures letter provides that the President's letter of findings "will include any sanction" and addresses what happens "[s]hould the University President determine that termination of a tenured appointment may be appropriate." Thompson Letter, Aug. 25, 2025 (DN 19-15) at 1571. Defendants have also told this Court that the investigation could lead to "tenure revocation or a lengthy suspension without pay." Defs.' Mot. Dismiss (DN 23) at 1298. And pairing the investigation with an immediate reassignment and campus ban conveys that threat by itself: it shows that the speech under investigation has already cost Woodcock his classroom and his access to the law school, and that more can follow. That Defendants voluntarily lifted the ban on September 28, 2026, hardly eliminates the threat: the reassignment and investigation remain in place, and the Dean, who lifted the ban on his own discretion and who the University says has "absolute authority" to impose one, may reimpose the ban at any time. Thro Letter, Sept. 19, 2025 (DN 19-4) at 1066; Ex. 8. "[T]hreats alone can constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in protected conduct." *Kubala v. Smith*, 984 F.3d 1132, 1139–40 (6th Cir. 2021). So is a suspension, even with pay. *Cf. Blick v. Ann Arbor Pub. Sch. Dist.*, 105

F.4th 868, 885 (6th Cir. 2024) ("one might reasonably argue that a temporary suspension (even with pay) causes 'some harm'" under Title VII) (following *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024)). And these measures are judged together: "an entire campaign of harassment which though trivial in detail may have been substantial in gross" states a claim. *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) (Posner, J.); *Thaddeus-X*, 175 F.3d at 396–97 (adopting *Bart*'s ordinary-firmness standard).

As if the reassignment were not stigmatizing enough, the investigation involves an outside attorney questioning dozens of witnesses inside and outside the University about Woodcock's speech. Thompson Decl. ¶ 8 (DN 26-4) at 1450–51; Am. Compl. ¶¶ 39, 58 (DN 36) at 1626, 1634; Ex. 1 ¶ 7. The record shows the deterrent effect: colleagues and students are afraid to support Woodcock publicly or to speak about Palestine, and his own academic output and public writing have declined. Woodcock Decl., Jan. 2, 2026 (DN 35) at 1608–12; Hr'g Tr. (DN 40) at 1842, 1885–87, 1892; Ex. 1 ¶¶ 15–16; Michael Decl. (DN 19-7) at 1109; Bolter Decl. (DN 19-9) at 1250; Lee Decl. (DN 19-11) at 1258–59; Donovan Decl. (DN 19-12) at 1262. Defendants have not disputed that evidence.

### 3. The Speech Caused the Adverse Actions

When the University acted on July 18, 2025, it acted twelve days after Woodcock circulated the petition on July 6, 2025. *Woodcock*, slip op. at 2. President Capilouto's announcement to the University community identified no speech other than the petition. It described "an online petition calling for the destruction of a people" that was "authored by a university employee who is circulating it broadly online," declared that "the views expressed by this employee" were "repugnant," raised Title VI concerns about "this employee's actions," and then announced: "As a result, this employee has been removed, pending an investigation, from any teaching and classroom responsibilities." Capilouto Email, July 18, 2025 (DN 19-3) at 496–97. The same message

announced a new campus-wide ban on linking from University websites to personal websites, adopted to make sure that "the petition in question is not found or hosted on any university-based sites." *Id.* at 497. The first Notice of Investigation also cites the petition, First NOI (DN 19-15) at 1559, and the General Counsel has confirmed that the reassignment rests on "all aspects" of the notices of investigation, which include the petition. Thro Email, Oct. 30, 2025 (DN 19-4) at 1085.

The timing points to the circulation of the petition and not to the content of the petition or to Woodcock's earlier speech, including conference speech that Defendants used to pad the allegations. The conference remarks were made in February 2024 and May 2025, and the University had known since March 2024 about his statement to the law faculty listserv, which called for "the immediate and complete dismantling of our colony in Palestine" and declared that "the Palestinians alone have a right to engage in armed struggle within their territory, which includes all of the territory of Israel." First NOI (DN 19-15) at 1558–59; Ex. 1 ¶ 12 & Ex. A. An anonymous complaint about one of his listserv emails reached the University's Office of Equal Opportunity before 2025, and the University took no action. First NOI (DN 19-15) at 1558–59; Hr'g Tr. (DN 40) at 1949–51. What changed after July 6 was the petition's circulation to law professors across the country, which is the conduct the President's message and the first Notice of Investigation both describe. Capilouto Email, July 18, 2025 (DN 19-3) at 496–97; First NOI (DN 19-15) at 1559. When it did act, the University opened the investigation, reassigned him, and barred him from the law school without any notice or any chance to respond. Ex. 1 ¶ 13. Action within "days or weeks" of protected speech can support an inference of causation. *Lemaster*, 65 F.4th at 310. Defendants have offered nothing to rebut that inference.

