# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# PADUCAH DIVISION

**RAMSI A. WOODCOCK** — **PLAINTIFF**

**v.** — **No. 5:25-cv-424-BJB**

**ELI CAPILOUTO, ET AL.** — **DEFENDANTS**

* * * * *

## OPINION & ORDER DENYING TEMPORARY RESTRAINING ORDER

Ramsi Woodcock, a tenured University of Kentucky law professor, has been under investigation for more than a year for controversial comments regarding Israel and Palestine. The alleged comments varied in both content and forum: an online petition calling for the invasion of Israel, listserv blasts to the University faculty and broader legal academy accusing Israel of genocide, the interjection of far-afield remarks about colonization at an antitrust panel in Hong Kong, shouts of "Free Palestine!" while driving two law students near campus, and more. None of the remarks came in the classroom and none appears to have disrupted school activities. Yet all related in some manner to his role as a state-employed professor—rendering all the more curious the University's July 2025 decisions to promote him to full professor one week and call him in for questioning (literally) the next.[1] The following week brought a public denunciation from the University's President, the start of a formal investigation into potential harassment under Title VI, reassignment from teaching duties to "professional development," and a (since rescinded) ban from campus.[2]

Rather than participate in the investigation, however, Woodcock filed this lawsuit in the U.S. District Court for the Eastern District of Kentucky in November

---

[1] Curiouser still, Woodcock maintains that the remarks in question dated as far back as February 2024 and were known (at least in part) to the University since March 2024. TRO Motion (DN 65) at 20 (citing conference remarks, listserv posting, and anonymous complaint to UK Office of Equal Opportunity).

[2] This first of two "Notice[s] of Investigation" laid out four allegations that Woodcock "may have violated" the University's code of conduct and other policies. July 22 NOI (DN 63-1) at 2–3. The notice declared (without elaboration) that the "investigation … is consistent with the First Amendment" and "addresses requirements under Title VI of the Civil Rights Act." *Id.* A second notice, based on reports from four students, identified four additional allegations that may have "created a hostile environment on the basis of race, color, or national origin." September 8 NOI (DN 63-3) at 2–3.

2025. The pleadings characterize his treatment by leaders of the University and its law school as retaliation for protected academic or personal speech, violations of the Due Process and Establishment Clauses, and racial and religious discrimination. (Other administrative, damages, and declaratory claims appear in the Amended Complaint, but those matter little at this stage.) The issue ripe for resolution today is Woodcock's request for temporary emergency relief halting the investigation and reinstating his teaching duties.

This is Woodcock's second or third such request, depending on how one counts. And it follows a journey so circuitous it would make a Baggins blush.

The judge previously assigned to this case held a preliminary-injunction hearing in December 2025. Instead of granting or denying interim equitable relief, however, that judge decided to abstain on the ground that the University investigation should precede any federal adjudication.[3] The Sixth Circuit, in the spring and summer of 2026, declined to issue a stay, reversed on appeal, and declined to accelerate the mandate.[4] Woodcock, meanwhile, filed a parallel lawsuit and TRO request in state court in September 2026—relief that the Franklin (County) Circuit Judge denied without prejudice.[5] The Sixth Circuit then remanded and reassigned

---

[3] *See* Memorandum Opinion & Order (DN 37) at 40–41 (abstaining under *Younger v. Harris*, 401 U.S. 37 (1971), and staying case "pending the completion of the investigation and subsequent proceedings, if initiated").

[4] *See Woodcock v. University of Kentucky*, 188 F.4th 969, 972–73 (6th Cir. 2026) (Because the "the disciplinary proceedings against Woodcock remain[ed] in a preliminary, investigatory stage," the proceedings were not "ongoing," rendering *Younger* abstention inapplicable). Concurring with the denial of Woodcock's request to immediately issue the mandate, Judge Gilman wrote that "the panel's opinion" did not "in any way limi[t] the sound discretion of the district court regarding how to proceed on remand," but instead "simply h[eld] that the district court erred in declining to accept jurisdiction based on *Younger*" without "purport[ing] to dictate what should happen upon remand; *i.e.*, whether the district court should immediately proceed with a ruling on Woodcock's preliminary-injunction motion, or whether it should first consider the University's motion to dismiss, or whether it should stay proceedings to allow for the University to complete its investigation." *Woodcock v. University of Kentucky*, No. 26-5057, 2026 WL 2821944, at *1 (6th Cir. Sept. 10, 2026) (Gilman, J., concurring).

