**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

**RAMSI A. WOODCOCK** — **PLAINTIFF**

**v.** — **No. 5:25-cv-424-BJB**

**ELI CAPILOUTO, ET AL.** — **DEFENDANTS**

* * * * *

**OPINION & ORDER RESCHEDULING PRELIMINARY-INJUNCTION HEARING**

This opinion addresses the latest chapter in the ongoing saga concerning Professor Ramsi Woodcock, his commentary regarding Israel and Palestine, and the University of Kentucky's investigation into whether he violated Title VI or the school's technology or conduct policies.

The opinion below follows numerous recent developments and filings during the two weeks after an order denying a temporary restraining order and setting an evidentiary hearing on Woodcock's request for a preliminary injunction. First, as promised at the Court's November 17 hearing, it explains the oral ruling granting a short continuance of the preliminary-injunction hearing. Next, it addresses Woodcock's requests for targeted discovery and rejects the University Defendants' suggestion of mootness. Then it clarifies the basis for the oral ruling denying Professor Woodcock's request that the Court bar the President of the University of Kentucky from reviewing and responding to an investigator's report regarding Woodcock's speech and related conduct. Finally, the order reschedules the PI hearing for two weeks after the initial hearing date and calls on the parties to file pre-hearing briefs addressing the proof and witnesses each side anticipates offering during that hearing.

**A. This Court's TRO Order.** Earlier this month, this Court denied law professor Ramsi Woodcock's request to halt the University of Kentucky's ongoing investigation into several comments he made related to his views on the Israeli-Palestinian conflict and his 2025 "Petition for Military Action Against Israel." Woodcock's initial submissions had not persuasively shown that the investigation was retaliatory in its origin or chilling in its ongoing effect. *See* Corrected TRO Op. (DN 86) at 6–7.

But the order set an evidentiary hearing two weeks later to address these fact-dependent questions and Woodcock's request for a preliminary injunction. The investigation—which had lasted more than a year and whose report was already

overdue—could not "last forever" without threatening Woodcock's First Amendment rights. *Id.* at 7. And the University of Kentucky's corresponding "reassignment" of Woodcock from teaching duties throughout the investigation was increasingly hard to justify, particularly given the absence of any articulated suspicion of classroom disruption. *Id.* at 6.

**B. Subsequent Developments.** After a year of relative stagnation, the TRO order seemingly broke the dam.

The day after its issuance, Woodcock sought leave to amend his complaint and moved for expedited discovery. *See* DNs 84 & 85. He also sought All Writs Act relief barring University investigators or leaders from issuing a report or findings—denied the next day, *see* DN 87—ostensibly to protect this Court's jurisdiction. Then, one week after the TRO decision, the outside investigator's 134-page sealed (for now[1]) report finally landed. DN 89.

To the University Defendants, this mooted Woodcock's request for an injunction halting the investigation. DN 62. To Woodcock, the report necessitated a supplemental PI motion. DN 97. And the Court set a status conference to discuss the updated pleadings, mootness, expedited discovery, and the scope and timing of the PI hearing. DN 104. The Court granted the motion to amend but stayed Defendants' response deadlines; the parties and the Court agreed to targeted document production; the parties conferred and filed status reports; and the Court held a second pre-hearing conference covering, among other items, the University Defendants' request for a short continuance of the November 19th evidentiary hearing. *See* DNs 104–107.[2]

**C. Continuance Request.** A "short continuance," defense counsel agreed, would "allow for the [University's] deliberative process to advance in a significant way." Nov. 13 Tr. (DN 109) at 25:15–19. "[S]ometime after Thanksgiving," he maintained, the University would better "know where we're going." *Id.* at 25:7. That clarity would follow two forthcoming steps in the administrative process.

---

[1] That report is provisionally under seal pending the resolution of a motion to seal, *see* DN 103, which will be referred to a Magistrate Judge.