The post-July 18 student reports described in the amended notice of investigation do not change this analysis. That notice issued on September 8, 2025, seven weeks after Defendants reassigned Woodcock, barred him from the law school, and opened the investigation, and it rests on reports

from four students gathered during the investigation. Second NOI (DN 19-15) at 1573. Reports that did not exist when Defendants initiated the investigation and reassignment cannot have caused them; an employer "could not have been motivated by knowledge it did not have." *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360 (1995). That the General Counsel later named the amended notice as a basis for continuing the reassignment shows only that the reasons have grown after the fact. His email said that if the investigator "were to issue a third notice of investigation, those aspects would [be] an additional basis for the reassignment as well." Thro Email, Oct. 30, 2025 (DN 19-4) at 1085. The reports are a product of the investigation that the petition set in motion, and speech-based allegations that a retaliatory investigation turns up share its retaliatory cause. *Cf. Staub v. Proctor Hosp.*, 562 U.S. 411, 419–21 (2011) ("We are aware of no principle in tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect."). Nor do the reports describe misconduct. Apart from conclusory allegations that Woodcock called for violence and genocide, with no statement identified, the notice cites two remarks at extracurricular events the year before. Second NOI (DN 19-15) at 1573–74. One was that he need not invite pro-Israel speakers to an optional program because such speakers are "pro-genocide," a characterization that a recording of the event refutes. Second NOI (DN 19-15) at 1574; Thompson Written Questions, Dec. 1, 2025 (DN 26-4) at 1461–62 (quoting recording); Woodcock Decl. ¶ 19 & Ex. 5, Dec. 12, 2025 (DN 19-3) at 226, 402–03; Am. Compl. ¶ 77 (DN 36) at 1641–42; Ex. 1 ¶ 11. The other was that he said "Free Palestine" to men in the street while driving students who had won a fundraiser auction to spend time with him. Second NOI (DN 19-15) at 1574; Woodcock Decl. ¶ 11, Dec. 12, 2025 (DN 19-3) at 224. No one complained to the University about either remark before the investigation began. Ex. 1 ¶ 8; *see* Lee Decl. ¶ 6 (DN 19-11) at 1258 (student in the car thought the remark "pretty cool"). Both remarks are political speech, and neither comes close to

harassment "so severe, pervasive, and objectively offensive" that it denies equal access to education. *Davis*, 526 U.S. at 650.

If the Court would find it useful to review the reports themselves, it may direct Defendants to file under seal the materials the investigator made available in the First Evidence Review, subject to an appropriate protective order. Those materials already exist; producing them requires no further investigation. *See* Fed. R. Civ. P. 26(d)(1) (permitting discovery before the Rule 26(f) conference "when authorized . . . by court order").

The manner of the investigation confirms its retaliatory purpose. The University's Office of Equal Opportunity process is "Complainant driven": generally, it is the complainant who decides whether the Office will "initiate an investigation." OEO Policy § IV (DN 42-1) at 2080. A "Complainant" is "the person who is the recipient of or impacted by the behavior in the alleged violation," *id.* § I.B, at 2075, and those "who are not members of the University Community may not serve as Complainants in a resolution process," *id.* § II.C, at 2079. No member of the University community had complained. Hr'g Tr. (DN 40) at 1982. Lacking any such complainant for a hostile-environment charge, the first Notice of Investigation instead alleged "spamming," speaking for the University without authorization, and misuse of University resources. First NOI (DN 19-15) at 1558–60. There is no evidence that those rules are ever enforced against faculty who email the listserv without authorization. The University did not invoke them when another law professor circulated a Black Lives Matter statement to the faculty listserv, or when Woodcock himself circulated to that listserv in 2024 a statement on Palestine that made the same core demand as the petition, "the immediate and complete dismantling of our colony in Palestine," and that the University knew about at the time. Bird-Pollan Decl. (DN 19-8) at 1113–14; Hr'g Tr. (DN 40) at 1819–20, 1949–51; Ex. 1 ¶ 12. And the University departed from its ordinary Office of Equal Opportunity process: the investigative report is now privileged, the President rather than the Office

decides whether to bring charges, and the President has "sole discretion" to recommend termination. Thompson Letter, Aug. 25, 2025 (DN 19-15) at 1570–71; Interim Due Proc. Regul. § II.F (DN 19-3) at 526. That is the same President who, before any investigation, announced to the University community that Woodcock's views were "repugnant." Capilouto Email, July 18, 2025 (DN 19-3) at 496–97.