[5] *See* Order (DN 69-1) at 3 (denying without prejudice Woodcock's request for a temporary restraining order "enjoining the completion of Defendants' investigation," but ordering University to "reconsider" the campus ban and provide 10 days' notice before any disciplinary action and promptly upon completion of outside report); Notice Re: State Court Proceedings (DN 72) at 1 (explaining procedural posture in state court and its relationship to Woodcock's requests for emergency relief in federal court). As far as the record reflects, that litigation remains pending and the Circuit Judge's order remains effective.

this federal case to a judge outside the Eastern District after one of that court's judge's was appointed dean of the law school. Woodcock had previously filed still another lawsuit—also reassigned here, and also to eventually land in state court—seeking to block the dean's appointment on First Amendment grounds.[6] The University investigation (led by a private law firm) resumed in September. And this Court held a TRO hearing in October. Although the investigator anticipated that this phase of the investigation would finish by November 2, that date has come and gone.

Such unusual litigation can raise unusual—and unusually tricky—legal questions. This is true here, even though the crux of Woodcock's claim is superficially simple: the University leaders (Defendants here) took adverse action (investigation and reassignment) against him because of his constitutionally protected speech (chiefly, at least on his telling, Woodcock's self-titled "Petition for Military Action Against Israel").[7] But resolving this question, at least in the context of preliminary equitable relief, raises several others that Supreme Court precedent leaves significantly undertheorized.

- When, if ever, does the fact, length, or nature of an investigation amount to retaliation for disfavored speech?[8]

---

[6] The Franklin Circuit Court consolidated the new case's request a TRO with the First Amendment suit Woodcock originally filed in federal court seeking to prevent former-Judge Van Tatenhove from assuming his role as dean of the UK Law School. After this Court denied his requests for emergency relief, *see* DN 19 (5:26-cv-262), Woodcock voluntarily dismissed the federal claims and refiled in state court. *See* Response (DN 69) at 2.

[7] *See, e.g., Stanalajczo v. Perry*, 174 F.4th 968, 974 (6th Cir. 2026) (setting forth three elements of First Amendment retaliation claim).

[8] First Amendment caselaw certainly contemplates speech-related investigations. *See Waters v. Churchill*, 511 U.S. 661, 677–78 (1994) (plurality op.) ("Only procedures outside the range" of reasonableness violate First Amendment despite investigation's "risk of erroneously punishing protected speech."). And caselaw appears to strongly suggest they are not *per se* invalid. Under federal law, "colleges and universities are legally required to maintain a hostile-free learning environment and must strive to create policies which serve that purpose." *Bonnell v. Lorenzo*, 241 F.3d 800, 823 (6th Cir. 2001) (University's investigation and suspension of professor under Title IX did not violate First Amendment). Schools may escape liability for harassment by "investigat[ing] promptly and thoroughly" when notified of alleged harassment. *Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834, 849 (6th Cir. 2016); *See Gartenberg v. Cooper Union for the Advancement of Science & Art*, 765 F. Supp. 3d 245, 267 (S.D.N.Y. 2025) (Cronan, J.) (even protected speech may be relevant to determining "whether actionable harassment occurred").

Woodcock hasn't pointed to any precedent indicating *per se* invalidity, though neither has the University pointed to any insulating investigations from scrutiny as the means of potential First Amendment retaliation. Some decisions have asked, for example, whether an investigation is outside the typical "formal process for reviewing evidence and weighing

- Under what circumstances may a public school restrict the speech of a state-employed teacher on subjects of personal or intellectual concern related to—but distinct from—the professor's public assignments? [9]
- To what extent may a federal district court exercise emergency equitable remedies to superintend these investigative or pedagogical processes?[10]
- Does the inquiry differ if the plaintiff has already unsuccessfully sought similar relief on similar grounds in state court?[11]

---

disputed claims." *Cutler v. Stephen F. Austin State University*, 767 F.3d 462, 474 (5th Cir. 2014). And a university may not use an investigation to punish or preemptively chill protected speech. See *Levin v. Harleston*, 966 F.2d 85, 89 (2d Cir. 1992) (the creation of a "shadow class" and "ad hoc committee" in response to professor's controversial publications would objectively chill speech); *cf. Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. 617, 638 (2018) (government hostility violated First Amendment). *See also Speech First, Inc. v. Sands*, 144 S. Ct. 675, 676 (2024) (Thomas, J., dissenting from denial of certiorari) (discussing First Amendment chill that may arise from university "policy" and "enforce[ment]"); *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) ("[T]he formal investigative process … itself is chilling even if it does not result in a finding of responsibility or criminality.").