[2] The Court's oral ruling during the November 13th status conference granted, in part, Woodcock's request for expedited discovery (DN 85) in advance of the preliminary-injunction hearing. As discussed on the record, the Court considered Woodcock's narrowed supplemental document request, *see* Reply in Support of Motion for Expedited Discovery (DN 96) at 5, and denied only the second request, which concerned documents regarding investigations of subjects other than Woodcock.

First, the Dean of the law school could decide whether to lift Woodcock's reassignment from teaching and restore him to the classroom for the spring semester. This could happen as late as mid-December, according to counsel, without prejudicing Woodcock's ability to teach. University Defendants' Status Report (DN 105) at 2; Nov. 17 Tr. (DN 110) at 11:18–12:13. The University did *not* pledge that he would teach again—only that enough time remained for the Dean to make a merits decision without any litigation delay running out the clock on that prospect. Were it forthcoming, reinstatement by the Dean would limit the need for judicial intervention in the law school's course catalog to the extent it mooted Woodcock's request to enjoin his reassignment from teaching to "professional development."

Second, the University President could decide, based on the investigative report, whether (in his view) Woodcock violated any laws or policies. He needed time to review the investigative report, confer with various affected constituencies, and decide what if any sanctions or charges to pursue. *See* University Defendants' Status Report at 3; Nov. 17 Tr. at 12:10–13, 23:10–11.

Again, these steps held out hope for de-escalation or resolution that might preserve ordinary academic governance and render extraordinary judicial intervention unnecessary. If the President opted against any formal findings or charges, for example, the administrative process (even if not the litigation) would presumably come to an end. If he filed formal charges, however, then an administrative process would follow—potentially including a tenure-revocation vote by the Board of Trustees. *See generally Woodcock v. University of Kentucky*, 188 F.4th 969, 972 n.1 (6th Cir. 2026), reh'g denied, No. 26-5057, 2026 WL 2821944 (6th Cir. Sept. 10, 2026) ("A formal hearing is required if the preliminary investigation indicates that serious consequences, such as terminating the faculty member's appointment before it expires or depriving him of a 'constitutionally protected property interest,' may result.").

A third intervening step stems from the pending parallel state-court litigation. As discussed in this Court's prior opinion, *see* Corrected TRO Op. at 2–3, this summer Woodcock filed a second free-speech suit in Franklin (County) Circuit Court. *See* State Court Order (DN 69-1). That complaint sought, among other relief, a temporary injunction against immediate University discipline "until the mandate issues and the federal district court ha[d] an opportunity to act" following the Sixth Circuit's decision. Nov. 13 Tr. at 9:15–17. Although plaintiff's counsel clarified that Woodcock was seeking only "one injunction hearing," "was not currently seeking any relief" in state court, and was "fine with proceeding with this one request for this form of relief" in federal court, *id.* at 12:4–5, 13:17–23, the state circuit judge's order denying Woodcock's TRO request obliged the University to give Woodcock and that court ten days' notice before the President filed administrative charges. *Id.* at 6:19–22. And Woodcock has not abandoned that lawsuit; to the contrary, he apparently has a

motion to amend the complaint (but not a motion for temporary injunctive relief) pending in that docket. *Id.* at 14:1–10. Additional time before this Court's preliminary-injunction hearing, defense counsel maintained, would allow the University Defendants to clarify any subsequent investigative steps without running afoul of another court's existing injunction. *Id.* at 27:2–28:4.

A modest continuance such as this lies well within a trial judge's ample discretion over the nature and timing of a preliminary-injunction hearing. A district court has "broad discretion … to manage the timing and process for entry of all interlocutory injunctions—both TROs and preliminary injunctions." *Ciena Corp. v. Jarrard*, 203 F.3d 312, 319 (4th Cir. 2000). 28 U.S.C. § 1657(a) requires "each court of the United States" to "determine the order in which civil actions are heard and determined" and to "expedite … any action for temporary or preliminary injunctive relief." *See also* 11A WRIGHT & MILLER'S FED. PRAC. & PROC. § 2949 (3d ed.).