The University also changed the rules that will govern any charge. In October 2025, weeks after the investigation began, the President adopted a new due process regulation on an interim basis, without the review by the University Senate and affected units that ordinarily precedes a new regulation. Interim Due Proc. Regul. (DN 19-3) at 522; Ex. 1 ¶ 14. Under the regulation it displaced, dismissal charges against a tenured professor were heard by the Faculty Senate Hearing Panel (Privilege and Tenure), and the President could send a case to the Board of Trustees only after accepting a panel report adverse to the professor. Regul. Affecting Emp't § B.1.f(2) (DN 19-3) at 448–49. Under the interim regulation, the hearing and appeal panels' decisions are "only advisory to the President," who may pursue termination before the Board "in their sole discretion" even if the panels find no violation. Interim Due Proc. Regul. § II.F (DN 19-3) at 526. And the panels are now drawn at random from boards on which faculty are guaranteed only a third of the seats, so a panel sitting in judgment on a law professor's scholarship need not include a single faculty member. Equal Dignity Due Proc. Regul. § I.A.3 (DN 19-3) at 481; Interim Due Proc. Regul. § II.D.1–2 (DN 19-3) at 524. Whether Woodcock's statements were scholarship within his expertise is a question of academic judgment, and courts "should show great respect for the faculty's professional judgment." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985). Removing the faculty from that decision, and giving the President the last word, while the investigation of a faculty member's speech was underway is further evidence that the process is being shaped to reach a result.

### 4. In the Alternative, Woodcock Is Likely to Succeed on His Due Process Claim

The reassignment independently violates due process, as did his exclusion from the College of Law building until it was lifted on September 28, 2026. A tenured professor has a property interest in the terms and conditions of his appointment, not only in his salary. *Gunasekera v. Irwin*, 551 F.3d 461, 468–69 (6th Cir. 2009) ("University custom gives him a property interest in his Graduate Faculty status," and "his suspension is a deprivation of property"); *Hulen v. Yates*, 322 F.3d 1229, 1241–44 (10th Cir. 2003) ("Dr. Hulen had a property interest in his departmental assignment based upon the terms and conditions of his appointment . . . ."); *see FDIC v. Mallen*, 486 U.S. 230, 240–42 (1988) (bank officer's "interest in the right to continue to serve as president of the bank and to participate in the conduct of its affairs is a property right protected by the Fifth Amendment Due Process Clause"). University rules define Woodcock's position by teaching, research, and service, Law Fac. Rules & Policies, rev. June 30, 2024 (DN 19-8) at 1207, and Defendants replaced all three with "100% professional development." Duff Letter, July 18, 2025 (DN 19-3) at 493. They did so without notice or any hearing. Ex. 1 ¶ 13. Due process permits that only in "extraordinary situations" where there is a "special need for very prompt action." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 52–53 (1993) (internal quotation marks omitted); *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002). There was no such need. No student or faculty member had complained, it was summer and Woodcock was not teaching, and the speech occurred off campus. Hr'g Tr. (DN 40) at 1976–77, 1982. Nor are these provisional steps that later review will correct. They last "for the duration of the investigation," Duff Letter, July 18, 2025 (DN 19-3) at 493, and nothing in the University's process allows Woodcock to challenge them. *See* Thompson Letter, Aug. 25, 2025 (DN 19-15) at 1570–71.