[9] "[T]he First Amendment protects a public employee's speech if: (1) the speech was on a matter of public concern, (2) the speech was not made pursuant to the employee's official duties, and, assuming the employee can satisfy the first two elements, (3) the employee's interest in speaking on a matter of public concern outweighs the employer's interest 'in promoting the efficiency of the public services it performs through its employees.'" *Josephson v. Ganzel*, 115 F.4th 771, 783–84 (6th Cir. 2024) (citations omitted). And "[s]peech involves a matter of public concern when it deals with 'any matter of political, social, or other concern to the community.'" *Patterson v. Kent State Univ.*, 155 F.4th 635, 649 (6th Cir. 2025) (citation omitted). In *Garcetti v. Ceballos*, the Supreme Court held that "when a public employee speaks pursuant to employment responsibilities," the First Amendment "does not insulate their communications from employer discipline." 547 U.S. 410, 421, 424 (2006). To determine whether "expression falls within the public or private bucket, … courts have looked to all of the circumstances surrounding the speech" and "have asked several recurring questions," "[m]ost notably, what was the 'impetus' for or 'motivation[]' behind the speech?" *DeCrane v. Eckart*, 12 F.4th 586, 595–96 (6th Cir. 2021).

[10] Public universities are in the "business of educating students," and they have a pedagogical interest in preventing employees from "undercut[ting] the university's power to do its basic job." *Patterson v. Kent State University*, 155 F.4th 635, 650 (6th Cir. 2025).

[11] Four factors constrain a trial court's authority and guide its discretion in considering a request for a temporary restraining order: "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the

None of the answers to these questions are obvious based on the record in this Court or the precedential decisions of others. Whether an investigation into speech and related conduct amounts to unconstitutional retaliation depends on whether the First Amendment protected the underlying speech and whether the state's response would deter a person of "ordinary firmness" from speaking similarly.[12] Protection for the speech, in turn, depends on whether Woodcock spoke in either his personal[13] or his "academic" capacity,[14] And even if one of those carve-outs apply, courts may still ask whether the "employee's interest in speaking on a matter of public concern outweigh[s] the employer's interest 'in promoting the efficiency of the public services it performs through its employees.'"[15] Additionally, the appropriateness of interim equitable relief turns on similarly difficult—even incommensurable—considerations, including the burdens on Woodcock's ongoing political speech (which appears to have continued in forums outside the classroom[16]), the Commonwealth's interest in controlling the taxpayer-subsidized education offered to its citizens and future

---

public interest would be served by granting the stay." *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) (citation omitted).

[12] *See Abbott v. Pastides*, 900 F.3d 160, 169 (4th Cir. 2018) (chilling effect amounts to a cognizable First Amendment injury if it is "objectively reasonable" that the challenged government action would "deter a person of ordinary firmness from the exercise of First Amendment rights") (citation omitted).

[13] *See Garcetti v. Ceballos*, 547 U.S. 410, 426 (2006) (distinguishing between protected personal speech and unprotected speech an "employee makes in the course of doing his or her job").

[14] *See Meriwether v. Hartop*, 992 F.3d 492, 503 (6th Cir. 2021) ("[T]he First Amendment protects the academic speech of university professors."); *id.* at 505 ("[P]rofessors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching and scholarship."). The Supreme Court recognized (but did not hold) in *Garcetti* that "expression related to academic scholarship or classroom instruction implicates additional constitutional interests that" might not be "fully accounted for by … customary employee-speech jurisprudence." *Garcetti*, 547 U.S. at 425.

[15] *Josephson*, 115 F.4th at 784 (quoting *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563, 568 (1968)). The "manner, time, and place of the employee's expression" are all relevant to this inquiry. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Courts also consider "whether the statement (a) impairs discipline by superiors or harmony among co-workers, (b) has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, (c) impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise," or (d) undermines the mission of the employer." *Bennett v. Metro. Government of Nashville & Davidson County*, 977 F.3d 530, 539–40 (6th Cir. 2020) (citation omitted).

[16] *See* Reply in Support of Motion for Judgment on the Pleadings (DN 79) at 15 (describing Woodcock's social-media posts on Palestine and Israel following his suspension).

officers of the court, and the public's interest in open dialogue, effective investigations, and the avoidance of harassment.[17]

Each of these determinations, courts have illustrated time and again, is fact-dependent.[18] And although a previous judge held an evidentiary hearing nearly a year ago, time and events have not stood still. Woodcock has not, at least not yet, shown that the mere fact of an investigation would chill an ordinary speaker (to say nothing of a tenured professor) in these strange circumstances from engaging in speech on public questions inside or outside the classroom.[19] After all, a university has an interest in "determin[ing] for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study."[20] Nor has Woodcock yet shown that the idiosyncratic lawprof speech at issue—in listservs, foreign conferences, links from the UK website, carpools, and the like—is necessarily protected, heedless of forum or audience.[21] To be sure, whether he spoke in his professorial capacity is hotly contested by the parties—and cannot be determined with confidence or specificity at this stage.[22]

Whether reassignment from all teaching duties would deter a speaker in a retaliatory manner is a closer question. This is particularly true because the University has seemingly identified no past or future campus disruption, little risk that Woodcock's speech has or will infect classroom instruction, and any reason why

---

[17] *See Bonnell*, 241 F.3d at 823–25 (describing competing interests in a First Amendment retaliation claim in an interim posture).