And ample cause supports a short pause here.

Importantly, rescheduling the hearing should not meaningfully prejudice Woodcock. The University Defendants have expressly represented to this Court that the extension will not limit Woodcock's opportunity to shed the collateral consequences of the investigation (chiefly his reassignment outside the classroom). *See* Nov. 17 Tr. at 11:18–12:13, 13:5–16. Nor, as discussed below, does the interregnum between the report's issuance and President's decision appear to contribute any marginal ongoing chill to Woodcock's speech—at least not beyond any already imposed by the investigation.

Equally significant, a continuance offers the chance to significantly reduce the potential friction between this Court's decision-making and that of the University officials and state-court judge. If the University reinstates Woodcock and the President doesn't press any charges, then Woodcock's request for federal judicial orders to the same effect becomes unnecessary. If the process persists, at least the subsequent administrative process and timeline will have crystallized in a manner that facilitates this litigation. And, crucially, the extra time affords the parties at least the possibility of clearing—or perhaps requesting modification of—the state court's 10-day notice requirement. Given the stated purpose of that injunction request—to facilitate this Court's adjudication of Woodcock's PI motion, which is exactly what is now happening—the need for a protective parallel order is hardly clear. (To the extent it's meant to facilitate alternative dispute resolution, as discussed during the latest hearing, nothing would preclude the same flexibility and negotiation here.) Getting past the interim 10-day order could drastically reduce any potential for federal/state conflict or courthouse-racing. *See generally* James E. Pfander & Nassim Nazemi, *The Anti-Injunction Act and the Problem of Federal-State Jurisdictional Overlap*, 92 Tex. L. Rev. 1, 39 (2013). And avoidance of the state

injunction would increase incentives for the President and Woodcock to accelerate their administrative decision-making and negotiations while streamlining their litigation efforts in federal court.

A final benefit, also discussed below at § F, concerns the orderly and efficient presentation of the parties' shifting proof and positions at the preliminary-injunction hearing. Following targeted discovery and this Court's discussions and orders regarding Woodcock's request for emergency relief based on alleged First Amendment retaliation, the parties may use pre-hearing briefs and their in-court presentations to directly address the outstanding questions identified by the Court and opposing counsel.

**D. Mootness.** Following issuance of the outside investigator's report, the University Defendants filed a "notice of suggestion of mootness." DN 92. Because Woodcock's previous preliminary-injunction request aimed to halt the just-issued report, *see, e.g.*, Motion for Preliminary Injunction (DN 19-1) at 31 (requesting that the Court halt the "continuing … investigation into his protected speech"), the University Defendants argued that the report's completion deprived this Court of a live dispute to resolve, at least via temporary injunction. Notice of Mootness at 3–4.

But as the events described above illustrate, this dispute is hardly moot.

In the preliminary-injunction context, mootness "depends on whether [a] decision would have any 'practical effect' during th[e] window of time" before final judgment. *Resurrection Schools v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022) (citation omitted). Although Woodcock's previous submissions *primarily* focused on halting the third-party investigation, that was not his only request. Woodcock also requested that the Court enjoin his reassignment as well as the whole investigative process (which would include more than merely the third-party report). Motion for Preliminary Injunction at 31.

Woodcock has complained about the "absence of a teaching assignment" for the pendency of this litigation. Nov. 13 Tr. at 15:9–13. As counsel noted during the November 13th hearing, "Professor Woodcock remains suspended from teaching and service" and the Dean has explicitly refused to reinstate Woodcock's teaching load for the spring semester at this point in time. *Id.* at 10:24–25; Dean's Email (DN 94-1). So it would be "artificial to say that because one phase of the investigation is over," "all of a sudden" *all* the ongoing "incidental effects" no longer remain in place. *Id.* at 15:14–15. And the Court may still provide "effectual relief" from these ongoing effects by enjoining the University from prolonging Woodcock's reassignment (which it continues to actively contemplate). *Hrivnak v. NCO Portfolio Mgmt., Inc.*, 719 F.3d 564, 567 (6th Cir. 2013).