The investigation offers no forum for these objections. The investigator has disclaimed any decision-making role: "I will not serve as the decision-maker with respect to the allegations against

Professor Woodcock." Thompson Letter, Aug. 25, 2025 (DN 19-15) at 1570. Her procedures letter acknowledges that the investigation "may raise unique First Amendment issues," but it provides only that the University may seek privileged legal advice about them; it says nothing about any review of the reassignment or the ban. *Id.* The first decision the process contemplates is President Capilouto's letter of findings. *Id.* at 1570–71. By then the reassignment will have run its course, because it ends with the investigation. Ex. 8. Review that can come only after a deprivation has ended is no remedy for it. *Cf. Habich v. City of Dearborn*, 331 F.3d 524, 532–33 (6th Cir. 2003) (declining abstention because "it cannot be said that the state proceedings afford the federal plaintiff an adequate opportunity to have his or her claim heard").

**B. Irreparable Harm**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Woodcock has now been out of the classroom for more than fourteen months, and he was barred from the law school for all of that time until September 28, 2026. Ex. 1 ¶ 2; Ex. 8. Without prompt relief he will lose the Spring 2027 semester as well, because the law school sets its spring teaching schedule during the fall. Ex. 1 ¶ 3. The harm is also about to become permanent. Once the Second Evidence Review closes and the report issues, the investigation the motion asks the Court to stop will be over, and no later ruling can undo it. *See* Thompson Letter, Aug. 25, 2025 (DN 19-15) at 1570–71. The next step runs on a seven-day clock and can begin at any time. *Id.*; Ex. 3. Woodcock has also lost access to the evidence against him until that step begins. Ex. 3 (Sept. 26, 2026 email).

The investigation itself inflicts First Amendment injury, apart from any sanction it may produce. "Merely to summon a witness and compel him, against his will, to disclose the nature of his past expressions and associations is a measure of governmental interference" with freedoms the First Amendment protects. *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (plurality opinion).

"Scholarship cannot flourish in an atmosphere of suspicion and distrust." *Id.* A formal investigative process "itself is chilling even if it does not result in a finding of responsibility or criminality," *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019), and "an implicit threat can chill as forcibly as an explicit threat," *Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir. 1992) (college president's creation of a committee to review a professor's speech "conveyed a chilling threat of discipline"); see *White v. Lee*, 227 F.3d 1214, 1229 (9th Cir. 2000). Woodcock has already answered the investigator's written questions about his speech, under protest, to avoid being treated as having abandoned the process. Ex. 1 ¶¶ 6, 16. Each remaining stage requires him to defend the content of his views before the officials who punished him for expressing them, and no later ruling can undo that. *See* Thompson Letter, Aug. 25, 2025 (DN 19-15) at 1570–71.

**C. Balance of Harms and Public Interest**

A short hold costs Defendants nothing they have not already chosen to bear: they kept the investigation paused for nine months while the courts considered this very motion. Ex. 2; Ex. 3 (Sept. 17, 2026 email). The University presumably shares an interest in not pursuing unconstitutional investigations, so a ruling on the investigation's constitutionality benefits it as well. And a hold would not leave any student report unaddressed: the reports in the amended notice concern two remarks made more than a year ago, raise no safety concern, and can be taken up if the investigation resumes after the Court rules. Second NOI (DN 19-15) at 1573–74. Nor can Defendants claim harm from Woodcock's presence at the law school: the state court found "no evidence" justifying the ban, Ex. 5 ¶ 5, and Defendants have now lifted it, Ex. 8. A professor whom Defendants have allowed back into the law building poses no risk that justifies keeping him out of the classroom. And "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

## D. No Abstention Doctrine or Stay Justifies Withholding Relief

*Younger* does not apply. The Sixth Circuit held that the investigation is not an ongoing proceeding because it "remain[s] in a preliminary, investigatory stage" and "no formalized proceeding is underway." *Woodcock*, slip op. at 4–5. That holding binds this Court, because "a district court is bound to the scope of the remand issued by the court of appeals." *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999). Nothing has changed since: no charge has issued, and the investigation is still at the evidence-review stage. Ex. 3.

The Franklin Circuit Court denied a restraining order without prejudice and without reaching the merits. Ex. 5 ¶ 4. Its direction that Defendants give ten days' notice before further discipline applies only after the report is complete; it does not stop the investigation or the reassignment. Ex. 5 ¶ 4. Federal courts have a "virtually unflagging obligation" to exercise their jurisdiction, *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), and "[p]arallel state-court proceedings do not detract from that obligation," *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013). The balance is "heavily weighted in favor of the exercise of jurisdiction," and "the presence of federal-law issues must always be a major consideration weighing against surrender." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16, 26 (1983). This action came first, *compare* DN 1 (filed Nov. 13, 2025), *with* Ex. 5 at 1 (Nos. 26-CI-00885, -01010, -01017), and Defendants themselves tell this Court that the state court, not this one, "must stay proceedings." Defs.' Mot. J. Pleadings (DN 63) at 2204.