[18] *See* n.26 below.

[19] The Sixth Circuit recently held that a professor's "core academic functions" extended to off-campus "panel remarks … on a topic he taught and wrote about as a child-psychiatry expert." *Josephson*, 115 F.4th at 786 (cleaned up) (speech related to official duties "stemmed from his scholarship and [was] thus related to scholarship or teaching").

[20] *Bonnell v. Lorenzo*, 241 F.3d 800, 823 (6th Cir. 2001) (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurt, J., concurring)).

[21] For instance, whether institutional IT policies that restrict a professor's use of school email resources amounts to a "prior restraint," *see* MJOP Response at 25, is hardly clear given the prevalence of content-neutral time/place/manner restrictions. *See also* Supplemental Response (DN 75-1) at 23–24 (arguing that faculty speech policies must be supported by "harms that are real, not merely conjectural") (quotation marks omitted). And whether a professor's off-topic panel remarks amount to an unprotected "shout-down" or instead protected academic speech, for example, likewise casts at least some doubt on Woodcock's argument that this amounts to pure academic or political speech.

[22] *See DeCrane*, 12 F.4th at 596 (outlining the "practical" and fact-specific test courts must undertake to determine whether an instance of speech occurred within the scope of employment).

responses other than prior restraint would be unavailable if Woodcock stepped outside the bounds of his role in the future.[23] On the other hand, Woodcock hasn't convincingly identified any aspect of this investigation or reassignment that is vindictive, disproportionately burdensome, or otherwise out of the ordinary. Such showings are neither obvious nor obviously foreclosed on the current record. Indeed, they are not susceptible to prudent resolution by a distant district judge in the middle of a semester, when interim relief measured in two- or four-week increments is highly unlikely to benefit Woodcock in a manner that outweighs the concomitant disruption to the University's orderly governance of academic affairs.[24] Since Woodcock bears the burden of justifying temporary emergency relief, but has not carried it, the Court must deny his TRO request. When in doubt, the Sixth Circuit has reminded us, "[t]he administration of the university rests not with the courts, but with the administrators of the institution."[25]

These are important questions worthy of further evidentiary presentation, however. To that end, the Court will schedule a second preliminary-injunction hearing later this month. The balance between state governance and individual speech can tilt too far in either direction, of course,[26] and investigations cannot last

---

[23] Contrast, for example, *Miles v. Denver Public Schools*, 944 F.2d 773, 778 (10th Cir. 1991) (upholding high school's 4-day reassignment of a teacher who commented, in class, on sexual activity between students); *Shub v. Hankin*, 869 F. Supp. 213 (S.D.N.Y. 1994) (upholding reassignment because "[c]ollege reasonably believed that Plaintiff presented a threat to the well-being of its students" due to allegations of sexual harassment).

[24] "[B]ecause 'States historically have been sovereign' in the field of education, the 'traditional role in the formulation and execution of educational policy' belongs to them—not [courts]." *Pernell v. Florida Board of Governors of State University*, 181 F.4th 1135, 1158 (11th Cir. 2026) (quoting *United States v. Lopez*, 514 U.S. 549, 564 (1995)).

[25] *Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir. 1989).

[26] *See id.* at 826 ("[T]he term academic freedom 'is used to denote both the freedom of the academy to pursue its end without interference from the government ... and the freedom of the individual teacher ... to pursue his ends without interference from the academy; and these two freedoms are in conflict.'") (quoting *Piarowski v. Illinois Community College District 515*, 759 F.2d 625, 629 (7th Cir. 1985)); *Bonnell*, 241 F.3d at 823 (describing "delicate," case-by-case balance between right of professor to speak and right of students to a campus free from harassment); *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 226 n.12 (1985) ("Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, ... but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself.").

forever.[27] In hopes of limiting any federal judicial intervention to its appropriate role, and with “reluctan[ce] to trench on the prerogatives of state and local educational institutions,”[28] therefore, the Court sets a preliminary-injunction hearing for Thursday, November 19, at 9:00 a.m. in the Louisville Courthouse. Should unavoidable conflicts necessitate rescheduling this hearing, the parties must confer in good faith regarding alternative dates and propose at least two potential alternative dates as soon as practicable.

Benjamin Beaton, District Judge
United States District Court

November 3, 2026

---

[27] *See Abbott*, 900 F.3d at 179 (discussing burden of administrative process); *White v. Lee*, 227 F.3d 1214, 1228–29 (9th Cir. 2000) (finding First Amendment violation when length of administrative investigation far exceeded a statutory time limit).

[28] *Ewing*, 474 U.S. at 226; *see also Miles.*, 944 F.2d at 778–79 (“We will protect appropriate constitutional interests. We should not and will not run the schools.”).