As for the forthcoming presidential findings, Woodcock's supplemental preliminary-injunction request (DN 97) and status report (DN 106) make clear that he opposes the issuance of the President's findings for many of the same reasons that he opposed the investigative report. He wants to prevent review that would allegedly "brand" Woodcock and chill his future speech. Woodcock Status Report at 1, 3. So Woodcock still has a "personal stake" in the outcome of his preliminary injunction motion, and a court order could still have practical effect if it were to enjoin the President from issuing findings. *Hrivnak*, 719 F.3d at 567.

To be sure, the President hasn't yet told Woodcock whether the University will institute formal discipline or sanctions, so the parties don't know "what happens next." Nov. 13 Tr. at 4:17–18. To the extent the University Defendants are concerned about an evidentiary hearing over hypothetical sanctions that haven't been issued, that would amount to a *ripeness* concern that sits downstream of Woodcock's threshold argument that the Court should prevent the President from ever reaching that point in the decision-making process. Regardless of the merits of Woodcock's request to enjoin presidential review and reassignment, those requests surely aren't moot.

**E. Temporary Injunction Against Presidential Findings.** During previous hearings, this Court observed that Woodcock's effort to end his reassignment from teaching stood on firmer ground that his request to halt the investigation itself. That view rested largely on caselaw that contemplated speech-related investigations consistent with the First Amendment yet considered whether any attendant consequences of such investigations abridged those rights based on a retaliatory purpose, chilled speech, or both.[3]

For reasons that for now remain imperceptible, Woodcock hardly pushed on the more open of these two doors. While he "of course" would be happy to return to the classroom, Nov. 17 Tr. at 17:17–18, Plaintiff's counsel has instead and overwhelming emphasized Woodcock's desire for an order halting the investigation before the President can review the report and issue his conclusions or disciplinary decisions. And to the limited extent that Woodcock presses the reassignment point, defense counsel has mitigated the risk that a prompt injunction would supply the only way to ensure Woodcock has a chance to teach next semester. The Dean, through

[3] *See generally, e.g.*, *Sensabaugh v. Halliburton*, 937 F.3d 621, 627–30 (6th Cir. 2019) (no adverse action based on "letter of guidance" and reprimand in the context of a "independent law firm" investigation involving "scores of documents and text messages" and "seventeen different witnesses"); *Moore v. Garnand*, 83 F.4th 743, 753 n.12 (9th Cir. 2023) ("[W]e never held that a retaliatory investigation alone could violate the First Amendment, as our holding rested on much more than just a retaliatory investigation[.]")

counsel, has now pledged that a continuance into mid-December wouldn't preclude Woodcock from teaching next semester should the Dean or the Court so decide. Nov. 17 Tr. at 11:1–11. Given the last-ditch nature of temporary injunctive relief, Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. 809, 817-18 (2025), this representation eliminates the need to consider reassignment before the rescheduled PI hearing.

This leaves Woodcock's curious request to stop the President from concluding the investigation.

Woodcock insists that the First Amendment bars the President from spending "weeks poring over documents" unrelated to "any arguable policy violation." Nov. 13 Tr. at 29:22–24. "Whatever the University decides about spring teaching, findings issued on the investigator's report would injure Woodcock irreparably on their own." Woodcock Status Report (DN 106) at 1. To the extent that review entails an inquiry into his political beliefs, Woodcock contends, the process is illegitimate and should be enjoined immediately. Nov. 13 Tr. at 29 (citing *Sweezy v. New Hampshire*, 354 U.S. 234 (1957)); Nov. 17 Tr. at 17:25–18:2 ("[T]here's nothing preventing the president from now reviewing closely hundreds of pages of documents relating to Professor Woodcock's political speech.").