No other abstention doctrine applies. *Pullman* abstention "is limited to uncertain questions of state law," *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984), and Woodcock's claims arise under the First and Fourteenth Amendments and turn on no unsettled question of Kentucky law. Am. Compl. Counts I, VI (DN 36) at 1658, 1667. Delay is especially harmful in a case like this one, where "to force the plaintiff who has commenced a federal action to suffer the delay of state court

proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *Zwickler v. Koota*, 389 U.S. 241, 252 (1967). *Burford* abstention protects state administrative schemes that present "difficult questions of state law bearing on policy problems of substantial public import," and it presupposes "timely and adequate state court review." *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989). It has no application to an investigation of one professor's speech conducted outside the University's ordinary procedures. *Compare* OEO Policy § IV (DN 42-1) at 2080, *with* Thompson Letter, Aug. 25, 2025 (DN 19-15) at 1570–71.

Judge Gilman's concurrence in the denial of rehearing does not counsel a stay. It explains only that the panel did not dictate how this Court should proceed on remand: whether to rule first on the preliminary-injunction motion or on a motion to dismiss, or to stay proceedings "to allow for the University to complete its investigation." Order at 2, *Woodcock v. Univ. of Ky.*, No. 26-5057 (6th Cir. Sept. 10, 2026), Dkt. 107 (Gilman, J., concurring). In other words, the Sixth Circuit had not ruled one way or the other on a stay motion the University has not yet filed. And the discretion to stay has limits. The Sixth Circuit remanded "for consideration of Woodcock's motion for a preliminary injunction." *Woodcock*, slip op. at 2, 5. A party seeking a stay "bears the burden of establishing its need," *Clinton v. Jones*, 520 U.S. 681, 708 (1997), and must show "that there is pressing need for delay, and that neither the other party nor the public will suffer harm," *Ohio Envtl. Council v. U.S. Dist. Ct.*, 565 F.2d 393, 396 (6th Cir. 1977). It must also "make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). A stay to let the University complete the investigation would do more than damage Woodcock. It would let the conduct the motion challenges run its course through to completion before the Court rules, permanently depriving Woodcock of the only adequate remedy for constitutional harm—injunctive

relief. *See Husted*, 697 F.3d at 436. And it would achieve through a stay what the Sixth Circuit held abstention could not. *Woodcock*, slip op. at 4–5.

## II. In the Alternative, Woodcock Requests That the Court Rule on the Preliminary-Injunction Motion by October 9, 2026

If the Court is not prepared to enter a restraining order on the existing record, it should set an expedited schedule that allows a ruling before the Second Evidence Review closes. Woodcock proposes: any supplemental response by Defendants by October 2, 2026; Woodcock's reply by October 6, 2026; and a hearing, if the Court wishes one, on October 7 or 8, 2026. The motion can be decided on the existing record: the evidentiary hearing already held (DN 40), the declarations filed with the motion, and Woodcock's supplemental declaration. That record is complete. Woodcock challenges Defendants' decisions of July 18, 2025, to open the investigation and to reassign and ban him, and each later stage of the investigation carries those decisions forward; the question is what Defendants knew and why they acted on that date. Capilouto Email, July 18, 2025 (DN 19-3) at 496–97; Duff Letter, July 18, 2025 (DN 19-3) at 493. Nothing the investigator gathers now can change that record. The remaining stages of the investigation serve a different purpose: to build a record for a separate administrative decision that has not yet been made: whether to impose discipline. Thompson Letter, Aug. 25, 2025 (DN 19-15) at 1570–71. The Sixth Circuit remanded "for consideration of Woodcock's motion for a preliminary injunction," slip op. at 5, and Woodcock asks the Court to decide that motion on its merits. To assist the Court on remand, Part I.A may serve as Woodcock's supplemental brief in support of the preliminary-injunction motion (DN 19), and the proposed schedule gives Defendants the opportunity to respond. If the Court would prefer separate supplemental briefing, Woodcock will file a supplemental brief within three days of the Court's order.