One might think that the quickest way to dissipate the cloud threatening Woodcock's speech is to bring this investigation to its speediest end. After all, that decision could bring exoneration if no violation of Title VI or university policy is established. And even if the President concludes otherwise, his findings would deliver Woodcock from investigatory limbo while shielding him from immediate punishment thanks to the state-court order (for at least ten days) and the University's administrative-hearing process (which could last much longer).

Yet Woodcock's preferred course is to *prevent* presidential findings that could conclude the investigation. He seeks to forestall this through a judicial order barring the President from "issuing, transmitting, or giving effect to any letter of findings or determination arising from the investigation of Woodcock." Supplemental Motion for a Preliminary Injunction (DN 97) at 4.

As discussed during the most recent status conference, Woodcock's novel argument against investigatory findings cannot support a temporary order barring the University President from reviewing the investigator's report, reaching his own conclusions about potential violations, and communicating that decision to Woodcock and the outside world. This is true for several reasons.

First, Woodcock has already sought virtually identical relief at least three times. And each attempt has failed for reasons that still apply. *See* State Court Denying TRO (DN 69-1) (declining to act before a presidential decision); Corrected

TRO Op. (holding that Woodcock hadn't carried his burden of showing the investigation alone retaliated against and chilled protected speech); Text Order (DN 87) (denying Plaintiff's request for interim relief under the All Writs Act on the ground that presidential findings would in no way divest the federal court of jurisdiction over Woodcock's requests for relief).

Recent developments have weakened Woodcock's case for temporary judicial intervention. The investigation is no longer stuck in an indefinite hold, as it seemed to be during the months following the previous judge's abstention order, the Sixth Circuit appeal, and the investigator's attempt to meet the November 2 deadline. Woodcock's receipt of the official report enhances his notice of the allegations against him and adds particularity to the rather open-ended process that preceded its November 10 issuance. While no deadline for presidential findings exists, counsel has expressed cautious optimism that a decision should arrive between Thanksgiving and early December. The rescheduled PI hearing will maintain healthy pressure against undue delay. And the University has addressed Woodcock's (and the Court's) concerns that litigation delay would of its own force prevent Woodcock's potential return to the classroom (which couldn't begin until January in any event).

Second, a substantial body of caselaw[4] indicates that a speech-related investigation alone generally doesn't amount to retaliation or adverse action. The collateral consequences of an investigation, by contrast, may create an intolerable chill that could warrant judicial intervention. *See, e.g.*, *Levin v. Harleston*, 966 F.2d 85, 89 (2d Cir. 1992); *White v. Lee*, 227 F.3d 1214, 1228–29 (9th Cir. 2000). The First Amendment leaves at least some room for employers to investigate their employees for perceived misconduct, even when the alleged offenses relate to speech. *See*

---

[4] *See, e.g.*, *Churchill v. Univ. of Colorado at Boulder*, 293 P.3d 16, 34 (Colo. App. 2010) ("Courts have concluded that investigations alone are not adverse employment actions."); *Sensabaugh*, 937 F.3d at 626–27, 630 (6th Cir. 2019) (concluding no adverse action even when context included a "painstakin[g] investigation"); *Couch v. Board. of Trustees of Memorial Hospital of Carbon County*, 587 F.3d 1223, 1238 (10th Cir. 2009) (investigation didn't amount to adverse action supporting First Amendment retaliation); *Benningfield v. City of Houston*, 157 F.3d 369, 376 (5th Cir. 1998) ("Although a reprimand can constitute an adverse employment action, an investigation does not[.]"); *Moore*, 83 F.4th at 753 ("[W]e have never held that a retaliatory investigation alone could violate the First Amendment"); *Bell v. Sheriff of Broward County*, 6 F.4th 1374, 1375 (11th Cir. 2021) ("[D]eputy Bell's five-day suspension with pay pending an investigation into his conduct is not an adverse action."). But as emphasized in the Court's previous TRO opinion, the caselaw in this area is hardly uniform and uncertainty remains about how different circuits might approach each specific factual scenario. *See, e.g., Holt v. Pennsylvania*, 683 F. App'x 151, 159 (3d Cir. 2017) ("Our Circuit has not considered whether the initiation of an internal investigation can constitute an 'adverse action' for purposes of a First Amendment retaliation claim, and our sister circuits are split on the issue.").