Defendants' pending motion for judgment on the pleadings (DN 63) is no reason to wait. Woodcock seeks prospective relief against state officials in their official capacities, Am. Compl. (DN 36) at 1677–78, and an official enforcing an unconstitutional act "is in that case stripped of his official or representative character." *Ex parte Young*, 209 U.S. 123, 159–60 (1908). Qualified immunity "protects officials from individual liability for money damages but not from declaratory or injunctive relief." *Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir. 2001). The Court can decide the injunction motion while the pleadings motion is briefed.

## III. In the Alternative, the Court Should Enter a Narrow Order Preserving Its Jurisdiction

The All Writs Act authorizes orders "necessary or appropriate in aid of" the Court's jurisdiction. 28 U.S.C. § 1651(a). "The requirements for a traditional injunction do not apply to injunctions under the All Writs Act," so an order that preserves the Court's ability to decide a pending motion need not satisfy the four-factor test. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004). The Sixth Circuit has not adopted *Klay*, but the principle is long established: "where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo." *Porter v. Lee*, 328 U.S. 246, 251 (1946).

The risk to the Court's jurisdiction is concrete. The remand directs the Court to decide whether the investigation and the reassignment should be enjoined. *Woodcock*, slip op. at 5. If Defendants complete the investigation first, they will have carried out the very acts the motion seeks to prevent before the Court can rule. Woodcock asks only that Defendants not conduct the Second Evidence Review, issue the report, or issue any findings or sanction until the Court rules.

## IV. At a Minimum, the Court Should Convene a Prompt Conference and Invite Defendants to Restore the Voluntary Hold

Defendants honored a hold for nine months so the courts could consider this motion. Ex. 2. A status conference would allow the Court to ask them to restore that hold for the short time needed to rule on remand, which is precisely what the Sixth Circuit directed. *See Woodcock*, slip op. at 5.

## NOTICE, BOND, AND HEARING

Under Rule 65(b)(1)(B), undersigned counsel certifies that on September 29, 2026, counsel emailed a copy of this motion and its exhibits to Defendants' counsel of record, Bryan Beauman and Carmine Iaccarino, and served it through the Court's electronic filing system. Woodcock does not ask for relief without notice.

Defendants face no monetary loss from a hold they maintained voluntarily for nine months. Ex. 2. The Court "possesses discretion over whether to require the posting of security," and it should require no bond or a nominal one. *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995).

If the Court wishes to hear argument before ruling on the request for a temporary restraining order, Woodcock respectfully requests a hearing on Thursday, October 1, 2026. His counsel will be in Kentucky on September 30 for a hearing in Franklin Circuit Court in the consolidated state action, *Woodcock v. University of Kentucky*, No. 26-CI-00885, and can appear in person the following day without additional travel.

## CONCLUSION

Woodcock respectfully asks the Court to enter a temporary restraining order halting the remaining stages of the investigation and lifting the reassignment tied to it until the Court rules on the preliminary-injunction motion (DN 19). In the alternative, he asks the Court to rule on that motion by October 9, 2026; to order Defendants not to conduct the Second Evidence Review, issue

the report, or issue any findings or sanction until it rules; or, at a minimum, to convene a prompt status conference. Should the Court wish to review the evidence gathered in the investigation, he also asks the Court to direct Defendants to file under seal the materials made available in the First Evidence Review, subject to an appropriate protective order.

Date: September 29, 2026

Respectfully submitted,

*/s/ Rima Kapitan*

Rima Kapitan
**Kapitan Gomaa Law, P.C.**
P.O. Box 46503
Chicago, IL 60646
(312) 566-9590

Joe F. Childers
**Joe F. Childers & Associates**
The Lexington Building
201 West Short Street
Suite 300
Lexington, Kentucky 40507
(859) 253-9824
joe@jchilderslaw.com

**INDEX OF EXHIBITS**

Exhibit 1: Supplemental Declaration of Ramsi A. Woodcock

Exhibit 2: Extension emails, December 2025 to September 1, 2026

Exhibit 3: First Evidence Review emails, September 11–26, 2026 (redacted)

Exhibit 4: Sixth Circuit opinion and judgment, August 24, 2026

Exhibit 5: Franklin Circuit Court order, September 24, 2026

Exhibit 6: Van Tatenhove letter, August 21, 2026

Exhibit 7: Petition for Military Action Against Israel, antizionist.net (Wayback Machine capture, July 18, 2025)

Exhibit 8: Van Tatenhove letter, September 28, 2026