Corrected TRO Op. at 3 n.8; *Waters v. Churchill*, 511 U.S. 661, 677–78 (1994) (plurality op.) ("Only [investigative] procedures outside the range" of reasonableness violate First Amendment despite investigation's "risk of erroneously punishing protected speech."); *Gartenberg v. Cooper Union*, 765 F. Supp. 3d 245, 267 (S.D.N.Y. 2025) (even protected speech may be relevant to determining "whether actionable harassment occurred").

Woodcock hasn't pointed to any precedent halting a school's investigation based only on its existence or the "brand" or "reputational harm" that it might produce. Woodcock Status Report at 3. To the contrary, the two precedents on which he relies most heavily are easily distinguishable.

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957), is a 70-year-old precedent concerning a state attorney general's investigation into a professor's affiliation with the Communist and Progressive Parties. It had little, if anything, to say about the operations, autonomy, or academic interests of a university. *Contra, e.g.*, *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 226 n.12 (1985).

*Fischer v. Thomas*, 52 F.4th 303 (6th Cir. 2022), likewise sits far afield from the context of university governance and academic speech. In that pre-enforcement challenge, the Sixth Circuit barred a state judicial commission from initiating formal proceedings against two judicial candidates after it "sen[t] vague and threatening letter to [the] candidates on the eve of election." 52 F.4th at 313. The opinion didn't address whether an investigation or its concluding findings amounted to adverse action or retaliation.

Third, to the extent Woodcock attempts to circumvent this precedent by re-tailoring his remedy to fit only the President's review, that distinction is artificial and unavailing. He hasn't pointed to any caselaw demarcating fact-finding and decisionmaking in this manner. Nor is any reason for doing so apparent. Why conduct an otherwise lawful investigation and do nothing with the results? Wouldn't that defeat the purpose? As Woodcock seemingly concedes, "[t]he President's review is itself part of the investigation, which has not ended." Woodcock Status Report at 2.

Fourth, Woodcock has failed to show that any marginal chilling effect of presidential findings is likely to constrain the speech of a law professor of ordinary firmness. This means that he hasn't established a likelihood of success on the merits. A First Amendment retaliation claim, as discussed previously, requires a plaintiff to show that "the First Amendment protected the underlying speech and [that] the state's response would deter a person of 'ordinary firmness' from speaking similarly." Corrected TRO Op. at 5 (citing *Abbott v. Pastides*, 900 F.3d 160, 169 (4th Cir. 2018)). Even assuming Woodcock's petition, panel and listerv commentary, and other

comments amount to protected academic speech, *but see* Corrected TRO Op. at 5, he hasn't pointed to evidence that the prospect of presidential findings would muzzle a law professor of ordinary firmness.[5]

Fifth, even assuming Woodcock could establish a likelihood of success on the merits of his retaliation claim, to obtain a TRO he'd have to show irreparable harm and the balance of the equities relative to third parties and the public. Irreparable harm likely requires at least some showing of subjective chill as well; otherwise a court would be left to wonder why and "whether it needs to act now." Bray, *supra*, at 824. So a plaintiff must show "that some irreparable harm *will* take place without the court's immediate intervention." *EOG Resources, Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 883 (6th Cir. 2025) (emphasis added). To be sure, many decisions collapse irreparable harm and other TRO factors into the merits in First Amendment interim-relief decisions. *See, e.g.*, *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012) (likelihood of success on the merits and irreparable harm "usually" overlap in the First Amendment context). But an automatic or even presumptive injunction in this context would sit uncomfortably with standard principles of equity if the record showed that a plaintiff was not, in fact, chilled and therefore not irreparably harmed. *See Fischer v. Thomas*, 78 F.4th 864, 868 (6th Cir. 2023) ("[T]he irreparable harm requirement is 'indispensable.'" A plaintiff "must show harm that is likely, not remediable at final judgment, and immediate."); *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003) ("[I]rreparable harm must still be shown—rather than simply presumed—by establishing an actual chilling effect.").

The current record does precious little to "identify speech that [Woodcock] wishes to make in the future but for the threat of prosecution of that *future* speech." *See Hess v. Oakland County, Michigan*, 174 F.4th 981, 996 (6th Cir. 2026). Despite boilerplate assertions that he'd otherwise say and write more about Israel and Palestine, *see* Woodcock Status Report at 2 (Woodcock "seek[s] to write and speak about Israel and Palestine continually"), it's hardly clear that this investigation has chilled Woodcock's speech at all. He points to a paper called "A Law and Economics Argument for Ending Israel" that he hasn't yet submitted to the law reviews; diminished posting on his blog, called "the Antizionist Legal Studies Movement;" and allegedly decreased Twitter activity. *See* Second Amended Complaint (DN 84-1) at ¶¶ 161–163. Yet Woodcock's social-media and listserv posting hasn't stopped

---

[5] Proving the merits of a First Amendment retaliation claim requires an objective showing: actions that would be "likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 29 (D.D.C. 2024), *aff'd,* 138 F.4th 563 (D.C. Cir. 2025); *Josephson v. Ganzel*, 115 F.4th 771, 787 (6th Cir. 2024).

altogether; during this investigation he has continued to post on X and the AALS online discussion groups, including about Israel; he has filed at least four lawsuits, several of which have been covered in the press; he maintains a webpage supplying information about and soliciting support for his speech and litigation. *See, e.g.*, Defendants' Reply in Support of MJOP (DN 79) at 15 (describing Woodcock's continued activity on X); Killian Baarlaer, *UK has paid over $1M investigating, litigating suspended law professor*, Courier Journal (Nov. 18, 2025), https://www.courier-journal.com/story/news/education/2026/11/18/university-of-kentucky-ramsi-woodcock-case-update; https://ramsiwoodcock.net/category/lawsuits. Without further evidence, the Court cannot conclude that Woodcock will be chilled over the next two weeks.

Although the general tendency in the caselaw to treat First Amendment violations as irreparable harm cautions against assigning dispositive weight to this factor, the weakness of Woodcock's showing on the current record at least cuts against automatic or presumptive injunctive relief to ameliorate any purported self-censorship.

Sixth, and finally, an injunction barring the President from reacting to the investigator's findings would—even on Woodcock's own terms—remedy one arguable free-speech violation with another. As any law professor knows, Justice Brandeis taught that the "remedy" for disfavored speech should ordinarily be more speech—not additional suppression. *See Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) ("[T]he remedy to be applied is more speech, not enforced silence"). A college president, just like a law professor, may presumptively speak—privately or publicly—about a matter of public and professional interest such as this. Indeed, both have done so during this process.

And President Capiluto's own speech rights aren't the only countervailing interests at issue. The University has its own governance interests in the orderly and prompt resolution of a high-profile pending investigation. *See Ewing*, at 226 n.12 ("Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, … but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself."). "Without this ability to investigate, a public employer would be left without recourse and would lose its 'greater leeway in its dealings with citizen employees.'" *Churchill*, 293 P.3d at 36–37 (Colo. App. 2010) (quoting *Engquist v. Oregon Department of Agriculture,* 553 U.S. 591, 599 (2008)).

Given these compounding considerations, the Court concluded that no temporary order revisiting the Court's prior orders and specifically restraining the President was warranted based on these allegations of objective chill (regarding Woodcock's likelihood of success on the merits), subjective chill (regarding any

irreparable harm associated with Woodcock's speech pending the forthcoming presidential findings), or the public and third-party interest in an orderly and prompt conclusion to an academic investigation.

**F. Next Steps.** The two-week continuance thus serves the Court's interest in the effective use of its resources and in managing the dispute toward a more orderly and well-presented PI hearing.

This order, to be clear, does not resolve whether the University officials' *past* actions constituted retaliation in violation of the First Amendment—a distinct and retrospective question, for which damages and attorney fees under 42 U.S.C. §§ 1983 & 1988 are at least potentially available (though the Defendants of course disagree). While those historical facts are necessary to Woodcock's showing of likelihood of success on the merits, even if proved they are not sufficient to warrant a restraining order, which requires a showing of *ongoing* chilled speech.

Nor does this order address the propriety of any discipline that Woodcock might eventually face. As described above, those questions haven't ripened and follow their own administrative process—one the Sixth Circuit specifically contemplated might alter the abstention analysis.[6] As the facts continue to develop, a short continuance of the PI hearing will allow the parties to present their evidence and arguments more cleanly without sacrificing Woodcock's ability to receive any relief to which he may be entitled.

To that end, the Court orders the parties to submit pre-hearing briefs of no more than 10 pages by December 1, 2026. These briefs should identify each witness the side proposes to call, any particularly relevant documentary evidence, and the disputed element(s) the evidence would tend to prove or rebut. Those disputed factual issues include, though they may not be limited to:

- The nature of Woodcock's "interest in speaking on a matter of public concern" and the nature of the University's "interest 'in promoting the

[6] To be clear, this continuance does not conflate the appropriateness and timing of interim equitable relief with the distinct doctrinal question of abstention. *See Woodcock v. Univ. of Kentucky*, No. 26-5057, 2026 WL 2821944, at *1 (6th Cir. Sept. 10, 2026) (Gilman, J., concurring); *Evans v. Garza*, 161 F.4th 315, 326 (5th Cir. 2025) (Oldham, J., dissenting) (distinguishing "the values of comity and federalism" associated with *Younger* from the balance of the equities and public interest relevant to a temporary injunction). The University Defendants have not asked the Court to pause this litigation entirely or simply defer to the administrative process; instead, they seek only the chance to clarify the University's position and plans in a manner that may streamline or moot any federal equitable intervention. And their representations regarding timing, coupled with the limited nature of the delay authorized by this order, ensure Woodcock's arguments are not prejudiced.

efficiency of the public services it performs through its employees'" as a public professional school. *Josephson v. Ganzel*, 115 F.4th 771, 784 (6th Cir. 2024) (quoting *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563, 568 (1968)).

- The extent to which the ongoing investigation, any presidential findings, and any subsequent process might chill the speech of a professor of "ordinary firmness." *Id.* at 787–88. *See also Abbott v. Pastides*, 900 F.3d 160, 170 (4th Cir. 2018) (evaluating a "student of ordinary firmness" in a student-speech case).

- Any unusual or ancillary aspects of the investigation or its origin that may bear on retaliation under the First Amendment, including the basis for Woodcock's campus ban and teaching reassignment. *See Churchill v. University of Colorado at Boulder*, 293 P.3d 16, 36 (Colo. App. 2010).

- Any University policies or customs governing employee investigations and their applicability to this investigation and its collateral consequences. *Cf. Pesta v. Cleveland State Univ.*, No. 24-3947, 2025 WL 3094128, at *10 (6th Cir. Nov. 4, 2025) (University's "one or two procedural shortcomings" in internal investigation of Professor did not constitute "implied bias from a procedurally defective investigation" sufficient to establish a retaliatory motive.)



Benjamin Beaton, District Judge
United States District Court

November 20, 2026